## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SUITABLE TECHNOLOGIES, INC.,[1] | Case No. 20- 10432  (____) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507
OF THE BANKRUPTCY CODE, (I) APPROVING POST-PETITION
FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Suitable Technologies, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), hereby submits this motion (this "Motion") for the entry of an interim order, substantially in the form attached hereto as Exhibit B (the "Interim Order"), and following a final hearing to be set by the Court, entry of a final order (the "Final Order," and together with the Interim Order, the "DIP Order"), pursuant to sections 105, 361, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"):  (i) authorizing the Debtor to obtain senior secured postpetition financing (the "DIP Facility") on an interim and final basis pursuant to the terms and conditions of that certain *Debtor-In-Possession Credit and Security Agreement* (the "DIP Credit Agreement") by and among the Debtor and MagicHeart Investments, LLC (the "DIP Lender" or the "Lender") attached hereto as Exhibit A; (ii) authorizing the use of Cash Collateral;[2] (iii) granting liens and superpriority claims; (iv) granting adequate protection to the Lender; (v) modifying the automatic stay; (vi) scheduling a final hearing on this Motion to incur such financing on a

---

[1]  The last four digits of the Debtor's United States federal tax identification number are 7816.  The Debtor's mailing address is 921 East Charleston Road, Palo Alto, CA 94303.

permanent basis pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (vii) granting related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Charles C. Reardon in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"). In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. Pursuant to Local Rule 9013-1(f), the Debtor consents to the Court's entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution

3. The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

**A.   General**

4. On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). As set forth in the First Day

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit

Declaration, the Debtor commenced the Chapter 11 Case to continue the process of winding down its business affairs and to conduct a sale process for substantially all of its assets pursuant to section 363 of the Bankruptcy Code (the "Sale Process"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing to manage its financial affairs as a debtor in possession. No official committees have been appointed in the Chapter 11 Case, and no request has been made for the appointment of a trustee or examiner.

5.    Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of this Chapter 11 Case is set forth in the First Day Declaration.

**B.    Pre-petition Debt Structure**

6.    As discussed in the First Day Declaration, since the Debtor's formation in 2011, the Debtor's founder, Scott Hassan, has been the Debtor's sole source of funding. Since that time, Mr. Hassan, through certain entities owned and controlled by him, including the Lender, has provided almost $92 million pursuant to documented promissory notes. Of this amount, $5.93 million was through secured notes with the Lender (i.e., the Prepetition Secured Promissory Notes), $8 million was through an unsecured note with the Lender, and the remainder was through unsecured notes (i.e., the Prepetition Unsecured Promissory Notes) with Greenheart Investments, LLC ("Greenheart"), an entity affiliated with Mr. Hassan.

7.    The most recent secured note—the Prepetition Secured 2020 Promissory Note— was executed on January 20, 2020, and was put in place as a "pre-DIP Loan" to provide the Debtor with the financing needed to prepare for this chapter 11 filing. As of the date hereof, the principal balance of the Prepetition Secured 2020 Promissory Note is approximately $1.655

---

Agreement or the Interim Order, as applicable.

million, and is secured by substantially all of the Debtor's assets, as provided for in the Prepetition Security Agreement.

8.      Aside from these obligations, the Debtor has no bank debt, less than $1 million in unsecured (liquidated) trade debt, and contingent liabilities arising from subscription service, warranty and repair obligations tied to its products.

## C.      Debtor's Need For Postpetition Financing and Use of the Cash Collateral

9.      As discussed in the First Day Declaration, the Debtor has never been profitable, and the Debtor suffered operating losses exceeding $50 million between 2013 and 2018.  As a result, the Debtor has always relied on Mr. Hassan to fund its operations and affairs.  As of December 19, 2018, the Debtor reported (on an unaudited basis) revenue of $3 million and net income of negative $10.9 million for 2018, with over $91.5 million in notes payable to Greenheart at that time.  Following these significant and continued losses, Greenheart ultimately determined that it would no longer fund the Debtor's continuing operating losses.  As a result, in December 2018, the Debtor determined to wind down its operations.

10.      In light of this, and the fact the Debtor's business is no longer generating meaningful revenue, the Debtor lacks sufficient liquidity to maintain its business and administer the Chapter 11 Case, which was initiated to effectuate a transparent, orderly and efficient process to sell substantially all of the Debtor' assets for the benefit of all stakeholders.  To enable the Debtor to fund the administration of the Chapter 11 Case and pursue the Sale Process, the Debtor, through the CRO and its other professionals advisors, solicited post-petition financing proposals from certain parties, including Mr. Hassan.

11.      As a result of those efforts, the Debtor was able to secure post-petition financing from the DIP Lender, an entity owned and controlled by Mr. Hassan, in the form of a $5.956 million secured line of credit, as provided for in the DIP Credit Agreement and described herein.

The DIP Facility is secured by a lien on substantially all of the Debtor's assets, and is a multi-draw term loan facility in the amount of new funds up to $3.801 million.

12.     Upon entry of the Interim Order, the DIP Credit Agreement rolls up an aggregate amount of the Prepetition Secured Debt equal to the amount of the Prepetition Secured 2020 Promissory Note (i.e., $1.655 million) (the "Interim Roll-Up").  And upon entry of the Final Order, in addition to the Interim Roll-Up, the DIP Credit Agreement will also roll up the aggregate amount of all advances made on or after November 27, 2019 in connection with the Prepetition Secured Debt Documents (i.e., an additional $500,000) (together with the Interim Roll-Up, the "Roll-Up").

13.     The Debtor's use of the Cash Collateral and the proceeds of the DIP Facility will be used to fund the Debtor's business and the expenditures permitted under the Interim Order, the DIP Credit Agreement, and the budget attached to the Interim Order as Exhibit B (the "Budget").  Access to the DIP Facility and the Cash Collateral will provide the Debtor with the liquidity necessary to administer the Chapter 11 Case and conduct the contemplated Sale Process.  Without this access, the Debtor's ability to successfully prosecute the Chapter 11 Case will be jeopardized, to the detriment of all of the Debtor's stakeholders.  The Debtor's financial situation requires it to seek immediate access to the DIP Facility to manage its business and to preserve the value of its estate for the benefit of all stakeholders until the Sale Process can be completed.  The absence of the DIP Facility and access to Cash Collateral would cause immediate and irreparable harm to the Debtor, its estate, and stakeholders, by compromising the Debtor's ability to, among other things, maintain its business relationships and pay independent contractors that are providing necessary services to the Debtor, and impeding the Debtor's chapter 11 efforts.

26042601.3

D.      **The DIP Facility**

14.      Pursuant to Bankruptcy Rule 4001, the following is a summary of the significant

elements of the DIP Facility:[3]

| | |
|---|---|
| ***Entities with an Interest in the Cash Collateral*** | MagicHeart Investments, LLC |
| ***Amount of DIP Facility***<br><br>**See DIP Credit Agreement, Article 1** | The aggregate amount of the DIP Facility is $5.956 million.<br><br>$3.801 million of this will consist of New Money Loans.<br><br>The interim borrowing limit is $2.713 million. |
| ***DIP Facility Fees and Expenses***<br><br>**See DIP Credit Agreement, § 4.5** | Borrower shall reimburse the DIP Lender for its reasonable and documented Attorney Costs relating to the preparation, approval, administration and enforcement of the DIP Credit Agreement.<br><br>*There are <u>no</u> commitment fees or the like under the DIP Credit Agreement or the Interim Order.* |
| ***Use of Proceeds; Roll-Up***<br><br>**See DIP Credit Agreement, §§ 1.1, 4.3; Interim Order, ¶ 3(b), (d)** | The Debtor is authorized and has agreed to incur Postpetition Debt solely:  (1) in accordance with the terms and provisions of the DIP Order; (2) to the extent required to pay those expenses enumerated in the Budget, including, without limitation, the Carveout and the Post-Termination Date Carveout, as and when such expenses become due and payable, subject to the Permitted Variance and the terms of the Postpetition Documents; (3) to pay Allowable 506(b) Amounts in connection with the Prepetition Secured Promissory Note Debt and Lender Charges; and  (4) as expressly permitted pursuant to the Postpetition Documents.  Notwithstanding the foregoing, if the DIP Lender advances monies to the Debtor and the Debtor uses any such monies other than in accordance with the terms and provisions of the DIP Order, then such advances will be considered to be Postpetition Debt for purposes of the DIP Order.<br><br>Effective upon entry of the Interim Order, the Debtor is authorized and has agreed to incur Postpetition Debt under the DIP Credit Agreement to refinance, in full, an aggregate amount of the Prepetition Secured Debt equal to the amount of Prepetition Secured Promissory Note Debt.  Effective upon entry of the Final Order, the Debtor is authorized and has agreed to incur Postpetition Debt under |

---

[3] The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Credit Agreement and the Interim Order.  The summary herein is qualified in its entirety by reference to such document and order.  Interested parties are encouraged to read the DIP Credit Agreement.  In the event there is a conflict or inconsistency between this Motion, on the one hand, and the DIP Credit Agreement and the Interim Order, on the other hand, the DIP Credit Agreement and the Interim Order shall control in all respects.

| | |
|---|---|
| | the DIP Credit Agreement to refinance, in full, the aggregate amount of all advances made on or after November 27, 2019, in connection with the Prepetition Secured Debt Documents. |
| *Interest Rate*<br><br>**See DIP Credit Agreement, § 1.5(a), (c)** | <u>Interest Rate</u>: Each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to five percent (5%).  Accrued interest on each Loan shall be payable in cash at maturity (whether by acceleration or otherwise).<br><br><u>Default Interest Rate</u>: At the election of the DIP Lender while any Event of Default exists, the Borrower shall accrue interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans and other Obligations under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum equal to seven percent (7%). |
| *Post-Petition Lien Granting*<br><br>**See DIP Credit Agreement, §§ 1.2, Article 6; Interim Order, ¶ 3(f)** | Among other things, the DIP Credit Agreement provides that all Obligations shall be secured by first-priority, properly perfected, valid and enforceable Liens on and security interests in all assets (other than Avoidance Actions) of the Borrower (including, without limitation, all intellectual property), wherever located, and whether existing now or after the date of entry of the Interim DIP Order, subject to the Permitted Priority Liens and the priorities described in section 6.2 of the DIP Credit Agreement.<br><br>Additionally, Paragraph 3(f) of the Interim DIP Order provides (and the Debtor anticipates the Final Order will similarly provide) as follows:<br><br>Lender is hereby granted the Postpetition Liens to secure the Postpetition Debt in the Postpetition Collateral.  The Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) are, by this Order hereby deemed to be, and shall be for all purposes, properly perfected, valid, and enforceable liens without any other or further action by the Debtor or Lender, and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, title notation, or other document or instrument; (3) under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, are Priority Liens (subject only to Permitted Priority Liens) without any further action by the Debtor or Lender, and without the execution, delivery, filing, or recordation of any financing statements, security agreements, control agreements, title notations, mortgages, or other documents or instruments; (4) will not be subject to any security interest or lien that is avoided and preserved under section 551 of the Bankruptcy Code; (5) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Case; (6) will not be subject to section 510(c) of the Bankruptcy Code; (7) shall rank junior to the Carveout and the Post-Termination Date Carveout; and (8) upon entry of the Final Order, will not be subject to any non-consensual statutory liens as described in section 546(b) of the Bankruptcy Code. Without limiting the |

| | |
|---|---|
| | foregoing, the Debtor must deliver to Lender any such financing statements, security agreements, control agreements, mortgages, title notations, and other documents and instruments as Lender may request from time to time in its discretion…Without limiting the foregoing, Lender has, and will be deemed to have, a perfected Postpetition Lien on all existing deposit accounts of the Debtor and any new deposit account that the Debtor may establish on or after the date hereof without any further action by the Debtor or Lender.<br><br>*There are no liens on avoidance actions under the DIP Credit Agreement or the Interim DIP Order.* |
| ***Superpriority Claim***<br><br>**See DIP Credit Agreement, § 6.2; Interim Order, ¶ 3(f)** | The Postpetition Debt is granted superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Chapter 11 Case that are incurred under any provision of the Bankruptcy Code other than the Carveout and the Post-Termination Date Carveout (the "Superpriority Claim"). |
| ***Maturity Date (Term of DIP Facility)***<br><br>**See DIP Credit Agreement, § 9.1 (definitions of "Maturity Date" and "Termination Date"); Interim Order, ¶ 3(d)(iv)** | Termination Date: At the DIP Lender's election, the DIP Facility will terminate by the earliest to occur of: (a) the date on which the DIP Lender provides, via electronic mail or overnight mail, written notice to counsel for the Borrower and the United States Trustee the occurrence and continuance of any Event of Default; (b) the date that is thirty-five (35) days following entry of the Interim Order if the Final Order is not entered in form and substance satisfactory to the DIP Lender by such date; (c) the date of the final hearing with respect to the Interim Order, if the Interim Order is modified at such hearing in a manner unacceptable to the DIP Lender; (d) the closing date of the sale of all or substantially all of the assets of the Borrower; (e) the date on which all Obligations are Paid in Full (as defined in the Interim DIP Order); and (f) August 4, 2020.<br><br>Maturity Date: The DIP Facility will mature and be due and payable in full by the earlier of (x) the date that is six (6) months after the entry of the Final Order by the Bankruptcy Court, (y) the effective date of a Chapter 11 plan in the Chapter 11 Case and (z) on the Termination Date. |
| ***Carveout and Post-Termination Date Carveout***<br><br>**See Interim Order, ¶ 6(a)** | For purposes of the Interim Order, "Carveout" shall mean the sum of:<br><br>(i) all fees required to be paid to the clerk of the Court (including fees and expenses of the noticing and claims agent) and statutory fees payable to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate;<br><br>(ii) for the Chief Restructuring Officer and Independent Director, $1,500,000 to pay any current or future Indemnity Obligations; and<br><br>(iii) for each Carveout Professional, an aggregate amount not to exceed the lesser of (A) the aggregate amount provided in the applicable line item in the Budget for such Carveout Professional for |

the period commencing on the Petition Date and ending on the Termination Date and (B) the aggregate amount of allowed fees and expenses that accrued during the period commencing on the Petition Date and ending on the Termination Date; provided, however, that such amount for each Carveout Professional will be reduced dollar-for-dollar by (1) any payments of fees and expenses to such Carveout Professional during the period commencing on the Petition Date and ending on the Termination Date and (2) the amount of any remaining Specified Retainer held by such Carveout Professional as of the Termination Date.

In addition to the Carveout, upon the Termination Date, Lender shall provide Postpetition Debt to the Debtor, to be used by the Debtor for the sole purpose of funding Carveout Professionals for fees and expenses first incurred after the Termination Date, in the aggregate amount of $100,000 for Carveout Professionals retained by the Debtor (minus the amount of any remaining Specified Retainers held by such Carveout Professionals as of the Termination Date not previously applied to the fees and expenses of such Carveout Professionals set forth in clause (iii) above) and in the aggregate amount of $25,000 for Carveout Professionals retained by any Committee (the "Post-Termination Date Carveout").

| **_Conditions Precedent_** <br><br> **See DIP Credit Agreement, Article 2** | Article 2 of the DIP Credit Agreement contains various conditions precedent, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to the facts and circumstances of this Chapter 11 Case. |
|---|---|
| | Among other things, pursuant to Article 2 of the DIP Credit Agreement, |
| | 1.    Within three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Lender in its sole discretion authorizing and approving (a) the financing contemplated by the DIP Credit Agreement, including, without limitation, the granting of the DIP Liens in favor of the Lender, and (b) the current cash payment of expenses under any Prepetition Obligations, including such amounts arising before and after the Petition Date and without the necessity of filing motions, to the extent such expenses have actually been incurred.  The Interim DIP Shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lender; and |
| | 2.    For any Subsequent Borrowing, the Final DIP Order in form and substance satisfactory to the Lender, shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal. |

| | |
|---|---|
| *Covenants*<br><br>**See DIP Credit Agreement, Articles 4-5** | Articles 4 and 5 of the DIP Credit Agreement contains various affirmative and negative covenants, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to the facts and circumstances of this Chapter 11 Case.<br><br>As set forth more fully therein, Articles 4 and 5 of the DIP Credit Agreement require, among other things, that:<br><br>1.     The Borrower shall reimburse the Lender for its reasonable and documented Attorney Costs relating to the preparation, approval, administration and enforcement of the DIP Credit Agreement.<br><br>2.     Compliance with the Budget shall begin testing in the first week after the date of entry of the Interim DIP Order and shall continue every two weeks thereafter (each, a "<u>Budget Test Date</u>") for the period from the prior Budget Test Date through the next applicable Budget Test Date (each period, a "<u>Budget Test Period</u>"). For the avoidance of doubt, the first Budget test shall occur the week beginning March 13, 2020. During each Budget Test Period, the Borrower will not permit the actual aggregate amount of disbursements to be more than 110% of the aggregate budgeted disbursements set forth in the Budget for such Budget Test Period nor permit actual aggregate receipts to be less than 90% of the aggregate budgeted receipts set forth in the Budget for such period (the "<u>Permitted Deviation</u>"); provided, that, if the actual aggregate amount of disbursements for a Budget Test Period is less than 100% of the aggregate budgeted disbursements set forth in the Budget for such Budget Test Period or if the actual aggregate amount of receipts for a Budget Test Period is greater than 100% of the aggregated budgeted receipts set forth in the Budget for such Budget Test Period, then all or a portion of such disbursement deficit or receipts surplus may be carried forward and applied in any future Budget Test Period when calculating the Permitted Deviation for such future Budget Test Period. The Lender may, in its sole discretion and without further Bankruptcy Court approval, authorize the Borrower in writing to exceed the Permitted Deviation.   Commencing in the first week following entry of the Interim order, the Borrower shall submit a Variance Report to the Lender every two weeks on Tuesday of the week following the immediately preceding Budget Test Period.<br><br>3.     the Borrower shall comply with each of the DIP Financing Milestones set forth in Exhibit D to the DIP Credit Agreement, which are set forth below;<br><br>4.     Except as provided in the DIP Order, the Borrower shall not, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired which did not exist as of the date of the DIP Credit Agreement other than Permitted Priority Liens. |

| | |
|---|---|
| ***Events of Default***<br><br>**See DIP Credit Agreement, § 7.1** | Section 7.1 of the DIP Credit Agreement contain various "Events of Default," many or all of which are customary for debtor-in-possession credit facilities of this nature.<br><br>Section 7.1(e) of the DIP Credit Agreement contains certain bankruptcy related defaults, which include, without limitation:<br><br>1.    the Interim DIP Order is not entered within three (3) Business Days after the Petition Date;<br><br>2.    other than in connection with the payment in full or other satisfaction or refinancing of the Obligations, the filing of any motion, taking of any action or the filing of any reorganization or liquidation plan or disclosure statement in the Case by the Borrower (A) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that is senior to or *pari passu* with the financing provided under the DIP Credit Agreement, (B) to grant any Lien upon or affecting any Collateral that is senior to or *pari passu* with the DIP Liens granted under the DIP Credit Agreement, (C) except as provided in a DIP Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code without prior written consent of the Lender, (D) that seeks to prohibit the Lender from credit bidding on any or all of the Borrower's assets during the pendency of the Chapter 11 Case or (E) that is otherwise materially adverse to the rights and remedies granted to the Lender under the DIP Credit Agreement or the DIP Order;<br><br>3.    the DIP Credit Agreement, any of the other Loan Documents, or the Interim DIP Order or the Final DIP Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or the Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Borrower or such Person) any other Person's motion to, disallow in whole or in part the Lender's claims in respect of the Obligations or to challenge the validity of any portion of the Loan Documents, the Loans and the related obligations or the applicability or enforceability of same or which seeks to void, limit, subordinate or otherwise adversely affect any Liens in favor of the Lender or any payment pursuant to the Loan Documents or the Interim DIP Order or the Final DIP Order;<br><br>4.    any Lien or security interest purported to be created under the Collateral Documents shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected Lien on or security interest in any of the Collateral, with the priority set forth in the DIP Credit Agreement and in the related Collateral Documents;<br><br>5.    the Bankruptcy Court shall enter one or more orders granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code to allow any one or more creditors to execute upon or enforce liens on or security interests in any Collateral; |

| | |
|---|---|
| | 6.      the Bankruptcy Court shall enter any order revoking, reversing, staying, vacating, rescinding, or materially modifying, supplementing or amending in each case, without the consent of the Lender, the Interim DIP Order or Final DIP Order, as applicable; |
| | 7.      any application for any of the orders described in (2), (3), (4), (5) or (6) above or (8) or (9) below shall be made and, if made by a Person other than a Borrower, such application is not being diligently contested by the Borrower in good faith; |
| | 8.      the Bankruptcy Court shall enter any order (which has not been reversed or vacated within five (5) calendar days): (a) appointing a Chapter 11 trustee under section 1104 of the Bankruptcy Code in the Chapter 11 Case, (b) appointing an examiner with expanded powers under section 1106(b) of the Bankruptcy Code in the Case or otherwise or (c) dismissing or converting the Chapter 11 Case to a Chapter 7 case; and |
| | 9.      if a plan of reorganization or liquidation is filed by the Borrower in the Chapter 11 Case, or an order shall be entered by the Bankruptcy Court confirming any plan in the Chapter 11 Case, that does not provide for (I)(A) the indefeasible payment in full in cash of all Obligations (or other treatment of the Obligations acceptable to the Lender) and (B) the release of the Lender and its affiliates in full from all claims of the Borrower and their estates arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the transactions contemplated by the Loan Documents, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated hereby and thereby, in each case on or before the effective date of such plan (provided, however, that this subpart (I)(B) does not apply to Scott Hassan solely in his capacity as a former director or officer of the Borrower), and (II) the continuation of the DIP Liens and security interests granted to the Lender until the effective date of such plan. |
| ***Section 506(c) and 552(b) waivers; marshalling waiver***<br><br>**See DIP Credit Agreement, § 8.5; Interim Order, ¶¶ 9 and 17** | <u>Section 506(c)/552(b) Waivers</u>:<br><br>Paragraph 9 of the Interim Order provides that, subject to entry of a Final Order, there shall be no surcharge of the Aggregate Collateral for any purpose unless agreed to in writing by Lender, and effective upon entry of the Final Order, the Debtor (or any Trustee), on behalf of its estate, will be deemed to have waived any and all rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, and under any other legal or equitable doctrine (including, without limitation, unjust enrichment) as they may relate to, or be asserted against, Lender or any of the Aggregate Collateral. |

| | |
|---|---|
| | Marshalling Waiver:

Section 8.5 of the DIP Credit Agreement provides as follows:

Subject to the entry of the Final DIP Order, the Lender shall not be under any obligation to marshal any Property in favor of the Borrower or any other Person or against or in payment of any Obligation. To the extent that the Lender receives a payment from the Borrower, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

Paragraph 17 of the Interim Order provides that upon entry of a Final Order that so provides, neither the Lender nor any of the Aggregate Collateral will be subject to the doctrine of marshaling. |
| ***Modification of Automatic Stay***

**See DIP Credit Agreement, § 7.2; Interim Order, ¶ 5(b)** | Section 7.2 of the DIP Credit Agreement provides that immediately upon the occurrence and during the continuation of an Event of Default, the Lender may, in its sole discretion (without further notice or grace period, unless required by any Requirements Law), take any or all of the actions set forth in section 7.2, including, without limitation, exercise all rights and remedies available to it under the Loan Documents, the DIP Order, or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code.

Paragraph 5(b) of the Interim Order provides (and the Debtor anticipates the Final Order will similarly provide) as follows:

On the fifth (5th) business day after the Termination Date, at Lender's election without notice or further order of the Court: (1) Lender will have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral (without regard to the passage of time provided for in Bankruptcy Rule 4001(a)(3)), and will be entitled to exercise all rights and remedies available to it under the Prepetition Secured Debt Documents, the Postpetition Documents, and applicable nonbankruptcy law; and (2) the Debtor must surrender the Aggregate Collateral promptly upon Lender's written demand and will not interfere in any manner with Lender in the exercise of Lender's rights and remedies under the Prepetition Secured Debt Documents, the Postpetition Documents, and applicable nonbankruptcy law, and the Debtor will file a motion to retain one or more agents to sell, lease, or otherwise dispose of the Aggregate Collateral upon the written request of, and subject to terms and conditions acceptable to, Lender. |

26042601.3

<table>
<tr><td></td><td>The costs of such agent(s), including, without limitation, the costs related to filing the retention motion(s) shall be paid by Lender.

Notwithstanding the foregoing, during the five (5) business day period following the Termination Date, the Debtor, any Committee, and the U.S. Trustee may seek an order of this Court determining that an Event of Default alleged to have given rise to the Termination Date did not occur or seek other appropriate relief; provided, however, that during such five (5) business day period, and subject to the terms of this Order with respect to the Carveout, the Post-Termination Date Carveout, and the funding under the DIP Credit Agreement of Lenders' Fees and Expenses, Lender will have no obligation whatsoever to advance any Postpetition Debt to the Debtor or allow the use of the Cash Collateral.  For the avoidance of doubt, notwithstanding the foregoing, the Debtor shall be permitted to fund and make payments from the Professional Fee Escrow (as defined below) as provided for in this Order.</td></tr>
<tr><td>**_Adequate Protection for the Benefit of the Lender_**

**See Interim Order, ¶¶ 4 and 18**</td><td>Pursuant to, and subject to the terms of, the DIP Order, as adequate protection for any decrease in the value of the Lender's interests in the Prepetition Collateral from and after the Petition Date on account of the stay, use, sale, lease, license, grant, or other disposition of any Prepetition Collateral:

A.   the Lender is granted, subject to the Carveout and the Post-Termination Date Carveout, the Replacement Liens as security for the complete payment and performance of the Prepetition Secured Debt. The Replacement Liens: (1) are in addition to the Prepetition Liens; (2) are, by the DIP Order deemed to be, and shall be for all purposes, properly perfected, valid, and enforceable liens without any other or further action by the Debtor or the Lender, and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, title notation, or other document or instrument;   and   (3)   will   remain   in   full   force   and   effect notwithstanding   any   subsequent   conversion   or   dismissal   of   the Chapter 11 Case;

B.   the Lender is granted, if and to the extent the adequate protection of the interests of the Lender in the Prepetition Collateral granted pursuant to the DIP Order proves insufficient, an allowed claim under section 507(b) of the Bankruptcy Code, subject to the Carveout and the Post-Termination Date Carveout, in the amount of any such insufficiency, with priority over (1) any and all costs and expenses of administration of the Chapter 11 Case (other than the Lender's claims under section 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code and (2) the claims of any other party in interest under section 507(b) of the Bankruptcy Code;

C.   the Lender shall receive payment of the reasonable fees and disbursements of counsel to the DIP Lender as provided for in the</td></tr>
</table>

14

| | |
|---|---|
| | DIP Credit Agreement and the DIP Order; and |
| | D.  any sale or other disposition of all or any portion of the Aggregate Collateral outside of the ordinary course of the Debtor's business must be for cash consideration. |
| *Releases*<br><br>**See Interim Order, ¶ 23** | In consideration of the DIP Lender providing the DIP Facility, Paragraph 23 of the Interim Order provides (and the Debtor anticipates the Final Order will similarly provide) as follows:<br><br>Upon the date that the Postpetition Debt is Paid in Full and prior to the release of the Postpetition Liens, the Debtor, on behalf of its estate and itself, must execute and deliver to Lender and its successors and assigns, and its present and former affiliates, shareholders, subsidiaries, divisions, predecessors, members, managers, directors, officers, attorneys, employees, agents, advisors, principals, consultants, and other representatives (collectively, the "Releasees"), a general release of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature, and description, that the Debtor had, has, or hereafter can or may have against any of the Releasees, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, in equity, or otherwise, with respect to, or in connection with, the Prepetition Secured Debt, the Prepetition Unsecured Debt, the Prepetition Liens, any of the Prepetition Secured Debt Documents, or any of the Prepetition Unsecured Promissory Notes in respect of events that occurred on or prior to the date on which the Postpetition Debt is Paid in Full (collectively, the "Release"); provided, however, that the foregoing does not apply to Scott Hassan solely in his capacity as a former director and officer of the Debtor.  The Release shall not impair any continuing rights of the Chief Restructuring Officer or the Independent Director to funding of the Indemnity Obligations, including their future funding by access to the Aggregate Collateral via the Carveout. |
| *DIP Financing Milestones*<br><br>**See DIP Credit Agreement, Ex. D** | The Borrower shall perform or deliver each of the items set forth in Exhibit D of the DIP Credit Agreement on or before the dates specified therein  (collectively, the "DIP Financing Milestones").<br><br>1.    Not later than 25 days after the Petition Date, (i) the confidential information memorandum (subject to supplementation) with respect to a 363 Sale by the Borrower shall have been finalized and delivered to potential bidders and (ii) an electronic dataroom (subject to supplementation) for such 363 Sale shall have been opened.<br><br>2.    Not later than 35 days after the Petition Date, the Borrower shall file a motion (the "Sale Procedures Motion") for approval of the Bidding Procedures.<br><br>3.    Not later than 60 days after the Petition Date, the Borrower will obtain entry of the Bid Procedures Order. |

4.     Not later than 145 days after the Petition Date, the Borrower will conduct one or more auctions for all, or substantially all, of the assets of the Borrower pursuant to and in accordance with the Bid Procedures Order.

5.     Not later than 150 days after the Petition Date, the Borrower shall obtain the entry of an order, in form and substance reasonably satisfactory to the Lender (the "Sale Order"), authorizing and approving one or more sales of all, or substantially all, of the assets of the Borrower pursuant to one or more definitive purchase agreements in form and substance reasonably acceptable to the Lender, including, without limitation, with respect to the purchase price, any conditions to closing, the closing date, and other terms and conditions (each, a "Purchase Agreement").

6.     Not later than 160 days after the Petition Date, the Borrower shall have consummated one or more sales of all, or substantially all, of the assets of the Borrower pursuant to, and in accordance with, the terms of the Sale Order and the Purchase Agreement(s), and, except as provided in the DIP Order with respect to any sale transaction fees of Stout Risius Ross Advisors, LLC, remitted all of the proceeds thereof to the Lender for application in accordance with the terms of the Loan Documents.

## LOCAL RULE 4001-2(a)(i) DISCLOSURES

15.     Local Rule 4001-2(a)(i) requires the disclosure of certain provisions that are contained in post-petition financing motions and proposed orders or in the loan documents underlying those pleadings (collectively, "Financing Motions"). The Debtor hereby makes the following disclosures in accordance with such Local Rule.

16.     **Lien Investigation**: Local Rule 4001-2(a)(i)(B) requires the disclosure of findings of fact in Financing Motions that are intended to bind the estate with respect to the validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation as to those facts or claims. The Interim Order contains certain findings of fact agreed to by the Debtor, but Paragraph 10 of the Interim Order provides for an "Investigation Period," which is the period from the Petition Date until the date that is the earlier of (a) seventy-five (75) days after the entry of the Interim Order and (b) sixty (60) days after the date that a Committee is formed, if any. Paragraph 10(a) of the

26042601.3

Interim Order also sets forth certain procedures by which a Challenge Party must assert any Challenge.

17.     **506(c) Waiver**:  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions in Financing Motions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The proposed waiver of the rights of the Debtor and its estate under section 506(c) of the Bankruptcy Code (the "506(c) Waiver") in Paragraph 9 of the Interim Order will be effective only after notice to parties in interest and entry of a Final Order granting such relief.

18.     **Liens on Avoidance Actions**:  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured lender liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code (collectively, "Avoidance Actions").   The DIP Lender is not being granted any liens on Avoidance Actions pursuant to the DIP Credit Agreement or the Interim Order.

19.     **Roll-Up**:   Local Rule 4001-2(a)(i)(E) requires disclosure of provisions in Financing Motions that deem prepetition secured debt to be postpetition debt.  As noted above, the Interim DIP Order and the DIP Credit Agreement provide for the Roll-Up.

20.     **Professional Fee Carve Out**:  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions in Financing Motions that, with respect to professional fee carve-outs, provide disparate treatment to professionals retained by any creditors' committee from professionals retained by the debtor.  The Post-Termination Date Carveout set forth in Paragraph 6(a) of the Interim Order is $100,000 for Carveout Professionals retained by the Debtor, and $25,000 for Carveout Professionals retained by any Committee.

26042601.3

21.    **Priming Liens**:  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions in Financing Motions that prime any secured liens without the consent of the lienholder.  As discussed herein, the Lender is consenting to the priming of its Prepetition Liens.

22.    **552(b) Waiver**:    Finally, Local Rule 4001-2(a)(i)(H) requires disclosure of provisions in Financing Motions that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  The proposed waiver in Paragraph 9 of the Interim Order of the enhancement of collateral provisions of section 552 of the Bankruptcy Code (the "552 Waiver") will be effective only after notice to parties in interest and entry of a Final Order granting such relief.

23.    The provisions of the DIP Credit Agreement requiring disclosure pursuant to Local Rule 4001-2(a)(i) are justified under the circumstances of this Chapter 11 Case.  First and foremost, without the inclusion of such terms, the DIP Lender would not agree to make the DIP Facility available to the Debtor, and would not agree to the Debtor's use of the Cash Collateral or the priming of its liens.  In light of the unavailability of adequate financing alternatives and for the reasons set forth more fully below, the Debtor determined, in the exercise of its sound business judgment, that agreeing to the terms of the DIP Facility, including the Roll-Up, is appropriate under the circumstances of this Chapter 11 Case.

**AUTHORIZATION TO USE THE CASH COLLATERAL**

24.    The Debtor needs to use the Cash Collateral to obtain services that are necessary to its business.  However, the Cash Collateral alone is insufficient to satisfy the Debtor's ongoing funding requirements for its business and the administration of the Chapter 11 Case, including the Sale Process.  Thus, the Debtor needs to supplement its use of the Cash Collateral with the funds being provided by the DIP Facility.  Nevertheless, as the Debtor's usage of the Cash Collateral is a key component of the DIP Facility, it is imperative that the Debtor obtain

authority to use the Cash Collateral, subject to the terms described in this Motion and provided for in the Interim Order.  Accordingly, to obtain the necessary financing, and to avoid immediate and irreparable harm to its business and estate, the Debtor has an immediate need for authority to use the Cash Collateral.

**THE LENDER'S ADEQUATE PROTECTION
ON ACCOUNT OF THE PREPETITION SECURED DEBT**

25.    The DIP Lender is entitled to adequate protection of its interest, including the Cash Collateral, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code for the Prepetition Collateral.  In light of this, the Debtor has agreed, subject to the Court's entry of the Interim Order, to provide the DIP Lender with certain adequate protection (as set for the more fully in the DIP Credit Agreement and the Interim Order, the "Adequate Protection") on account of the Debtor's use of the Prepetition Collateral (including the Cash Collateral), the imposition of the automatic stay, and the subordination to the Carveout and the Post-Termination Date Carveout, and in return for the DIP Lender's agreement to permit the priming of its pre-petition liens by the post-petition liens described herein.

26.    The Adequate Protection consists of, among other things, the following:

A.    subject to the Carveout and the Post-Termination Date Carveout, the Lender is granted the Replacement Liens as security for the complete payment and performance of the Prepetition Secured Debt.   The Replacement Liens: (1) are in addition to the Prepetition Liens; (2) are, by the DIP Order deemed to be, and shall be for all purposes, properly perfected, valid, and enforceable liens without any other or further action by the Debtor or the Lender, and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, title notation, or other document or instrument; and (3) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Case;

B.    if and to the extent the adequate protection of the interests of the Lender in the Prepetition Collateral granted pursuant to the DIP Order proves insufficient, the Lender will have an allowed claim under section 507(b) of the Bankruptcy Code, subject to the Carveout and the Post-Termination Date Carveout, in the amount of any such insufficiency, with

19

priority over (1) any and all costs and expenses of administration of the Chapter 11 Case (other than the Lender's claims under section 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code and (2) the claims of any other party in interest under section 507(b) of the Bankruptcy Code;

C.      payment of the reasonable fees and disbursements of counsel to the DIP Lender as provided for in the DIP Credit Agreement and the DIP Order; and

D.      any sale or other disposition of all or any portion of the Aggregate Collateral outside of the ordinary course of the Debtor's business must be for cash consideration.

## RELIEF REQUESTED

27.     By this Motion, the Debtor requests entry of the Interim Order and a Final Order authorizing:

A.      in the case of the Interim Order, the Debtor to borrow up to an aggregate principal amount of $2.713 million or, in the case of a Final Order, the Debtor to borrow the full amount of the DIP Facility up to an aggregate principal amount of $5.956 million;

B.      the Debtor to execute and enter into the DIP Credit Agreement and to perform such other and further acts as may be required by the DIP Credit Agreement in connection therewith;

C.      the granting to the DIP Lender of the Postpetition Liens;

D.      the granting of the Superpriority Claim in favor of the DIP Lender for the Postpetition Debt;

E.      the Debtor, pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code, to use the Collateral, including the Cash Collateral;

F.      the Debtor to provide the Adequate Protection in favor of the Lender, as adequate protection for the diminution in value of the Lender's interests in the Prepetition Collateral (including Cash Collateral) on account of the Debtor's use of such collateral, the imposition of the automatic stay and the subordination to the Carveout and the Post-Termination Date Carveout;

G.      pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") to be held on this Motion to consider entry of the Interim Order;

H.      the scheduling of a final hearing (the "Final Hearing") to be held on this Motion to consider entry of a Final Order; and

20

I.      in the case of a Final Order, among other things, the Roll-Up, the 506(c) Waiver and the 552 Waiver.

## BASIS FOR RELIEF REQUESTED

28.     For the following reasons, the Debtor respectfully submits that it has satisfied the standards applicable for the use of the Cash Collateral and for the Court's approval of the DIP Facility and entry of the Interim Order and a Final Order.

### A.      The Debtor Should Be Authorized to Use the Cash Collateral

29.     Section 363 of the Bankruptcy Code governs the Debtor's use of property of the estate.[4]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

30.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or

> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

---

[4] Pursuant to section 1107 of the Bankruptcy Code, a debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.

26042601.3

31.     In this case, the DIP Lender has consented to the use of the Cash Collateral in exchange for the Adequate Protection.  Therefore, the Debtor is authorized to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code.  Moreover, the Debtor submits that the Adequate Protection to be provided to the DIP Lender is appropriate.  Section 363(e) of the Bankruptcy Code provides as follows:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... by the [debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest.

See 11 U.S.C. § 363(e).

32.     The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests. H.R. Rep. No. 595, 95th Cong., 1st Sess. 338-40 (1977), reprinted in U.S. Code Cong & Admin. News 1978, pp. 5963.  Adequate protection is also grounded in the belief that secured creditors should not be deprived of the benefit of their bargain. Id.  The Bankruptcy Code does not define adequate protection, but section 361 of the Bankruptcy Code does list three non-exclusive examples of adequate protection.  First, making a cash payment or periodic cash payments to the extent necessary to compensate for any decrease in value of an entity's interest in property may constitute adequate protection.   See 11 U.S.C. § 361(1).  Second, providing additional or replacement liens to the extent necessary to compensate for any decrease in value of an entity's interest in property may suffice.  See 11 U.S.C. § 361(2).  Third, "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property" may also suffice.  See 11 U.S.C. § 361(3).

33.     As adequate protection under sections 361 and 363 of the Bankruptcy Code on account of the Prepetition Collateral, the Debtor has agreed to provide the Lender with the Adequate Protection, which includes the Replacement Lien and the Superpriority Claim.

26042601.3

Additionally, as noted above, the Debtor receiving authorization from the Court to use the Cash Collateral is a critical component of the DIP Facility. Hence, absent such authority, the Debtor would not have access to sufficient liquidity, which would imperil its ability to successfully prosecute this Chapter 11 Case.

34.     Therefore, the Debtor requests that the Court authorize it to use the Cash Collateral.

**B.     The Debtor Should Be Authorized to Enter into the DIP Facility**

35.     The Debtor proposes to obtain post-petition financing under the DIP Facility by providing security interests and other liens, as described herein and provided for in the DIP Credit Agreement, pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).

36.     Indeed, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Banks. E.D. Pa. 1987) (secured credit under section 364(e)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

37.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; In re Gen. Growth Props., Inc., 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) that the debtors needed postpetition financing "to preserve [their] assets and continue their operations"; and (c) that the terms and conditions of the DIP Documents had been negotiated in good faith).

38.    Prior to the Petition Date, the Debtor endeavored to identify potential sources of post-petition financing.  Based on the outcome, the Debtor has determined that adequate post-petition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Debt is not available.  Without post-petition financing, the Debtor would be unable to maintain its business and consummate the Sale Process, which would significantly impair the value of the Debtor's assets, to the detriment of all stakeholders.  In addition, the terms of the DIP Facility, including the interest rate, the absence of a commitment fee or the like, the Postpetition Liens not extending to any Avoidance Actions, and the DIP Financing Milestones, are fair, reasonable and adequate given the Debtor's circumstances, all as more fully set forth below.

**C.**    **The Court Should Approve the Priming Liens and the Adequate Protection**

39.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).    Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice

and a hearing, authorize a debtor to obtain credit or incur debt secured by a senior or equal lien

on property of the estate that is subject to a lien, only if:

> (A)   the trustee is unable to obtain credit otherwise; and
>
> (B)   there is adequate protection of the interest of the holder of
> the lien on the property of the estate on which such senior or equal
> lien is proposed to be granted.

11 U.S.C. § 364(d); In re Levitt & Sons, LLC, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008) ("In

the event the debtor is unable to obtain credit under the provisions of §364(c) of the Bankruptcy

Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that

is already subject to a lien, commonly called a "priming lien.").

40.   A debtor has the burden of establishing that the holder of a lien to be

subordinated, or whose cash collateral will be used, has adequate protection.   See In re

Swedeland Dev. Co., 16 F.3d 552, 564 (3d Cir. 1994); see also In re Marcys Lee Assocs., L.P.,

Case No. 10-667 (Bankr. E.D. Pa. Jan. 20, 2011) (memo and order, Judge J. William Ditter, Jr.).

The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-

case basis.   In re Stoney Creek Techs., LLC, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007) (section

364(d)(3) of the Bankruptcy Code serves as a catch-all that allows the bankruptcy court

discretion to fashion adequate protection on a case by case basis); see In re Mosello, 195 B.R.

277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its

focus is protection of the secured creditor from diminution in the value of its collateral during the

reorganization process." In re Mosello, 195 B.R. at 288 (quoting In re Beker Indus. Corp., 58

B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

41.   In accordance with section 364(d) of the Bankruptcy Code, and consistent with

the purposes underlying the provision of adequate protection, the Interim Order provides the

Lender with the Adequate Protection on account of its interest in the Prepetition Collateral.  The

Lender has consented to the priming of its prepetition liens with respect to the Prepetition Secured Debt provided that the relief requested herein is granted, including the grant of the Adequate Protection provided for in the Interim Order.

42.     Moreover, a "priming" lien may be granted with the consent of the secured creditors whose lien will be primed.  See In re Sun Healthcare Grp., Inc., 245 B.R. 779, 782 n.5 (Bankr. D. Del. 2000) ("Their consent (to the use of their cash collateral and priming of their liens) was given in exchange for . . . adequate protection"); In re El Paso Refinery, L P., 171 F.3d 249, 252 (5th Cir. 1999) (noting that "El Paso gave BBL a priming lien, which by agreement was given a priority over the preexisting first lien of a group of Term Lenders"); In re Outboard Marine Corp., No. 00-37405, 2002 WL 571661, at *1 (Bankr. N.D. Ill Jan. 9, 2002) ("the DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Pre-petition Lenders consented to the imposition of priming liens upon the Pre-Petition Collateral and in favor of the DIP Lenders"), aff'd, Bank of America, N.A. v. Moglia, 330 F.3d 942 (7th Cir. 2003).

43.     The Lender agreed to the priming of its liens in favor of the DIP Facility. Therefore, the Court should authorize the Debtor to grant priming liens to the Lender to secure the Debtor's obligations under the DIP Facility, as provided for in the Interim Order.

**D.     No Adequate Alternative to the DIP Facility is Currently Available**

44.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  In re YL West 87th Holdings I LLC, 423 B.R. at 441 ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); In re Gen. Growth Props., Inc., 412 B.R. at 125 (debtor has an obligation to make "reasonable efforts, under the circumstances . . .to obtain [unsecured financing], in the ordinary course of business or

otherwise" ); In re Harborwalk, LP, Case No. 10-80043-G3-11 (LZP) (Bankr. S.D. Texas, Jan. 29, 2010) ("Section 364(d)(1) does not require that a debtor seek credit from every possible source, but a debtor must show that it made a reasonable effort to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable.").

45.     Substantially all of the Debtor's assets are subject to the prepetition liens asserted by the Lender on account of the Prepetition Secured Debt.  Under the circumstances, including the nature and amount of the Prepetition Secured Debt and the Debtor's other outstanding pre-petition debt obligations, obtaining the financing needed by the Debtor as unsecured debt, or debt secured by liens junior to the liens of the DIP Lender, was not a realistic option.  In the days prior to the commencement of the Chapter 11 Case, the Debtor pursued alternative post-petition financing.  None of the potential lenders that were solicited were willing to provide an adequate stand-alone debtor-in-possession financing facility on terms more favorable than the DIP Facility, which includes no commitment fees or the like, the Postpetition Liens not extending to any Avoidance Actions, and interest rates and DIP Financing Milestones that are reasonable under the circumstances of this Chapter 11 Case.  Therefore, the Debtor determined that the DIP Facility is the best post-petition financing option available to the Debtor and its estate under the circumstances.

46.     Thus, the Debtor has satisfied the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor.

**E.     The DIP Facility Terms are Fair, Reasonable and Appropriate Under the Circumstances of this Chapter 11 Case**

47.     The proposed terms of the DIP Credit Agreement are fair, reasonable, and appropriate under the circumstances.  First and foremost, as discussed above, the Debtor made a good-faith effort to obtain credit on the most favorable terms available under the circumstances. No other lender that the Debtor reached out to was willing to provide the funding necessary to

pay the Prepetition Secured Debt and fund the Debtor's business and the contemplated Sale Process on terms more favorable than those provided in the DIP Facility.  Against this backdrop, the Debtor and its bankruptcy counsel carefully evaluated the proposed financing offered by the DIP Lender, and engaged in extensive good faith negotiations with the Lender and its professionals regarding the proposed terms and conditions of the DIP Facility and the Interim Order.  Eventually, the Debtor, in its sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtor's needs in connection with this Chapter 11 Case.  Moreover, the terms and conditions of the DIP Facility were negotiated by the parties and their respective professionals in good faith, and the Debtor believes that the terms of the DIP Facility—including the interest rates, the fees to be paid by the Debtor (which generally include only the fees of counsel to the DIP Lender associated with this Chapter 11 Case, and no commitment fees or the like), the Postpetition Liens (which do not extend to any Avoidance Actions), and the DIP Financing Milestones (which allow for a 160-day sale process)—are fair, reasonable and adequate under the circumstances.

48.    To further illustrate this, the proposed DIP Facility and the Interim Order provide that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carveout and the Post-Termination Date Carveout.  In In re Ames Dep't Stores, the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  115 B.R. at 40; accord In re Gen. Growth Props., Inc., 412 B.R. at 125.

49.    Accordingly, the terms of the DIP Facility are fair, reasonable and appropriate, and the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

26042601.3

F.      **The Roll-Up of Should Be Approved**

50.      The Debtor's agreement to the Roll-Up should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

51.      The proposed use, sale, or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification.  See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"); Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 466 & n. 21 (2d Cir. 2007); In re Global Crossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003); In re Del. & Hudson H.R. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).  The Debtor believes that entry into the proposed DIP Facility is a sound exercise of its business judgment. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon the debtor's prudent business judgment); see also In re General Growth Props., Inc., 412 B.R. at 125 (finding that the terms of the borrowings and other financial accommodations reflected prudent business judgment consistent with the debtors' fiduciary duties).  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to

fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets. <u>See, e.g.,</u> <u>In re Fleurantin</u>, Case No. 09-4376 (unpaginated) (3d Cir. March, 24 2011); <u>see also</u> <u>In re Padilla</u>, 389 B.R. 409, 429 (Bankr. E.D. Pa. 2008); <u>Chinichian v. Campolongo</u>, 784 F.2d 1440, 1443 (9th Cir. 1986).

52.     As noted above, the Roll-Up is supported by sound business judgment and was a condition to the DIP Facility.  Also, the Roll-Up will not affect the rights of any Committee or other appropriate parties in interest to assert any challenges to the liens or claims of the DIP Lender during the Investigation Period and as otherwise provided for in the DIP Order.

**G.     Interim Approval of the DIP Facility Should Be Granted**

53.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  <u>See</u> Fed. R. Bankr. P. 4001(c)(2).

54.     The Debtor requests that the Court authorize the Debtor, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an aggregate amount up to $2.713 million.  This relief will enable the Debtor to maintain its business in a manner that will permit the Debtor to preserve and maximize value.  Absent the Court's entry of the Interim Order, the Debtor's business and its efforts to find a value-maximizing transaction for its assets would suffer immediate and irreparable harm.  The Debtor would have no funds available to obtain necessary services and administer the Chapter 11 Case, which has been commenced to preserve and maximize value for the benefit of all stakeholders.  Simply put, the failure to obtain interim

(and final) approval of the DIP Facility will imperil the Debtor's chapter 11 efforts and the contemplated Sale Process, to the detriment of all stakeholders.

## FINAL HEARING

55.     The Debtor respectfully requests that the Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Motion no later than thirty (30) days after the date of the Court's entry of the Interim Order (the "Interim Order Date"), because pursuant to the DIP Credit Agreement a Final Order must be entered within thirty-five (35) days after the Interim Order Date.

## WAIVER OF ANY APPLICABLE STAY

56.     The Debtor also requests that the Court waive any applicable stay of the Interim Order and a Final Order, including any stay that may be imposed by Bankruptcy Rules 4001(a)(3) and 6004(h).  As described above, the relief that the Debtor seeks in this Motion is necessary for it to maintain its business without interruption and to preserve and maximize value for its estate.  The exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

57.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) counsel for the DIP Lender; (v) those creditors holding the largest unsecured claims against the Debtor's estate (excluding insiders); and (vi) any party that the Debtor believes has asserted or may assert a lien in the Debtor's assets.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtor will serve copies of the Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, the Debtor submits that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtor requests entry of the Interim Order and, after the Final

Hearing, a Final Order, granting the relief requested herein and such other and further relief as is

just and proper.

Dated: February 26, 2020           YOUNG CONAWAY STARGATT & TAYLOR, LLP
   Wilmington, Delaware

         */s/ Robert F. Poppiti, Jr.*
         Robert S. Brady (No. 2847)
         Michael R. Nestor (No. 3526)
         Robert F. Poppiti, Jr. (No. 5052)
         Jaclyn C. Marasco (No. 6477)
         Rodney Square, 1000 North King Street
         Wilmington, Delaware 19801
         Telephone:  (302) 571-6600
         Facsimile:  (302) 571-1253
         Emails:  rbrady@ycst.com
            mnestor@ycst.com
            rpoppiti@ycst.com
            jmarasco@ycst.com

         *Proposed Counsel to the Debtor*
         *and Debtor in Possession*

26042601.3

# **EXHIBIT A**

DIP Credit Agreement

**Execution Version**

**DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**

Dated as of

February 26, 2020

between

**SUITABLE TECHNOLOGIES, INC.,**

as the Borrower and Debtor-in-Possession,

and

**MAGICHEART INVESTMENTS, LLC,**

as the Lender

# TABLE OF CONTENTS

ARTICLE 1 THE CREDIT ............................................................................. 2
    1.1    Amounts and Terms of Commitments ................................................. 2
    1.2    Security ..................................................................................... 2
    1.3    Availability of Funds ....................................................................... 2
    1.4    Evidence of Loans; Notes .................................................................. 3
    1.5    Interest, Fees and Other Amounts ....................................................... 3
    1.6    Procedure for Borrowing .................................................................. 3
    1.7    Payments by the Borrower ................................................................. 4
    1.8    Disbursement of Loan Proceeds .......................................................... 4
    1.9    Mandatory Prepayments ................................................................... 4
    1.10   Termination ................................................................................. 5

ARTICLE 2 CONDITIONS PRECEDENT .......................................................... 5
    2.1    Conditions of Loans ....................................................................... 5
    2.2    Conditions to All Loans ................................................................... 6

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ...................................... 7
    3.1    Corporate Existence and Power .......................................................... 7
    3.2    Corporate Authorization; No Contravention ......................................... 8
    3.3    Governmental Authorization ............................................................. 8
    3.4    Binding Effect ............................................................................. 8
    3.5    Litigation ................................................................................... 8
    3.6    Regulated Entities ......................................................................... 9
    3.7    Ownership of Property; Liens ............................................................ 9
    3.8    Full Disclosure ............................................................................. 9

ARTICLE 4 AFFIRMATIVE COVENANTS ........................................................ 9
    4.1    Notices ..................................................................................... 9
    4.2    Compliance with Laws ................................................................... 9
    4.3    Use of Proceeds ........................................................................... 10
    4.4    Financing Orders .......................................................................... 10
    4.5    Reimbursement of the Lender's Fees .................................................. 10
    4.6    Budget ...................................................................................... 10
    4.7    Further Assurances ....................................................................... 11
    4.8    Bankruptcy Matters ....................................................................... 12
    4.9    Other Information; Inspection of Property and Books and Records ............... 12
    4.10   Cash Management ........................................................................ 13

ARTICLE 5 NEGATIVE COVENANTS ............................................................ 13
    5.1    Limitation on Liens ...................................................................... 13
    5.2    Limitation on Indebtedness and Contingent Obligations ........................... 13
    5.3    Margin Stock; Use of Proceeds ......................................................... 13
    5.4    Bankruptcy Matters ....................................................................... 14

ARTICLE 6 SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC. ......... 14

6.1 Generally ...................................................................................................... 14
6.2 Priority .......................................................................................................... 14
6.3 Identification of Collateral ............................................................................. 15
6.4 Perfection and Maintenance of Liens ............................................................ 15
6.5 Costs of Perfection and Enforcement ............................................................ 16

ARTICLE 7 EVENTS OF DEFAULT ...................................................................... 16
7.1 Events of Default ........................................................................................... 16
7.2 Remedies ....................................................................................................... 18
7.3 Rights Not Exclusive ..................................................................................... 19

ARTICLE 8 MISCELLANEOUS .............................................................................. 19
8.1 Amendments and Waivers ............................................................................. 19
8.2 Notices .......................................................................................................... 19
8.3 No Waiver; Cumulative Remedies ................................................................. 20
8.4 Costs and Expenses; Yield Protection; Indemnity etc. ................................. 20
8.5 Marshalling; Payments Set Aside .................................................................. 21
8.6 Successors and Assigns ................................................................................. 22
8.7 Binding Effect ............................................................................................... 22
8.8 Counterparts; Facsimile Signature ................................................................ 22
8.9 Severability .................................................................................................... 22
8.10 Captions ........................................................................................................ 22
8.11 Independence of Provisions ........................................................................... 22
8.12 Interpretation ................................................................................................. 23
8.13 No Third Parties Benefited ............................................................................ 23
8.14 Governing Law and Jurisdiction .................................................................... 23
8.15 Waiver of Jury Trial ...................................................................................... 25
8.16 Entire Agreement; Release; Survival ............................................................ 25

ARTICLE 9 DEFINITIONS ...................................................................................... 26
9.1 Defined Terms ............................................................................................... 26
9.2 Other Interpretive Provisions ........................................................................ 33
9.3 Accounting Terms and Principles .................................................................. 34
9.4 Inconsistencies with Other Documents ......................................................... 34

**EXHIBITS**

Exhibit A                    Form of Term Note
Exhibit B                    Form of Notice of Borrowing
Exhibit C                    Form of Initial Budget
Exhibit D                    Milestones

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, modified and/or restated from time to time, this "Agreement") is entered into as of February 26, 2020, by and between SUITABLE TECHNOLOGIES, INC., a Delaware corporation and a debtor and debtor-in-possession (the "Borrower"), and MAGICHEART INVESTMENTS, LLC, a California limited liability company, as the Lender (the "Lender").

WITNESSETH:

WHEREAS, on February 26, 2020 (the "Petition Date"), the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which case is being administered as Bankruptcy Case No. _____ (the "Case") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Borrower remains in possession of its assets and is managing its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code;

WHEREAS, pursuant to that certain Secured Line of Credit Promissory Note, dated as of January 20, 2020 (as amended, restated, supplemented or otherwise modified from time to time (the "2020 Prepetition Credit Agreement") executed by the Borrower in favor of the Lender, the Lender made certain loans and financial accommodations to the Borrower, on the terms and conditions set forth therein, which loans and other financial accommodations are secured by liens on all of the assets of the Borrower;

WHEREAS, the Borrower has a need for additional liquidity and has requested that the Lender make advances and other financial accommodations available to the Borrower of up to $5,956,000.00 on a senior secured and superpriority basis (subject to the limitations described herein), pursuant to, inter alia, Section 364(c) and (d) of the Bankruptcy Code to be used for the purposes specified herein, and in accordance with the terms hereof; and

WHEREAS, the Lender is willing to provide advances and other financial accommodations to the Borrower on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Borrower, whether now owned or hereafter acquired, which Liens are superior to all other Liens (other than the Permitted Priority Liens) pursuant to Sections 364(c) and (d) of the Bankruptcy Code (collectively, the "DIP Liens"); and (ii) given priority over any or all administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, subject, as to priority, only to the Permitted Priority Liens, as provided in the DIP Order.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated herein by this reference, the mutual agreements, provisions and covenants contained herein, the Borrower (acting for itself and as debtor-in possession) and the Lender hereby agree as follows:

ARTICLE 1

THE CREDIT

1.1    <u>Amounts and Terms of Commitments</u>

.

(a)    Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Borrower contained herein, the Lender agrees to make available to the Borrower (i) a multi-draw term loan facility in the amount of new funds up to $3.801 million dollars ($3,801,000.00) (such loans being referred to herein as "<u>New Money Loans</u>"); and (ii) subject to the entry of the Interim DIP Order, the Lender is hereby authorized to make (or deemed to make) Loans in an amount equal to the then outstanding 2020 Prepetition Obligations, and subject to the entry of the Final DIP Order, the Lender is authorized to make (or deemed to make) Loans in an amount equal to the then outstanding Prepetition Obligations (the "<u>Roll-Up Facility Loans</u>" and the New Money Loans, are referred to as "<u>Loans</u>").

(b)    Amounts borrowed as a Loan that are repaid or prepaid may not be reborrowed.

(c)    The New Money Loan Commitments shall be reduced as provided in <u>Section 1.10</u> and in <u>Section 7.2</u> hereof.

1.2    <u>Security</u>

.    All Obligations shall be secured by first-priority, properly perfected, valid and enforceable Liens on and security interests in all assets (other than Avoidance Actions) of the Borrower (including, without limitation all intellectual property) wherever located, and whether existing now or after the date of entry of the Interim DIP Order, subject only to the Permitted Priority Liens and the priorities descrbed in Section 6.2.

1.3    <u>Availability of Funds</u>

.

(a)    <u>Interim DIP Facility</u>.  During the period commencing on the date hereof and ending upon the earlier of (i) entry of the Final DIP Order or (ii) the Maturity Date (such period, the "<u>Interim Period</u>"), subject to compliance with the terms, conditions and covenants in this Agreement, the Interim DIP Order and the Budget, the maximum amount of New Money Loans available to be drawn by the Borrower shall be $1,058,000.00, which may be borrowed in one or more draws in accordance with the initial Budget.

(b)    <u>Full Availability</u>.  Upon entry of the Final DIP Order, subject to compliance with the terms, conditions and covenants in this Agreement, the DIP Order and the Budget, the full remaining amount of the New Money Loan Commitment (the "<u>Subsequent Borrowing</u>") shall be available to the Borrower during the Availability Period in one or more

borrowings; provided, that, in any event the Lender shall not be required to advance to the Borrower an amount greater than $3,801,000.00 in New Money Loans.

(c)     Roll-Up Facility Loans.  Notwithstanding anything set forth herein to the contrary, (i) upon entry of the Interim DIP Order, the Lender shall be deemed to have exchanged the 2020 Prepetition Obligations for Roll-Up Facility Loans equal to the then outstanding amount of the 2020 Prepetition Obligations, and (ii) upon entry of the Final DIP Order, the Lender shall be deemed to have exchanged the Prepetition Obligations for Roll-Up Facility Loans equal to the then outstanding amount of the Prepetition Obligations, in each case without any further action on behalf of any Party.

(d)     Reserves.  Notwithstanding anything set forth herein to the contrary, pursuant to and in accordance with the DIP Order, the Lender shall have the right to establish and maintain such sums as it deems necessary or advisable to permit satisfaction of the Carveout (such amounts, the "Reserves").  The availability of New Money Loans hereunder shall be subject to, and reduced by, any Reserves.

1.4     Evidence of Loans; Notes

.  The Loans made by the Lender shall be evidenced by the books and records of the Lender, or, if requested by the Lender, shall be evidenced by a Term Note (in the form attached hereto as Exhibit A) payable to the Lender in an amount equal to the unpaid principal balance of the Loans held by the Lender.

1.5     Interest, Fees and Other Amounts

.

(a)     Each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to five percent (5%).  Accrued interest on each Loan shall be payable in cash at maturity (whether by acceleration or otherwise).

(b)     All computations of fees, interest and other amounts payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed.  Interest, fees and other amounts, as applicable, shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(c)     At the election of the Lender while any Event of Default exists, the Borrower shall accrue interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans and other Obligations under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum equal to seven percent (7%).

1.6     Procedure for Borrowing

.

(a)     Subject to Section 1.3(c), each Borrowing of a Loan, both in terms of timing, use and amount, shall occur at the Borrower's request, but subject to, and based upon

advances scheduled to be made by the Lender pursuant to, and in accordance with the Budget. The Borrower shall request a Borrowing by written notice delivered to the Lender substantially in the form of a Notice of Borrowing attached hereto as <u>Exhibit B</u>, or in writing in any other form acceptable to the Lender, which notice must be received prior to 1:00 p.m. (New York time) on the date that is three (3) Business Days prior to the requested Borrowing date.  Such Notice of Borrowing shall specify:

> (i)    the amount of the Borrowing; and

> (ii)    the requested Borrowing date, which shall be a Business Day.

(b)    The Borrower shall only request a Borrowing to the extent it reasonably determines that the amount of such Borrowing is necessary to satisfy amounts due and payable within thirty (30) days of such Borrowing in accordance with the Budget.  Any Notice of Borrowing shall constitute a certification by the Borrower with respect to the preceding sentence.

1.7    <u>Payments by the Borrower</u>

.

(a)    The Loans, including the aggregate outstanding principal amount of the Loans, plus accrued and unpaid interest thereon and all other Obligations, shall be repaid on the Maturity Date (whether by acceleration or otherwise).

(b)    All payments (including prepayments) to be made by the Borrower on account of principal, interest, fees and other amounts required hereunder shall be made (i) without set-off, recoupment, counterclaim or deduction of any kind and shall be free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings  (other than taxes that are imposed on the Lender's overall net income), (ii) except as otherwise expressly provided herein, to the Lender pursuant to the wiring instructions delivered to the Borrower prior to the date hereof or as the Lender may from time to time specify in accordance with this Agreement), and (iii) in Dollars and in immediately available funds, no later than 2:00 p.m. (New York time) on the date due.

(c)    If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

1.8    <u>Disbursement of Loan Proceeds</u>

. The Lender shall disburse funds into the Blocked Account.

1.9    <u>Mandatory Prepayments</u>

.  The Borrower shall repay the Obligations promptly following receipt of the net proceeds of any insurance proceeds or extraordinary receipts or proceeds of any asset disposition

received by the Borrower that were not otherwise contemplated to be received under the Budget or subject to Article 5, upon the receipt of proceeds of any equity or debt issuances.

1.10    Termination

.    The New Money Loan Commitment shall terminate upon the earlier of (A) an Acceleration, (B) a Lender declaration of a Default, (C) the Maturity Date, or (D) the termination of the Commitments in accordance with Section 7.2(a) hereof.

ARTICLE 2

CONDITIONS PRECEDENT

2.1    Conditions of Loans

.    The effectiveness of this Agreement and the obligation of the Lender to advance the initial New Money Loan and any other New Money Loans during the Interim Period are subject to satisfaction or waiver of the following conditions, each as of the date of such Borrowing, in a manner satisfactory to the Lender:

(a)    Bankruptcy Filing.  The filing of the Case with the Bankruptcy Court;

(b)    Loan Documents.  The preparation, authorization and execution of the Loan Documents with respect to the financing contemplated by this Agreement, in form and substance satisfactory to the Lender;

(c)    Bankruptcy Case.  The Case shall have not been dismissed or converted to a Chapter 7 case and there shall be no pending motion to dismiss or convert the Case to a Chapter 7 case; and no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in the Case;

(d)    Interim DIP Order.  Within three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Lender in its sole discretion authorizing and approving (a) the financing contemplated by this Agreement, including, without limitation, the granting of the DIP Liens in favor of the Lender and (b) the current cash payment of expenses under any Prepetition Obligations, including such amounts arising before and after the Petition Date and without the necessity of filing motions, to the extent such expenses have actually been incurred.  The Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lender;

(e)    Approvals.  All governmental and third-party consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained and shall remain in effect;

(f)    Budget.  The delivery of the initial Budget in form and substance mutually agreeable to the Borrower and the Lender;

-5-

(g)     Liens.   The Lender shall have valid and perfected DIP Liens in the Collateral.  A deposit account control agreement shall be entered into with respect to each deposit account and security account of the Borrower, establishing "control" under the applicable state Uniform Commercial Code, in favor of the Lender;

(h)     First Day Orders.  All of the "first day orders" entered around the time of the Petition Date shall be consistent with the Loan Documents and be reasonably satisfactory in form and substance to the Lender in all respects;

(i)     Officer's Certificates.  The Lender shall have received customary officer's certificate(s) for the Borrower attaching (a) certificates of incorporation or other similar document for the Borrower, certified as of a recent date by the applicable governmental authority, (b) the bylaws for the Borrower, (c) the resolutions of the Borrower's board of directors or other appropriate governing body approving and authorizing the execution, delivery and performance of the Loan Documents and (d) incumbency specimens;

(j)     No Default or Event of Default shall exist under the Loan Documents;

(k)     A Material Adverse Effect shall not have occurred.

(l)     The representations and warranties of the Borrower under the Loan Documents shall be true and correct immediately prior to, and after giving effect to, such funding, except to the extent such representations and warranties specifically relate to an earlier date;

(m)     After giving effect to a Borrowing, the Commitments would not be exceeded;

(n)     Receipt of a Notice of Borrowing from the Borrower in form and substance reasonably satisfactory to the Lender; and

(o)     Other Information.  The Lender shall have received and be reasonably satisfied with such other information (financial or otherwise) with respect to the Borrower or the Case reasonably requested by the Lender.

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof and the date of such Borrowing, a representation and warranty by the Borrower that the conditions in this Section 2.1 have been satisfied;

2.2     Conditions to All Loans

.  Unless otherwise indicated below, during the Availability Period, the obligation of the Lender to make each Loan shall be subject to the prior or concurrent satisfaction by the Borrower (unless waived by the Lender) of each of the following:

(a)     No Default or Event of Default shall exist under the Loan Documents;

(b)     The representations and warranties of the Borrower under the Loan Documents shall be true and correct immediately prior to, and after giving effect to, such funding, except to the extent such representations and warranties specifically relate to an earlier date;

(c)     The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

(d)     After giving effect to a Borrowing, the Commitments would not be exceeded;

(e)     For any Subsequent Borrowing, the Bankruptcy Court has approved the Roll-Up Facility;

(f)     For any Subsequent Borrowing, the Final DIP Order, in form and substance satisfactory to the Lender, shall have been entered by the Bankruptcy Court and shall be in full force and effect, and shall not have been amended, vacated, reversed, modified or rescinded or subject to a presently effective stay pending appeal;

(g)     Receipt of a Notice of Borrowing from the Borrower in form and substance reasonably satisfactory to the Lender; and

(h)     Each of the conditions set forth in clauses (c), (e), (g) and (k) of Section 2.1 shall have been satisfied or waived by the Lender.

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof and the date of such Borrowing, a representation and warranty by the Borrower that the conditions in this Section 2.2 have been satisfied.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that the following are, and after giving effect to the funding of any Loan will be, true, correct and complete:

3.1     <u>Corporate Existence and Power</u>

. The Borrower:

(a)     is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)     has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and, following entry of the DIP Order to execute, deliver, and perform its obligations under the Loan Documents to which it is a party;

(c)      is duly qualified and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)      is in compliance with all Requirements of Law in all material respects.

3.2      Corporate Authorization; No Contravention

.  Following the entry of the DIP Order the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document shall have been duly authorized by all necessary action, and do not and will not:

(a)      contravene the terms of any of the Borrower's Organization Documents;

(b)      other than as a result of the commencement of the Case and the Liens granted hereunder and by the DIP Order, to the Knowledge of the Borrower, conflict with or result in any breach or contravention of, or result in the creation of any Lien under, any document evidencing any contractual obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject;

(c)      require any Consent to be obtained, which has not already been authorized pursuant to an order of the Bankruptcy Court or obtained prior to the execution, delivery or performance of the terms of this Agreement; or

(d)      violate any Requirement of Law in any material respect.

3.3      Governmental Authorization

.  Following the entry of the DIP Order no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Borrower of this Agreement or any other Loan Document except (a) for recordings and filings in connection with the Liens granted to the Lender under the Collateral Documents and (b) those obtained or made on or prior to the date hereof.

3.4      Binding Effect

.  Following the entry of the DIP Order this Agreement and each other Loan Document shall constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, except as enforceability may be limited by equitable principles relating to enforceability.

3.5      Litigation

.  Except for audits conducted by the IRS and other taxing authorities, any related actions, suits, proceedings, claims or disputes, claims and disputes arising in connection with the Case, or claims or disputes arising in connection with the Chancery Court Action, to the Knowledge of

the Borrower, there are no actions, suits, proceedings, claims or disputes pending, or threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against the Borrower or any of its Property which purport to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated hereby or thereby.

### 3.6    Regulated Entities

.    The Borrower is not (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

### 3.7    Ownership of Property; Liens

.    The Borrower has good and valid title to the Collateral.  The Borrower does not own or have an interest in any Subsidiaries or other entities.

### 3.8    Full Disclosure

.    None of the representations or warranties made by the Borrower in the Loan Documents as of the date such representations and warranties are made in writing, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of the Borrower in connection with the Loan Documents on or after the date hereof contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered; provided that with respect to projections, the Borrower represents only that such projections were prepared in good faith based upon estimates, information and assumptions believed to be reasonable.

## ARTICLE 4

## AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that, so long as the Lender shall have any Commitment hereunder, or any Loan shall remain unpaid, unsatisfied or outstanding:

### 4.1    Notices

.    The Borrower shall notify promptly the Lender following (and in no event later than three (3) Business Days after a Responsible Officer has actual knowledge thereof) the occurrence or existence of any Default, Event of Default or Material Adverse Effect.

### 4.2    Compliance with Laws

.    The Borrower shall comply in all material respects with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business.

4.3     Use of Proceeds

.  The Borrower shall use the proceeds of the Loans solely in accordance with the Budget and the DIP Order.

4.4     Financing Orders

.  The Borrower shall comply with the DIP Order.

4.5     Reimbursement of the Lender's Fees

.  The Borrower shall reimburse the Lender for its reasonable and documented Attorney Costs relating to the preparation, approval, administration and enforcement of the Agreement.

4.6     Budget

.

(a)     Budget and Approvals.  Attached hereto as **Exhibit C** is the initial Budget, which has been approved by the Lender.  Commencing on the Wednesday of the fourth (4th) week following the Petition Date, the Borrower shall deliver to the Lender no less frequently than once every two (2) weeks an updated budget (each a "Proposed Budget") reflecting weekly cash flow forecasts of receipts and disbursements for such Budget period (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements), in the manner and with the accompanying information set forth in this Agreement.  Each Proposed Budget shall be subject to review and approval by the Lender before being deemed an approved Budget.  Three (3) Business Days after delivery of a Proposed Budget, unless the Lender delivers a written objection to the Borrower (a "Proposed Budget Objection") setting forth specific objections to the Proposed Budget, such Proposed Budget shall be deemed approved by the Lender and shall become the new Budget.  If the Lender shall have timely delivered a Proposed Budget Objection to the Borrower, the prior approved Budget shall continue in place and the Parties shall negotiate to resolve the objections set forth in the Proposed Budget Objection. Upon resolution of the objections set forth in the Proposed Budget Objection, such Proposed Budget shall become the new Budget.

(b)     Payment of the Post-Termination Date Carve Out.  Any payment made on or after the occurrence of the Termination Date in respect of any allowed fees and expenses of the Carveout Professionals that accrued during the period commencing on the Petition Date and ending on the Termination Date shall permanently reduce the Carveout on a dollar-for-dollar basis; provided, that, for the avoidance of doubt, such payments shall not reduce the Post-Termination Date Carveout.  Any funding of the Carveout shall be added to, and made a part of, the Obligations secured by the Collateral and shall be otherwise entitled to the protections granted under the DIP Order, the Loan Documents, the Bankruptcy Code, and Applicable Law.

(c)     Budget Covenants.

(i)     The Borrower shall not, directly or indirectly, (A) use any proceeds of the Loans in a manner or for a purpose other than those consistent with this Agreement and

-10-

the DIP Order; or (B) permit a disbursement causing any deviation from the Budget other than the Permitted Deviations.

(ii)     Prior to the occurrence of an Event of Default, the Borrower shall be permitted to pay fees and expenses of Carveout Professionals solely to the extent that such fees and expenses are in accordance with the Budget and authorized to be paid under sections 330 and 331 of the Bankruptcy Code (other than any Carveout Professionals whose fees are not subject to such provisions) pursuant to an order of the Bankruptcy Court, as the same may be due and payable.  Subject to the DIP Order, upon the occurrence of an Event of Default (subject to all applicable grace periods set forth in this Agreement and the DIP Order), the right of the Borrower to pay Carveout Professional fees and expenses shall terminate, other than as provided with respect to the Carveout and the Post-Termination Date Carveout.

(d)     <u>Budget Tests; Permitted Deviation</u>.  Compliance with the Budget shall begin testing in the first week after the date of entry of the Interim DIP Order and shall continue every two weeks thereafter (each, a "<u>Budget Test Date</u>") for the period from the prior Budget Test Date through the next applicable Budget Test Date (each period, a "<u>Budget Test Period</u>").  For the avoidance of doubt, the first Budget test shall occur the week beginning March 13, 2020.  During each Budget Test Period, the Borrower will not permit the actual aggregate amount of disbursements to be more than 110% of the aggregate budgeted disbursements set forth in the Budget for such Budget Test Period nor permit actual aggregate receipts to be less than 90% of the aggregate budgeted receipts set forth in the Budget for such period (the "<u>Permitted Deviation</u>"); provided, that, if the actual aggregate amount of disbursements for a Budget Test Period is less than 100% of the aggregate budgeted disbursements set forth in the Budget for such Budget Test Period or if the actual aggregate amount of receipts for a Budget Test Period is greater than 100% of the aggregated budgeted receipts set forth in the Budget for such Budget Test Period, then all or a portion of such disbursement deficit or receipts surplus may be carried forward and applied in any future Budget Test Period when calculating the Permitted Deviation for such future Budget Test Period.  The Lender may, in its sole discretion and without further Bankruptcy Court approval, authorize the Borrower in writing to exceed the Permitted Deviation.  Commencing in the first week following the entry of the Interim DIP Order, the Borrower shall submit a Variance Report to the Lender every two weeks on Tuesday of the week following the immediately preceding Budget Test Period.

4.7     <u>Further Assurances</u>

.

(a)     The Borrower will promptly disclose to the Lender and correct any defect or error that may be discovered in any Loan Document, any written information, exhibits and reports furnished to the Lender or in the execution, acknowledgement or recordation thereof.

(b)     Without any further order of the Bankruptcy Court, promptly upon request by the Lender, the Borrower shall take such additional actions and execute such documents as the Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the DIP Liens created by any of the Loan Documents all of the properties, rights or interests covered by any of the

Loan Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and the DIP Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Loan Document.

       4.8    <u>Bankruptcy Matters</u>

.

       (a)    The Borrower shall perform or deliver each of the items set forth on Exhibit D (the "Milestones") on or before the dates specified therein with respect to such item (the "Milestone Covenants"), which Milestone Covenants pertain to the sale of all, or substantially all, of the assets of the Borrower in the Case pursuant to a 363 Sale.

       (b)    The Borrower shall deliver to the Lender (i) as soon as practicable in advance of filing with the Bankruptcy Court the proposed Interim DIP Order and proposed Final DIP Order, as applicable, and pleadings proposed to be filed seeking approval of the Loans (which, in each case, must be in form and substance reasonably satisfactory to the Lender prior to being filed), any other material filings proposed to be filed in the Case (including the Bid Procedures Order), any plan of reorganization or liquidation, and any disclosure statement related to such plan, which in each case shall be in such form acceptable to the Lender in its sole discretion (unless this Agreement provides for a different standard); (ii) contemporaneously with delivery thereof to the Committee, if any, copies of all material written reports and all term sheets for any 363 Sale, with copies of such reports and term sheets also provided to or served on the Lender's counsel; and (iii) access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with the chief restructuring officer and other advisors of the Borrower (including any investment bankers), which meetings shall include reports with respect to asset sales and other matters reasonably requested by the Lender.

       4.9    <u>Other Information; Inspection of Property and Books and Records</u>

.

       (a)    The Borrower shall promptly forward or make available to the Lender any such business, financial, corporate affairs, perfection certificate and other information regarding the Borrower (including, without limitation, Collateral reports) as the Lender may from time to time reasonably request.

       (b)    The Borrower shall maintain proper books of record and account, in which full, true and correct entries consistent with Borrower's existing accounting practices applied on a consistent basis shall be made of all financial transactions and matters involving the assets and business of such Person.  The Borrower shall, with respect to each owned, leased or controlled property, during normal business hours and upon reasonable advance notice (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and the Lender shall have access at any and all times during the continuance thereof): (a) provide access to such property to the Lender and any of its respective employees or representatives, as frequently as such party reasonably determines to be appropriate; and (b) permit the Lender and

any of their respective employees or representatives to conduct field examinations, audit, inspect and make extracts and copies from all of the Borrower's books and records, and evaluate and make physical verifications of the inventory and other Collateral in any manner and through any medium that such party considers advisable, in each instance, at the Borrower's expense; provided the Borrower shall only be obligated to reimburse such party for the expenses for two such field examination, audit and inspection per year.

4.10    Cash Management

.  The Borrower shall deposit all cash or cash equivalents received by the Borrower into the Blocked Account promptly upon the Borrower's receipt thereof in accordance with the DIP Order.  All Cash Collateral shall be used in accordance with the DIP Order.

ARTICLE 5

NEGATIVE COVENANTS

The Borrower covenants and agrees that, so long as the Lender shall have any Commitment hereunder, or any Loan shall remain unpaid, unsatisfied or outstanding:

5.1    Limitation on Liens

.  Except as provided in the DIP Order, the Borrower shall not, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired which did not exist as of the date of this Agreement other than Permitted Priority Liens.

5.2    Limitation on Indebtedness and Contingent Obligations

.  The Borrower shall not create, incur, assume, permit to exist or otherwise become or remain directly or indirectly liable with respect to, any indebtedness or Contingent Obligations, except for (a) the Obligations, (b) indebtedness incurred in accordance with the Budget or the DIP Order, (c) indebtedness consented to in writing by the Lender, (d) any indebtedness or Contingent Obligations in existence on the date hereof, or (e) arising out of arrangements for the sale of goods entered into by Borrower in the ordinary course of business consistent with Borrower's past practices immediately prior to the Petition Date.

5.3    Margin Stock; Use of Proceeds

.  The Borrower shall not use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of the Borrower or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of any Loan Document.

5.4     Bankruptcy Matters

.

(a)     The Borrower shall not directly or indirectly, seek, consent to, incur, assume, create, permit or suffer to exist (i) any material modification or amendment or stay or vacation to (a) the DIP Order, unless the Lender has consented in advance to such modification, stay, vacation or amendment in writing; (ii) entry of any material order impacting this financing or the Collateral in the Case that is not, in form and substance, reasonably satisfactory to the Lender; (iii) a claim for any administrative expense or unsecured claim which is pari passu with or senior to the Superpriority Claim of the Lender in respect of the Obligations other than the Permitted Priority Liens; or (iv) any Lien on any Collateral having a priority equal or senior to the Liens in favor of the Lender in respect of the Obligations other than the Permitted Priority Liens; provided, however, that none of the restrictions set forth in this Section 5.4 shall apply if the Obligations have been Paid in Full (as defined in the Interim DIP Order).

(b)     The Borrower shall not make any expenditure except of the type and for the purposes and in the amounts provided for in the Budget and subject to the variances provided herein and in the DIP Order.

ARTICLE 6

SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC.

6.1     Generally

.  To secure payment of the Obligations, subject to the DIP Order, the Borrower hereby grants to the Lender Liens upon, and security interest in, subject to the Carveout, the Post-Termination Date Carveout, and priorities set forth in Section 6.2 (collectively, the "DIP Liens"), in and to the Collateral.

6.2     Priority

.  The Borrower hereby covenants, represents and warrants that, upon entry of the DIP Order and subject to the Carveout and the Post-Termination Date Carveout, at all times:

(a)     All amounts owing by the Borrower under the Loan Documents at all times will constitute allowed superpriority administrative expense claims in the Case, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

(b)     All Liens authorized and granted pursuant to the DIP Order entered by the Bankruptcy Court approving the Loan Documents and the transactions contemplated hereby shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

(c)     All Obligations, including all Loans under the Loan Documents, and the DIP Liens against the Collateral securing the Obligations shall:

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, constitute valid, fully perfected and enforceable, senior first priority DIP Liens on all Collateral that is not subject to the Permitted Priority Liens; and

(ii)    pursuant to section 364(d) of the Bankruptcy Code, constitute valid, fully perfected, enforceable, first priority, priming DIP Liens on all Collateral subject to the Permitted Priority Liens.

6.3    Identification of Collateral

.    No submission by the Borrower to the Lender of a schedule or other particular identification of Collateral shall be necessary to grant to the Lender a DIP Lien upon, or to vest in the Lender security title to and a security interest in each and every item of Collateral now existing or hereafter created or acquired, but rather such Lien, security title and security interest shall vest in the Lender immediately upon the creation or acquisition or any item of DIP Collateral hereafter created or acquired, without the necessity for any other or further action by any the Borrower or by the Lender.

6.4    Perfection and Maintenance of Liens

.

(a)    The DIP Liens securing the Obligations shall become effective and perfected automatically pursuant to and upon entry of the Interim DIP Order and shall continue pursuant to and in accordance with the Final DIP Order.  No filing or registration of any kind shall be required in order to perfect the DIP Liens granted herein or in any other Collateral Document.  Nevertheless, the Lender may elect, from an abundance of caution and in order to remove uncertainty, to file or record any and all Collateral Documents, including any financing statements, mortgages, deeds of trust, deeds to secure Debt, pledge agreements, affidavits, security agreements, fixture filings, assignments, memoranda or other documents, instruments or evidences of perfection with respect to the Collateral as the Lender may deem appropriate, and no such filing or recording shall in any manner alter, diminish or otherwise limit the automatic perfection of all DIP Liens granted by the DIP Order.

(b)    In order to further evidence and perfect DIP Liens, the Borrower agrees that it shall execute and deliver to the Lender all such Collateral Documents as the Lender may from time to time reasonably request, including without limitation any deposit account control agreement to be executed in connection with the Blocked Account.

(c)    The Borrower authorized the Lender to prepare and record or file all such notices or instruments of perfection as may be necessary or desirable, in the sole discretion of the Lender, to establish, perfect and maintain the DIP Liens upon the Collateral including Uniform Commercial Code financing statements (collectively referred to herein as the "Perfection Documents").

(d)    The Borrower hereby appoints the Lender as its true and lawful attorney-in-fact (without requiring the Lender to act as such), which power shall be coupled with an interest and irrevocable, for the limited purpose to prepare and record or file any Collateral

Documents or Perfection Documents, and to perform all other acts that the Lender deems appropriate, to establish, perfect, maintain and continue the DIP Liens upon the Collateral.

6.5     Costs of Perfection and Enforcement

.  The Borrower shall reimburse the Lender for the payment of all costs, expenses and taxes of any kind or character incurred in connection with filing, recording or enforcing the Collateral Documents or the Perfection Documents, with all such costs and expenses being automatically added to the principal amount of the Loans.

ARTICLE 7

EVENTS OF DEFAULT

7.1     Events of Default

.  Any of the following shall constitute an "Event of Default":

(a)     DIP Order.  The occurrence of any Event of Default as defined in the Interim DIP Order or the Final DIP Order;

(b)     Non-Payment.  The Borrower fails to pay when and as required to be paid herein, any amount of any Loan within three (3) Business Days from the date that such amount has become due;

(c)     Representation or Warranty.  Any representation, warranty or certification by or on behalf of the Borrower made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made.

(d)     Specific Defaults.  The Borrower (i) fails to perform or observe any term, covenant or agreement contained in Article 4 or Article 5 of this Agreement or (ii) fails to perform any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (i) the date upon which a Responsible Officer of the Borrower becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by the Lender;

(e)     Bankruptcy Defaults.  The occurrence of any of the following in the Case:

(i)     the Interim DIP Order is not entered within three (3) Business Days after the Petition Date;

(ii)     other than in connection with the payment in full or other satisfaction or refinancing of the Obligations, the filing of any motion, taking of any action or the

filing of any reorganization or liquidation plan or disclosure statement in the Case by the Borrower (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code that is senior to or *pari passu* with the financing provided under this Agreement, (B) to grant any Lien upon or affecting any Collateral that is senior to or *pari passu* with the DIP Liens granted under this Agreement, (C) except as provided in a DIP Order, to use Cash Collateral under Section 363(c) of the Bankruptcy Code without prior written consent of the Lender, (D) that seeks to prohibit the Lender from credit bidding on any or all of the Borrower's assets during the pendency of the Case or (E) that is otherwise materially adverse to the rights and remedies granted to the Lender hereunder or under the DIP Order;

(iii)    this Agreement, any of the other Loan Documents, or the Interim DIP Order or the Final DIP Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or the Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Borrower or such Person) any other Person's motion to, disallow in whole or in part the Lender's claims in respect of the Obligations or to challenge the validity of any portion of the Loan Documents, the Loans and the related obligations or the applicability or enforceability of same or which seeks to void, limit, subordinate or otherwise adversely affect any Liens in favor of the Lender or any payment pursuant to the Loan Documents or the Interim DIP Order or the Final DIP Order;

(iv)    any Lien or security interest purported to be created under the Collateral Documents shall cease to be, or shall be asserted by the Borrower not to be, a valid and perfected Lien on or security interest in any of the Collateral, with the priority set forth herein and in the related Collateral Documents;

(v)    the Bankruptcy Court shall enter one or more orders granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any one or more creditors to execute upon or enforce liens on or security interests in any Collateral;

(vi)    the Bankruptcy Court shall enter any order revoking, reversing, staying, vacating, rescinding, or materially modifying, supplementing or amending in each case, without the consent of the Lender, the Interim DIP Order or Final DIP Order, as applicable;

(vii)    any application for any of the orders described in clauses (ii), (iii), (iv), (v) or (vi) above or (viii) or (ix) below shall be made and, if made by a Person other than a Borrower, such application is not being diligently contested by the Borrower in good faith;

(viii)    the Bankruptcy Court shall enter any order (which has not been reversed or vacated within five (5) calendar days): (a) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (b) appointing an examiner with expanded powers under Section 1106(b) of the Bankruptcy Code in the Case or otherwise or (c) dismissing the Case or converting the Case to a Chapter 7 case; and

(ix)    if a plan of reorganization or liquidation is filed by the Borrower in the Case, or an order shall be entered by the Bankruptcy Court confirming any plan in the

Case, that does not provide for (I)(A) the indefeasible payment in full in cash of all Obligations (or other treatment of the Obligations acceptable to the Lender) and (B) the release of the Lender and its affiliates in full from all claims of the Borrower and their estates arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the transactions contemplated by the Loan Documents, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated hereby and thereby, in each case on or before the effective date of such plan (provided, however, that this subpart (I)(B) does not apply to Scott Hassan solely in his capacity as a former director or officer of the Borrower), and (II) the continuation of the DIP Liens and security interests granted to the Lender until the effective date of such plan.

       (f)    <u>Collateral</u>.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against the Borrower or the Borrower shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document (together with the DIP Order) shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason cease to be a perfected and first priority security interest.

    7.2    <u>Remedies</u>

  .  Immediately upon the occurrence and during the continuation of an Event of Default, the Lender may, in its sole discretion (without further notice or grace period, unless required by any Requirements Law), take any or all of the following actions:

       (a)    Declare all or any portion of the Commitments of the Lender to make Loans to be suspended or terminated, whereupon such Commitments shall forthwith be suspended or terminated;

       (b)    declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Documents to be immediately due and payable (such event being referred to herein as an "<u>Acceleration</u>") without presentment, demand, protest or (except as provided above) other notice of any kind, all of which are hereby expressly waived by the Borrower;

       (c)    terminate the Borrower's ability (i) to access the Loans and (ii) to use the cash collateral provided for by the DIP Order; and

       (d)    exercise all rights and remedies available to it under the Loan Documents, the DIP Order, or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code.

The Borrower shall not seek to enjoin, hinder, delay or object to the Lender's exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to the

Lender's exercise of rights and remedies, the Borrower cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default.

7.3     Rights Not Exclusive

.  The rights provided for in this Agreement are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

ARTICLE 8

MISCELLANEOUS

8.1     Amendments and Waivers

.

(a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by the Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Lender and the Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

(b)     No amendment, waiver or consent to this Agreement or any other Loan Document shall become effective prior to delivery of a copy of such amendment, waiver or consent to the Lender.

(c)     Notwithstanding anything in this Section 8.1 to the contrary, the parties hereto shall be permitted to amend this Agreement and the other Loan Documents without further approval or order of the Court to the extent provided in the DIP Order.

8.2     Notices

.

(a)     Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing or by Electronic Transmission, unless otherwise expressly specified herein, and addressed to the address set forth on the applicable signature page hereto.

(b)     Effectiveness,  (i) All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service and with a copy to be delivered by electronic mail, and (ii) if by electronic mail, upon successful delivery.

(c)     The Lender shall notify the Borrower in writing of any changes in the address to which notices to the Lender should be directed.

-19-

8.3     No Waiver; Cumulative Remedies

.  No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between the Borrower or the Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

8.4     Costs and Expenses; Yield Protection; Indemnity etc.

(a)     Any action taken by the Borrower under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Lender, shall be at the expense of the Borrower, and the Lender shall not be required under any Loan Document to reimburse the Borrower therefor.  In addition, the Borrower agrees to pay or reimburse upon demand (1) the Lender for all reasonable out-of-pocket costs and expenses incurred by them or any of their respective Related Persons in connection with the investigation, development, preparation, negotiation, syndication, court approval, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including, without limitation, any out-of-pocket costs and expenses incurred in connection herewith or therewith, in each case including Attorney Costs, (2) the Lender for all reasonable costs and expenses incurred in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by the Lender for its examiners), (3) each of the Lender and its Related Persons for all reasonable costs and expenses incurred in connection with (i) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (ii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to any Borrower, any Loan Document or Obligation, including Attorney Costs, (4) the Lender and its Related Persons, in connection with the Case, including without limitation for, reasonable costs and expenses incurred in connection with (i) the review of pleadings and other filings made with the Bankruptcy Court, (ii) attendance at hearings in respect of the Case, and (iii) defending and prosecuting any actions or proceedings arising out of or relating to the Obligations, the Liens securing the Obligations or any transactions related to arising in connection with the Loan Documents and (5) the reasonable fees and disbursements of Attorney Costs of one law firm on behalf of the Lender and, in each case, to the extent necessary, one local counsel in each relevant jurisdiction (and in the case of an actual or perceived conflict of interest, one additional law firm on behalf of the Lender) incurred in connection with any of the matters referred to in clauses (3) and (4) above. Such expenses shall be part of the Obligations.

(b)     If, due to either a change in law, the compliance with any law, guideline or request from any central bank or other governmental authority (whether or not having the force of law) or other Requirement of Law, there shall be any increase in the cost to the Lender of

agreeing to make or of making, funding or maintaining Loans, including costs due to taxes imposed on payments to be made hereunder, or changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which the Lender is organized, then the Borrower shall from time to time, upon demand by the Lender, pay to the Lender additional amounts sufficient to compensate the Lender for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by the Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)    The Borrower agrees to indemnify, defend and save and hold harmless the Lender and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an "Indemnitee") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnitee, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) the transactions contemplated by the Loan Documents, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated hereby and thereby, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's actual fraud, gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors, any Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  The Borrower also agrees not to assert any claim against the Lender or any of its Affiliates, or any of its respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the transactions contemplated by the Loan Documents, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated by the Loan Documents.  Notwithstanding the foregoing, this Section 8.4(c) shall not apply to Scott Hassan solely in his capacity as a former director or officer of the Borrower.

(d)    If any taxes (other than the Lender income taxes) shall be required by law to be deducted from or in respect of any amount payable under the Loan Documents to the Lender (i) such amount shall be increased as necessary to ensure that, after all required deductions for taxes are made the Lender receives the amount it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within thirty (30) days after such payment is made, the Borrower shall deliver to the Lender an original or certified copy of a receipt evidencing such payment.

8.5    Marshalling; Payments Set Aside

.  Subject to the entry of the Final DIP Order, the Lender shall not be under any obligation to marshal any Property in favor of the Borrower or any other Person or against or in

payment of any Obligation.  To the extent that the Lender receives a payment from the Borrower, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

8.6     Successors and Assigns

.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that the Borrower may not assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Lender.  The rights and obligations of the Lender under this Agreement shall be freely assignable by the Lender.

8.7     Binding Effect

.  Subject to Section 2.1 hereof, this Agreement shall become effective when it shall have been executed by the Borrower and the Lender and approved by the Bankruptcy Court. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, the Borrower and the Lender receiving the benefits of the Loan Documents and, in each case, their respective successors and permitted assigns.  Except as expressly provided herein, the Borrower shall not have the right to assign any rights or obligations hereunder.

8.8     Counterparts; Facsimile Signature

.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.   Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

8.9     Severability

.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

8.10    Captions

.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

8.11    Independence of Provisions

.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

8.12    Interpretation

.  This Agreement is the result of good faith negotiations among the parties hereto and has been reviewed by counsel to the Borrower and the Lender.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lender merely because of the Lender's involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 8.14 and 8.15.

8.13    No Third Parties Benefited

.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrower and the Lender and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  The Lender shall not have any obligation to any Person not a party to this Agreement or the other Loan Documents.

8.14    Governing Law and Jurisdiction

.

(a)    Governing Law.

(i)    The laws of the State of Delaware shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest), except to the extent that the application of the Bankruptcy Code is mandatory.

(ii)    IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING

OUT OF OR FROM, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN STATE OR FEDERAL COURTS LOCATED WITHIN THE COUNTY OF NEW CASTLE, STATE OF DELAWARE.

(iii)    The Borrower hereby waives personal service of any and all process upon it by the Lender and consents that all such service of process may be made by registered mail (return receipt requested) directed to the Borrower at its address set forth on its signature page and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mail of the United States of America.  Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of any Lender to bring proceedings against the Borrower in the courts of any other jurisdiction.  The Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Any judicial proceeding by the Borrower against the Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought in the Bankruptcy Court provided that if the Bankruptcy Court does not have jurisdiction, then only in a federal or state court located in the County of New Castle, State of Delaware.

(b)    <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to any Loan Document over which the Bankruptcy Court does not have jurisdiction or any action described in Section 8.14(a)(ii) above, shall be brought exclusively in the courts of the State of Delaware located in the County of New Castle, or of the United States of America for the District of Delaware and, by execution and delivery of this Agreement, the Borrower hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; <u>provided</u> that nothing in this Agreement shall limit the right of the Lender to commence any proceeding in the federal or state courts of any other jurisdiction to the extent the Lender determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    <u>Service of Process</u>.  The Borrower hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind by the Lender and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  The Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    <u>Non-Exclusive Jurisdiction</u>.  Nothing contained in this <u>Section 8.14</u> shall affect the right of the Lender to serve process in any other manner permitted by applicable

-24-

Requirements of Law or commence legal proceedings or otherwise proceed against the Borrower in any other jurisdiction.

8.15    Waiver of Jury Trial

. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

8.16    Entire Agreement; Release; Survival

.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES WITH RESPECT TO DEBTOR-IN-POSSESSION FINANCING AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER HEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING THE BORROWER, THE LENDER OR ANY OF THE LENDER'S AFFILIATES WITH RESPECT HERETO. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT (OTHER THAN THE DIP ORDER, IN WHICH CASE THE DIP ORDER SHALL GOVERN), THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENT OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)    Execution of this Agreement by the Borrower constitutes a full, complete and irrevocable release of any and all claims which the Borrower may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the Loan Documents. In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). The Borrower hereby waives, releases and agrees not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    Any indemnification or other protection provided to any Indemnitee pursuant to this Agreement shall (x) survive the termination of the Commitments and the payment in full or other satisfaction of all other Obligations and (y) inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

ARTICLE 9

DEFINITIONS

9.1     Defined Terms

.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| **Term** | **Section** |
|---|---|
| Acceleration | 7.2(b) |
| Agreement | Preamble |
| Bankruptcy Court | Recitals |
| Borrower | Preamble |
| Case | Recitals |
| DIP Liens | Recitals |
| Event of Default | 7.1 |
| Indemnitee | 8.4(c) |
| Interim Period | 1.3(a) |
| Lender | Preamble |
| Loans | 1.1(a) |
| Milestone Covenants | 4.8(a) |
| Petition Date | Recitals |
| 2020 Prepetition Credit Agreement | Recitals |
| primary obligations | 9.1 |
| primary obligor | 9.1 |
| Proposed Budget | 4.6(a) |
| Proposed Budget Objection | 4.6(a) |
| Roll-Up Facility Loans | 1.1(a) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"363 Sale" means a sale of the Borrower's assets as approved by the 363 Sale Order.

"363 Sale Order" means an order entered by the Bankruptcy Court approving the 363 Sale, which order shall be reasonably satisfactory to the Lender.

"2019 Prepetition Obligations" means any and all advances made under the Prepetition Secured Promissory Notes on or after November 27, 2019, together with any interest, fees or any charges accrued with respect to such advances; provided, however, that the 2019 Prepetition Obligations shall not include (i) any advances made under the Prepetition Secured Promissory Notes on or before November 26, 2019, or (ii) any interest, fees, penalties or other costs attributable to any advances made under the Prepetition Secured Promissory Notes on or

before November 26, 2019 regardless of when such interest, fees, penalties or other costs accrued.

"<u>2020 Prepetition Obligations</u>" means any and all amounts outstanding under the 2020 Prepetition Credit Agreement.

"<u>Attorney Costs</u>" means and includes all reasonable and documented (in summary form) fees and disbursements of any law firm or other external counsel acting for the Lender hereunder and as permitted hereunder.

"<u>Avoidance Actions</u>" means any and all claims and causes of action of the Borrower's estate arising under Bankruptcy Code sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a), together with any proceeds therefrom.

"<u>Auction</u>" means an auction of the Borrower's assets to be held in accordance with the Bidding Procedures and Bid Procedures Order.

"<u>Availability Period</u>" means the period during which New Money Loans shall be available hereunder, which period shall commence upon the entry of the Final DIP Order and end on the Maturity Date.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy" (11 U.S.C. § 101, <u>et seq.</u>)

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"<u>Bidding Procedures</u>" means the bidding procedures governing the 363 Sale, as approved by the Bankruptcy Court pursuant to the Bid Procedures Order and any other order of the Bankruptcy Court affecting the 363 Sale, in such form reasonably satisfactory to the Lender.

"<u>Bid Procedures Order</u>" means an order of the Bankruptcy Court approving the Bidding Procedures for the 363 Sale, scheduling the date for an Auction of the Borrower's assets, scheduling the hearing to consider approval of the 363 Sale, establishing related objection and other deadlines, and approving related notices and forms, in form and substance satisfactory to the Lender.

"<u>Blocked Account</u>" shall have the meaning set forth in the DIP Order.

"<u>Borrowing</u>" means each borrowing under a Notice of Borrowing of Loan(s) by the Borrower from the Lender pursuant to this Agreement.

"<u>Budget</u>" means (i) the initial budget for the ensuing thirteen (13) week period reflecting weekly cash flow forecasts of receipts and disbursements attached hereto as <u>Exhibit C</u>, and (ii) each subsequent thirteen (13) week budget (in substantially the same format as the initial budget) submitted by the Borrower to the Lender in accordance with the terms of Section 4.6.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City.

"Carveout" shall have the meaning set forth in the DIP Order.

"Carveout Professional" shall have the meaning set forth in the DIP Order.

"Cash Collateral" shall have the meaning given to such term in Section 363(a) of the Bankruptcy Code.

"Chancery Court Action" means the civil action pending before the Court of Chancery in the State of Delaware, captioned Allison Huynh, derivatively on behalf of Suitable Technologies, Inc. v. Scott Hassan, Blue Ocean Robotics Holdings ApS, Beam Robots Aps, Beam Robots US Incorporated, C.A. No. 2019-0893-JTL.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all real and personal property of the Borrower and its estate of any kind or nature whatsoever, tangible or mixed, now existing or hereafter acquired or created, whether existing before or arising after the commencement of the Case, including: (a) Accounts; (b) money of every kind; (c) Intellectual Property; (d) Chattel Paper; (e) Commercial Tort Claims; (f) Deposit Accounts; (g) Documents: (h) Electronic Chattel Paper; (i) Equipment; (j) Fixtures; (k) General Intangibles; (l) Goods; (m) Instruments; (n) Inventory; (o) Investment Property; (p) Letter-of-Credit Rights; (q) Payment Intangibles; (r) Promissory Notes; (s) Securities Entitlements; (t) Securities Accounts; (u) Software; (v) Supporting Obligations; (w) Tangible Chattel Paper; (x) all other personal property not otherwise described in clauses (a) through (w) above; and (y) all accessions to, substitutions and replacements for and proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing; provided that Collateral shall not include any Avoidance Actions.

"Collateral Documents" means, collectively, this Agreement, the DIP Order and any and all other security agreements, pledge agreements, deposit account control agreements and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by the Borrower pledging or granting a Lien on Collateral now or hereafter delivered to the Lender pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against the Borrower in favor of the Lender, as any of the foregoing may be amended, restated and/or modified from time to time.

"Committee" shall have the meaning set forth in the DIP Order.

"Commitments" means an amount equal to $5,956,000.00 consisting of the New Money Loan Commitment and the Roll-Up Commitment.

"Contingent Obligations" mean, as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent (a) to purchase any such

primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof.

"Default" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"DIP Order" means, (i) until entry of the Final DIP Order, the Interim DIP Order and (ii) from and after the entry of the Final DIP Order, the Final DIP Order, in each case as the same may be amended, modified or otherwise supplemented from time to time in a manner satisfactory to the Lender and in compliance with this Agreement.

"Dollars," "dollars" and "$" each mean lawful money of the United States of America.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or other customary electronic system.

"Final DIP Order" means an order of the Bankruptcy Court, satisfactory to the Lender in its sole discretion, approving the Loan Documents and granting the Super-priority Claim status and Liens described in Article 6 on a final basis, which Final DIP Order (i) shall have been entered upon an application or motion of the Borrower satisfactory in form and substance to the Lender in all material respects, on such prior notice to such Parties as may in each case be entitled to notice under the Bankruptcy Code, (ii) shall be in full force and effect, and (iii) shall not have been stayed, reversed, modified or amended in any respect; and, if the Final DIP Order is the subject of a pending appeal in any respect, neither the making of any Loan nor the performance by the Borrower of any of its obligations hereunder or under any of the other the Loan Documents or under any other instrument or agreement related thereto shall be the subject of a presently effective stay pending appeal.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory

body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Interim DIP Order" means an order of the Bankruptcy Court, satisfactory to the Lender in its sole discretion, approving, on an interim basis, the Interim DIP Facility.

"Interim DIP Facility" means the agreement among the Borrower and the Lender, subject to compliance with the terms, conditions and covenants of this Agreement, the Interim DIP Order and the Budget, pursuant to which the Lender shall make available to the Borrower an amount equal to $2,713,000.00, which may be borrowed in one or more draws in accordance with the Budget.

"Knowledge of Borrower" means facts actually known by the Responsible Officer.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever.

"Loans" means, collectively, the Roll-Up Facility Loans and the New Money Loans.

"Loan Documents" means this Agreement, the DIP Order, the Term Notes (if any), the Collateral Documents, and all documents delivered to the Lender in connection with any of the foregoing.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse change in any of (a) the condition (financial or otherwise) or business, performance, operations or Property of the Borrower taken as a whole; (b) the ability of the Borrower to perform its obligations under any Loan Document; or (c) the validity or enforceability of any Loan Document or the rights and remedies of the Lender under any Loan Document; provided, however, that a Material Adverse Effect will not be deemed to include (i) changes as a result of the commencement of the Case and the financial condition of the Borrower or (ii) events or conditions arising from changes in general business or economic conditions.

"Maturity Date" means at the earlier of (a) the date that is six (6) months after the entry of the Final Order by the Bankruptcy Court, (b) the effective date of a Chapter 11 plan in the Chapter 11 Case or (c) on the Termination Date.

"New Money Loan Commitment" means the commitments of the Lender under and subject to, this Agreement and the DIP Order to advance to the Borrower a maximum of $3,801,000.00 of New Money Loans.

"Notice of Borrowing" means a notice given by the Borrower to the Lender pursuant to Section 1.4, in substantially the form of Exhibit B hereto.

"Obligations" means all Loans and other indebtedness, fees, interest, advances, debts, liabilities, obligations, expenses (including Attorney Costs), covenants and duties owing by the Borrower to the Lender or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner (including, without limitation, under the DIP Order), whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"Organization Documents" means, (a) the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement or (b) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other contractual obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Permitted Priority Liens" means collectively, (a) the Carveout, (b) the Post-Termination Date Carveout, (c) liens in favor of third parties upon any of the Borrower's property and assets, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law to the Prepetition Liens, and (3) are non-avoidable, valid, properly perfected, and enforceable as of the Petition Date, (d) non-consensual statutory liens as described in Section 546(b) of the Bankruptcy Code, and (e) liens securing the payment of taxes not yet delinquent.

"Person" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"Post-Termination Date Carveout" shall have the meaning set forth in the DIP Order.

"Prepetition Liens" means the Lender's asserted security interests in, and liens on the Prepetition Collateral under the Prepetition Secured Debt Documents (as such terms are defined in the Interim DIP Order).

"Prepetition Obligations" means, collectively, the 2020 Prepetition Obligations and the 2019 Prepetition Obligations.

"Prepetition Secured Promissory Notes" shall have the meaning set forth in the DIP Order.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Related Person" means, with respect to any Person, each affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisors and other consultants and agents of or to such Person or any of its affiliates.

"Requirement of Law" means with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer" means the chief restructuring officer of the Borrower.

"Roll-Up Commitment" means the commitment of the Lender under and subject to this Agreement and, as applicable, the Interim DIP Order or the Final DIP Order to advance to Borrower a principal amount equal to $2,155,00.00 of Roll-Up Facility Loans.

"Roll-Up Facility" means the agreement among the Borrower and the Lender, subject to compliance with the terms, conditions and covenants of this Agreement, and effective upon the entry of the Interim DIP Order or the Final DIP Order, as applicable, pursuant to which the Lender shall make available to the Borrower the roll-up of the Prepetition Obligations such that they become Loans hereunder.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Superpriority Claim" means an allowed claim against the Borrower or the Borrower's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Section 105, 326, 328, 330, 331, 364(c)(l), 365, 503, 506(c), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"Term Note" means a promissory note of the Borrower payable to the Lender in substantially the form of Exhibit A hereto, evidencing the Obligations of the Borrower to the Lender resulting from the Loans made to the Borrower by the Lender or its predecessor(s).

"Termination Date" means at the Lender's election, the earliest to occur of: (a) the date on which the Lender provides, via electronic mail or overnight mail, written notice to counsel for the Borrower, and the United States Trustee of the occurrence and continuance of an Event of Default; (b) the date that is thirty-five (35) days following the entry of the Interim DIP Order if the Final DIP Order is not entered in form and substance satisfactory to the Lender by such date; (c) the date of the final hearing with respect to the Interim DIP Order, if the Interim DIP Order is modified at such hearing in a manner unacceptable to the Lender; (d) the closing date of the sale of all or substantially all of the assets of the Borrower; (e) the date on which all of the Obligations are Paid in Full (as defined in the Interim DIP Order); and (f) August 4, 2020.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of Delaware.

"United States" and "U.S." each means the United States of America.

"Variance Report" means a detailed bi-weekly variance report, in form and substance satisfactory to Lender, prepared by the Borrower's chief restructuring officer that reconciles Borrower's actual performance for the applicable Budget Test Period with Borrower's projected performance for such period pursuant to the Budget.

9.2     Other Interpretive Provisions

.

(a)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms.  Terms (including uncapitalized terms) not otherwise defined herein and that are defined in Article 9 of the UCC shall have the meanings therein described.

(b)     The Agreement.  The words "hereof, "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)     Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)     Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.

(e)     Contracts; Instruments.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements, orders and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)     Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

9.3     Accounting Terms and Principles

.   All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.

9.4     Inconsistencies with Other Documents

.   In the event there is a conflict or inconsistency between this Agreement and the Interim DIP Order or the Final DIP Order, the Interim DIP Order or the Final DIP Order, as applicable, shall control.

[Signature Pages Follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

**BORROWER:**

**SUITABLE TECHNOLOGIES, INC.**

By: _____
Name: _____
Title: _____

Address for notices:

Suitable Technologies, Inc.
c/o Asgaard Capital, LLC
1934 Old Gallows Rd, Suite 350
Tysons Corner, VA  22183
Attention: Charles C. Reardon
Email: creardon@asgaardcapital.com


With a copy (that shall not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE  19801
Attention:  Robert S. Brady (rbrady@ycst.com)
　　　　　　Robert F. Poppiti, Jr. (rpoppiti@ycst.com)
　　　　　　Allurie R. Kephart (akephart@ycst.com)

**LENDER:**

**MAGICHEART INVESTMENTS, LLC**
as a **Lender**


By: _____
Name:  Scott Hassan
Title:   Manager


Address for notices:

548 Market St #63636
San Francisco, CA, 94104
Attention:  Scott Hassan
Email:  hassan@willowmail.com


With a copy to:

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, Suite 16
P.O. Box 1346
Wilmington, DE  19899-1346
Attention:  Curtis S. Miller (cmiller@mnat.com)
                   Tarik J. Haskins (thaskins@mnat.com)

# **EXHIBIT A**

Term Note

*THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT FILED UNDER SUCH ACT OR PURSUANT TO AN OPINION OF COUNSEL SATISFACTORY TO SUITABLE TECHNOLOGIES, INC., THAT SUCH REGISTRATION IS NOT REQUIRED.*

## FORM OF NOTE

$[●]

_____ __, 2020
Palo Alto, California

        **FOR VALUE RECEIVED, SUITABLE TECHNOLOGIES, INC.**, a Delaware corporation (the "Borrower"), promises to pay to the order of MagicHeart Investments, LLC, or its registered assigns ("Lender"), the principal sum of up to $[●].  Interest shall commence with the date hereof and shall continue on the outstanding principal of this Promissory Note (this "Note") until paid in full, payable at the rate(s) and at the time(s) set forth in the Debtor-in-Possession Credit and Security Agreement dated as of March __, 2020 between the Borrower and Lender (the "DIP Credit Agreement").  Capitalized terms used herein and not otherwise herein defined are used as defined in the DIP Credit Agreement.

        1.      This Note evidences indebtedness incurred under, and is subject to the terms and provisions of the DIP Credit Agreement, the Interim DIP Order and, if entered, the Final DIP Order.

        2.      Loans.  Loans evidenced by this Note shall be made in accordance with the DIP Credit Agreement and this Note.  Lender is hereby authorized to record the date, type and amount of each Loan made hereunder, the date and amount of each payment (if any) of principal and interest, and other information with respect thereto on Schedule 1 attached hereto and made a part hereof (or by any other analogous method of recordation that Lender may elect), and any such recordation shall constitute prima facie evidence of the accuracy of the information so recorded; provided however, that the failure to make a notation or the inaccuracy of any notation shall not limit or otherwise affect the obligations of Borrower hereunder or under any documents, instruments or agreements relating thereto.

        3.      Manner of Making and Application of Payments.  All payments and other sums due to Lender under this Note shall be paid to Lender at the time and in the manner set forth in the DIP Credit Agreement.

        4.      Governing Law.  This Note is to be construed in accordance with and governed by the laws of the State of Delaware (without giving effect to principles of conflicts or choices of law).

5.    <u>Consent to Jurisdiction</u>.    Borrower hereby irrevocably consents to the jurisdiction of the courts of the State of Delaware and of any federal courts located in the State of Delaware for all purposes in connection with any action or proceeding that arises from or relates to this Note, and hereby waives any right it may have to personal service of summons, complaint or other process in connection therewith and agrees that service may be made as set forth in Section 8.14(c) of the DIP Credit Agreement.    Borrower hereby waives any objection, including without limitation any objection to the laying of venue or based on the grounds of forum non conveniens, which they may now or hereafter have to the bringing of any such action or proceeding with respect to this Note in any jurisdiction set forth above. Notwithstanding the foregoing, Lender, in its absolute discretion, may also initiate proceedings in the courts of any other jurisdiction in which Borrower may be found or in which any of its properties or the Collateral may be located.

6.    <u>Miscellaneous Provisions</u>.

(a)    Lender shall not be deemed, by any act or omission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender and then only to the extent specifically set forth in such writing.    A waiver with reference to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy as to a subsequent event.    No delay or omission of Lender to exercise any right hereunder shall impair any such right or shall be construed to be a waiver of any right hereunder.

(b)    The remedies of Lender as provided at law or in equity shall be cumulative and concurrent, and may be pursued singularly, successively or together in Lender's sole discretion and may be exercised as often as occasion therefor shall occur.

(c)    If any provision of this Note is held to be unenforceable or invalid such holding shall not invalidate the remaining provisions hereof, and this Note shall remain enforceable to the fullest extent permitted by law.    The invalidity or unenforceability of any provision hereof in any one jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed by its officers, thereunto duly authorized as of the date first written above.

**SUITABLE TECHNOLOGIES, INC.**


By:_____

Name: Charlie Reardon

Title:  Chief Restructuring Officer

13526409.3

# **SCHEDULE 1**

Loan Ledger

| Date of Loan | Type of Loan: New Money Loan / Roll-up Facility Loan | Principal Amount | Repayments |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**<u>EXHIBIT B</u>**

Notice of Borrowing

## **FORM OF NOTICE OF BORROWING**

To:     MagicHeart Investments, LLC

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Credit and Security Agreement, dated as of February __, 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "DIP Credit Agreement," the terms defined therein being used herein as therein defined), between Suitable Technologies, Inc., a Delaware corporation (the "Borrower"), and MagicHeart Investments, LLC, a Delaware limited liability company.   Capitalized terms used herein and not otherwise herein defined, shall have the meanings ascribed thereto in the DIP Credit Agreement.

Pursuant to the terms of the DIP Credit Agreement, the Borrower hereby irrevocably notifies you of the Notice of Borrowing:

1.     The amount of the requested Borrowing is _____.

2.     The   Business   Day   of   the   requested   Borrowing   date   is _____.

3.     Borrower hereby authorizes and directs the Lender to disburse the proceeds of the Borrowing to the Blocked Account, in accordance with the instructions below:

  Bank Name:
  Address of Bank:
  Account Number:
  ABA Number:
  Reference:

The Borrower hereby represents that the following statements are true on the date hereof and will be true on the date of the proposed Borrowing, both before and after giving effect to the proposed Borrowing:

A.     The representations and warranties contained in the DIP Credit Agreement or any other Collateral Document are true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date of such Borrowing, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date);

B.     No Default or Event of Default exists, or would result from the proposed Borrowing, or from the application of the proceeds hereof; and

C.       [Each of the conditions set forth in Section 2.1 of the DIP Credit Agreement have been satisfied.][1]/ [Each of the conditions set forth in Section 2.2 of the DIP Credit Agreement have been satisfied.][2]

D.       The amount of the requested Borrowing is necessary to satisfy amounts due and payable within thirty (30) days of the Business Day of the requested Borrowing date in accordance with the Budget.

*[Signature Page Follows]*

---

[1]       Include this statement if such request is made during the Interim Period.
[2]       Include this statement if such request is made following the Interim Period.

This Notice of Borrowing is issued pursuant to and is subject to the DIP Credit Agreement referenced above.

<u>BORROWER</u>:

**SUITABLE TECHNOLOGIES, INC.**

By: _____
Name: _____
Title: _____

13525646.3

## __EXHIBIT C__

Initial Budget

**Suitable Technologies, Inc.**
Cash Forecast
DIP Budget

| | | (a) Feb 26-29 | W/E 3/7 | W/E 3/14 | W/E 3/21 | W/E 3/28 | W/E 4/4 | W/E 4/11 | W/E 4/18 | W/E 4/25 | W/E 5/2 | W/E 5/9 | W/E 5/16 | W/E 5/23 | W/E 5/30 | 13 Weeks Ending 5/30 | M/E 6/27 (4 weeks) | M/E 7/31 (5 weeks) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | (b) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Cash Receipts** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRO and Additional Personnel | (c) | 34,800 | 83,275 | 69,200 | 53,575 | 58,100 | 70,050 | 43,050 | 43,050 | 43,050 | 39,600 | 31,450 | 31,450 | 42,775 | 50,275 | 693,700 | 119,100 | 205,125 | 1,017,925 |
| Independent Director Fees | | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 0 | 60,000 | 20,000 | 20,000 | 100,000 |
| Independent Contractors | (d) | 0 | 182,848 | 5,000 | 5,000 | 5,000 | 149,848 | 0 | 0 | 0 | 134,848 | 0 | 0 | 0 | 0 | 487,816 | 119,848 | 119,848 | 727,512 |
| Utilities | (e) | 9,600 | 17,541 | 0 | 0 | 0 | 7,800 | 0 | 0 | 0 | 7,800 | 0 | 0 | 0 | 0 | 42,741 | 7,800 | 7,800 | 58,341 |
| Rent | | 0 | 11,700 | 0 | 0 | 11,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23,400 | 0 | 0 | 23,400 |
| Other Miscellaneous Expenses | (f) | 0 | 137,480 | 0 | 0 | 30,000 | 62,980 | 0 | 0 | 0 | 73,280 | 0 | 0 | 0 | 0 | 303,740 | 70,780 | 120,780 | 495,300 |
| Restructuring Professional Fees | | 0 | 79,000 | 75,333 | 87,333 | 75,333 | 70,875 | 70,875 | 70,875 | 70,875 | 65,260 | 54,260 | 54,260 | 54,260 | 54,260 | 882,799 | 271,300 | 271,300 | 1,425,399 |
| US Trustee Fees | | 0 | 0 | 0 | 0 | 0 | 4,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,875 | 0 | 27,400 | 32,275 |
| **Total Disbursements** | | 49,672 | 531,844 | 149,533 | 145,908 | 180,133 | 386,428 | 113,925 | 113,925 | 113,925 | 340,788 | 85,710 | 85,710 | 97,035 | 104,535 | 2,499,071 | 608,828 | 772,253 | 3,880,152 |
| **Net cash flow before financing** | | (49,672) | (531,844) | (149,533) | (145,908) | (180,133) | (386,428) | (113,925) | (113,925) | (113,925) | (340,788) | (85,710) | (85,710) | (97,035) | (104,535) | (2,499,071) | (608,828) | (772,253) | (3,880,152) |
| Beg Cash Balance (Book) | (g) | 80,000 | 80,328 | 80,484 | 80,951 | 81,043 | 80,910 | 501,482 | 501,557 | 501,632 | 501,707 | 501,919 | 502,209 | 502,499 | 502,464 | 80,000 | 501,929 | 501,101 | 80,000 |
| DIP Advances (Paydowns) | (d) | 50,000 | 532,000 | 150,000 | 146,000 | 180,000 | 807,000 | 114,000 | 114,000 | 114,000 | 341,000 | 86,000 | 86,000 | 97,000 | 104,000 | 2,921,000 | 608,000 | 772,000 | 4,301,000 |
| **End Cash Balance (Book)** | | 80,328 | 80,484 | 80,951 | 81,043 | 80,910 | 501,482 | 501,557 | 501,632 | 501,707 | 501,919 | 502,209 | 502,499 | 502,464 | 501,929 | 501,929 | 501,101 | 500,848 | 500,848 |
| Beg DIP Balance | (h) | 1,655,000 | 1,705,000 | 2,237,000 | 2,387,000 | 2,533,000 | 2,713,000 | 3,520,000 | 3,634,000 | 3,748,000 | 3,862,000 | 4,203,000 | 4,289,000 | 4,375,000 | 4,472,000 | 1,655,000 | 4,576,000 | 5,184,000 | 1,655,000 |
| **End DIP Balance** | (i) | 1,705,000 | 2,237,000 | 2,387,000 | 2,533,000 | 2,713,000 | 3,520,000 | 3,634,000 | 3,748,000 | 3,862,000 | 4,203,000 | 4,289,000 | 4,375,000 | 4,472,000 | 4,576,000 | 4,576,000 | 5,184,000 | 5,956,000 | 5,956,000 |

(a) Includes stub week (Feb 26-29)
(b) To the extent that any receipts are received, the Debtor will adjust its anticipated DIP Advances set forth below accordingly and account for the same in an updated budget
(c) Includes fees and expenses of Chief Restructuring Officer and his staff
(d) Includes former employees and other third parties paid as independent contractors
(e) Assumes utility adequate assurance deposit established during 1st week of case
(f) Includes security alarm service, outside storage, pest control, janitorial, postage, permits , taxes, licenses, bank fees, credit card charges, ordinary course professionals and other ordinary course expenses
(g) Amount does not include $100,000 balance in money market account as of the petition date
(h) Includes roll-up amounts
(i) Principal only

## EXHIBIT D

Milestones

Borrower hereby agrees that Borrower will timely deliver, or cause the timely delivery of, the following items on or before the dates specified below:

1.    On or before the date that is 25 days after the Petition Date, (i) the confidential information memorandum (subject to supplementation) with respect to a 363 Sale by the Borrower shall have been finalized and delivered to potential bidders and (ii) an electronic dataroom (subject to supplementation) for such 363 Sale shall have been opened.

2.    On or before the date that is 35 days after the Petition Date, Borrower shall file a motion (the "Sale Procedure Motion") for approval of the Bidding Procedures.

3.    On or before the date that is 60 days after the Petition Date, Borrower will obtain entry of the Bid Procedures Order.

4.    On or before the date that is 145 days after the Petition Date, Borrower will conduct one or more auctions for all, or substantially all, of the assets of the Borrower pursuant to, and in accordance with, the Bid Procedures Order.

5.    On or before the date that is 150 days after the Petition Date, Borrower will obtain entry of an order of the Court, in form and substance reasonably satisfactory to Lender ("Sale Order"), authorizing and approving one or more sales of all, or substantially all, of the assets of the Borrower pursuant to one or more definitive purchase agreements in form and substance reasonably acceptable to Lender, including, without limitation, with respect to the purchase price, any conditions to closing, the closing date, and other terms and conditions (each, a "Purchase Agreement").

6.    On or before the date that is 160 days after the Petition Date, Borrower shall have consummated one or more sales of all, or substantially all, of the assets of Borrower, pursuant to, and in accordance with, the terms of the Sale Order and the Purchase Agreement(s), and, except as provided in the DIP Order with respect to any sale transaction fees of Stout Risius Ross Advisors, LLC,  remitted all of the proceeds thereof to Lender for application in accordance with the terms of the Loan Documents (the consummation of such sales, the "Sale Closing").

**EXHIBIT B**

Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SUITABLE TECHNOLOGIES, INC.,[1] | Case No. 20-10432 (__) |
| Debtor. | **Ref. Docket No. _____** |

### INTERIM ORDER AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, (B) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING, AND (C) GRANT ADEQUATE PROTECTION AND PROVIDE SECURITY AND OTHER RELIEF

This matter came before this Court on the motion [Docket No. *] ("<u>Motion</u>") of Suitable Technologies, Inc. (the "<u>Debtor</u>"), a Delaware corporation, requesting that this Court enter an order authorizing, on an interim and final basis, the Debtor to (a) use certain Cash Collateral, (b) obtain senior secured superpriority postpetition financing, and (c) grant adequate protection and provide security and other relief to MagicHeart Investments, LLC ("<u>Lender</u>"), in its capacity as holder of the Prepetition Secured Promissory Notes, and as lender, under that certain Debtor-in-Possession Credit and Security Agreement between the Debtor and Lender attached to the Motion. Capitalized terms used but not defined herein have the meaning assigned to them in <u>Exhibit A</u> attached hereto.

This Order constitutes findings of fact and conclusions of law under Fed. R. Bankr. P. 7052 and will take effect and be fully enforceable as of the Petition Date.

Having examined the Motion, being fully advised of the relevant facts and circumstances surrounding the Motion, and having completed a hearing pursuant to Sections 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), and objections, if any,

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number is Suitable Technologies, Inc. (7816). The Debtor's headquarters are located at 921 East Charleston Road, Palo Alto, CA 94303.

having been withdrawn, resolved, or overruled by the Court, **THE MOTION IS GRANTED AS PROVIDED FOR HEREIN, AND THE COURT HEREBY FINDS THAT:**

A.      On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has retained possession of its property and continues to manage its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

B.      The Court has jurisdiction over the Chapter 11 Case and this proceeding under 28 U.S.C. § 1334.  Determination of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  Venue over the Motion is proper under 28 U.S.C. § 1409(a).

C.      As of the entry of this Order, no Committee has been appointed in this Chapter 11 Case.

D.      Subject to Paragraph 10 of this Order, the Debtor admits, stipulates, and agrees that:

1.      the Prepetition Secured Debt Documents evidence and govern the Prepetition Secured Debt, the Prepetition Liens, and the prepetition secured financing relationship between the Debtor and Lender;

2.      any Prepetition Secured Debt constitutes legal, valid, and binding obligations of the Debtor, enforceable in accordance with the terms of the Prepetition Secured Debt Documents, all of which are deemed to be reaffirmed by the Debtor;

3.      the Prepetition Unsecured Debt constitutes legal, valid, and binding obligations of the Debtor, enforceable in accordance with the terms of the Prepetition Unsecured Promissory Notes, all of which are deemed to be reaffirmed by the Debtor;

4.      as of the Petition Date, the Debtor is liable for the payment and performance of the Prepetition Secured Debt and the Prepetition Secured Debt is an allowed claim in an amount not less than $5,930,000, exclusive of accrued interest, fees, costs, other charges, and accrued and accruing Allowable 506(b) Amounts, and is an allowed secured claim with respect to all advances made under the Prepetition Secured Promissory Notes on and after November 27, 2019, in an amount not less than $2,155,000;

5.      as of the Petition Date, the Debtor is liable for the payment and performance of the Prepetition Unsecured Debt and the Prepetition Unsecured Debt is an allowed claim in an amount not less than $86,000,000, exclusive of accrued interest, fees, costs, and other charges;

6.      no offsets, defenses, or counterclaims to the Prepetition Secured Debt or Prepetition Unsecured Debt exist, and no portion of the Prepetition Secured Debt or Prepetition Unsecured Debt is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, or other claim, cause of action, or challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;

7.      the Prepetition Liens are Priority Liens, subject to Permitted Priority Liens and secure payment of all of the Prepetition Secured Debt;

8.      the Prepetition Liens securing the Prepetition Secured Debt are valid, subsisting, duly perfected and unavoidable as to all debt incurred by the Debtor under the Prepetition Secured Debt Documents from and after November 27, 2019; and

9.      the Debtor does not have, and hereby absolutely, unconditionally, and irrevocably releases, remises, and discharges, and is forever barred from bringing or asserting, any claims, defenses, or setoff rights with respect to, or in connection with, the

Prepetition Secured Debt Documents, the Prepetition Liens, or the Prepetition Secured Debt, or otherwise, against Lender and its successors and assigns, and its present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, advisors, principals, employees, consultants, agents, legal representatives, and other representatives; provided, however, that the foregoing does not apply to Scott Hassan solely in his capacity as a former director and officer of the Debtor.

E.      Lender has consented to the terms of this Order and is entitled to adequate protection as set forth herein pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code for any decrease in the value of its interests in the Prepetition Collateral from and after the Petition Date.

F.      The Debtor has agreed to remit Cash Collateral to Lender, and the Debtor needs to incur Postpetition Debt, as provided herein, through the conclusion of the Final Hearing in order to prevent immediate and irreparable harm to the Debtor's estate and to minimize disruption to its business. Entry of this Order will also enhance the possibility of maximizing the value of the Debtor's business in connection with an orderly sale or other disposition of the Aggregate Collateral.

G.      The Debtor is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code sufficient to finance its business. Except as provided below, the Debtor is unable to obtain credit allowable under Sections 364(c)(1), (c)(2), or (c)(3) of the Bankruptcy Code on terms more favorable than those offered by Lender.  An immediate need exists for the Debtor to obtain Postpetition Debt in order to continue its business and to administer and preserve the value of its estate.  The Debtor, as of the Petition Date, does not have sufficient cash resources to finance its business and requires the availability of working capital

from Postpetition Debt, the absence of which would immediately and irreparably harm the Debtor, its estate, and creditors.

H.      The terms of the Postpetition Debt have been negotiated, and the Postpetition Debt is being extended, in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

I.      The terms and conditions of the Postpetition Documents are fair and reasonable, the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.

J.      The Debtor represents that, with the exception of Lenders' Fees and Expenses, which are not included in the Budget and the DIP Commitment but shall nevertheless be (i) permitted to be paid by the Debtor as provided for herein and (ii) funded by Lender under the DIP Credit Agreement, the Budget contains a good faith estimate of all of the anticipated expenses that are reasonable and necessary for the continuation of the Debtor's business and the preservation of the Aggregate Collateral through the period for which the Budget runs, including any and all items potentially chargeable to Lender under Section 506(c) of the Bankruptcy Code.

K.      Under the circumstances of this Chapter 11 Case, this Order is a fair and reasonable response to the Debtor's request for Lender's consent to the use of Cash Collateral and the provision of Postpetition Debt, and the entry of this Order is in the best interest of the Debtor's estate and its creditors.

L.      The notice provided by the Debtor of the Motion, the hearing on the Motion, and the entry of this Order complies with the requirements of Bankruptcy Rules 2002, 4001(b) and (c), and 9014, Local Rules 2002-1 and 4001-2, and Sections 102(1), 363, and 364(c) and (d) of the Bankruptcy Code and is appropriate under the circumstances.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED AND THAT:**

1.  <u>Authorization to Use Cash Collateral</u>.  The Debtor is authorized to use Cash Collateral through the Termination Date solely in accordance with the terms of this Order.

2.  <u>Procedure for the Debtor's Use of Cash Collateral</u>.

(a)  <u>Remittance of All Cash Collateral to Lender</u>.  The Debtor must deposit all Cash Collateral now or hereafter in its possession or control into the Blocked Account (or otherwise remit such Cash Collateral to Lender in a manner satisfactory to Lender) promptly upon the Debtor's receipt thereof for application in accordance with Paragraph 2(d) of this Order.

(b)  <u>Account Debtors</u>.  Without further order of the Court, the Debtor shall, and Lender may, directly notify in writing all account debtors of existing and future accounts receivable of the Debtor and instruct all such account debtors to make payments directly into the Blocked Account.

(c)  <u>Cash Collateral in Lender's Possession</u>.  Lender is authorized to collect upon, convert to cash, and enforce checks, drafts, instruments, and any other forms of payment now or hereafter coming into Lender's possession or control that constitute Aggregate Collateral or proceeds thereof.

(d)  <u>Application of Cash Collateral</u>.  Except as Lender may otherwise elect in its discretion, Lender is authorized to apply all Cash Collateral now or hereafter in Lender's possession or control as follows: (1) first, to the payment of the Prepetition Secured Promissory Note Debt consisting of Allowable 506(b) Amounts, until Paid in Full; (2) second, to the payment of the Prepetition Secured Promissory Note Debt in accordance with the terms of the Prepetition Secured Debt Documents, until Paid in Full; (3) third, to the payment of

Postpetition Debt consisting of Lender Charges, until Paid in Full; and (4) fourth, to the payment of all other Postpetition Debt in accordance with the terms of the Postpetition Documents, until Paid in Full.  All such applications to Postpetition Debt shall be final and not subject to challenge by any Person, including, without limitation, the Debtor, the Committee, or any Trustee.  All such applications to the Prepetition Secured Promissory Note Debt shall be final, subject only to the rights of parties in interest under Paragraph 10 of this Order.  Any amounts that are determined by the Court as a result of any such objection or determination to have been improperly applied to the Prepetition Secured Debt will be first applied to pay Postpetition Debt consisting of Lender Charges and then to all other Postpetition Debt, dollar-for-dollar, until Paid in Full.

(e)    Prohibition Against Use of Cash Collateral.    Other than as provided for in the Postpetition Documents and this Order, the Debtor may not use, seek to use, or be permitted to use any Cash Collateral for any purpose until the Prepetition Secured Promissory Note Debt and Postpetition Debt are Paid in Full.

3.    Authorization To Incur Postpetition Debt.

(a)    Postpetition Documents.  The Debtor is authorized and has agreed to (1) execute the Postpetition Documents, including, without limitation, all documents that Lender finds reasonably necessary to implement the transactions contemplated by the Postpetition Documents, and (2) perform its obligations under, and comply with, all of the terms and provisions of the Postpetition Documents and this Order.  Upon execution and delivery thereof, the Postpetition Documents will constitute valid and binding obligations of the Debtor enforceable in accordance with their terms.  To the extent that there exists any conflict among the terms of the Motion, the Postpetition Documents, and this Order, this Order will govern and control.

(b)     <u>Permitted Uses of Postpetition Debt</u>.  The Debtor is authorized and has agreed to incur Postpetition Debt solely:  (1) in accordance with the terms and provisions of this Order; (2) to the extent required to pay those expenses enumerated in the Budget, including, without limitation, the Carveout and the Post-Termination Date Carveout, as and when such expenses become due and payable, subject to the Permitted Variance and the terms of the Postpetition Documents; (3) to pay Allowable 506(b) Amounts in connection with the Prepetition Secured Promissory Note Debt and Lender Charges; and (4) as expressly permitted pursuant to the Postpetition Documents.  Notwithstanding the foregoing, if Lender advances monies to the Debtor and the Debtor uses any such monies other than in accordance with the terms and provisions of this Order, then such advances will be considered to be Postpetition Debt for purposes of this Order.

(c)     <u>Delivery of Documentation</u>.  The Debtor shall deliver to Lender, counsel to Lender, and any financial advisors to Lender, all variance reports, Budgets, forecasts, and all other legal or financial documentation that are either (i) required to be provided by the Debtor to Lender pursuant to the DIP Credit Agreement or (ii) reasonably requested by Lender (or its legal and financial advisors).  All variance reports shall be delivered to counsel for Lender every two weeks via electronic mail.

(d)     <u>Refinancing of Certain Outstanding Prepetition Secured Debt Upon Entry of Final Order</u>.  Effective upon entry of the Interim Order, the Debtor is authorized and has agreed to incur Postpetition Debt under the DIP Credit Agreement to refinance, in full, an aggregate amount of the Prepetition Secured Debt equal to the amount of Prepetition Secured Promissory Note Debt.  Effective upon entry of the Final Order, the Debtor is authorized and has agreed to incur Postpetition Debt under the DIP Credit Agreement to refinance, in full, the aggregate amount of all advances made on or after November 27, 2019, in connection with the

Prepetition Secured Debt Documents. Such refinancing of such portion of the Prepetition Secured Debt upon entry of the Interim Order or Final Order, as applicable, will be final, subject only to the rights of parties under Paragraph 10 of this Order. Any amounts that are disgorged in connection with any objection or determination pursuant to Paragraph 10 of this Order will be first applied to pay Postpetition Debt consisting of Lender Charges and then to all other Postpetition Debt in accordance with Paragraph 2(d) of this Order, dollar-for-dollar, until Paid in Full.

(e)      Certain Additional Material Terms of Postpetition Debt.

(i)      Maximum Amount. The maximum principal amount of Postpetition Debt outstanding may not at any time exceed the DIP Commitment, subject to the terms and conditions of the DIP Credit Agreement.

(ii)      Interest. (A) Each Loan (as defined in the DIP Credit Agreement) will bear interest at a per annum rate equal to 5%.

(iii)      Contingent Obligations. Upon the entry of the Interim Order, the Prepetition Secured Promissory Note Debt will be deemed to be assumed by the Debtor and reissued by the Debtor under the Postpetition Documents as Postpetition Debt. All of the "Obligations", as defined in the Prepetition Secured 2020 Promissory Note, will be deemed to be assumed by the Debtor and incurred under the Postpetition Documents as Postpetition Debt upon entry of the Interim Order. Upon the entry of the Final Order, any advances made on or after November 27, 2019, in connection with the Prepetition Secured Debt Documents will be deemed to be assumed by the Debtor and reissued by the Debtor under the Postpetition Documents as Postpetition Debt; provided, however that this shall not include any interest, fees, penalties or other costs attributable to any advances made under the Prepetition Secured Debt Documents on or before November 26, 2019 regardless of when such interest, fees, penalties or other costs accrued. To the extent provided for in this Order, all of the "Obligations", as defined in the applicable Prepetition Secured Debt Documents, will be deemed to be assumed by the Debtor and incurred under the Postpetition Documents as Postpetition Debt upon entry of the Final Order.

(iv)      Maturity. The Postpetition Debt will mature and be due and payable in full by the earlier of (x) the date that is six (6) months after the entry of the Final Order by the Bankruptcy Court, (y) the effective date of a Chapter 11 plan in the Chapter 11 Case and (z) the Termination Date.

(v)      Prepetition Documents. Each Prepetition Third Party Document and other Prepetition Secured Debt Document will remain in full force and effect notwithstanding the entry of this Order and any subsequent orders amending

this Order or otherwise providing for the use of any Cash Collateral consented to by Lender pursuant to Section 363 of the Bankruptcy Code or additional financing by Lender pursuant to Section 364 of the Bankruptcy Code; provided, however, that nothing in this Order is intended or shall be deemed to prohibit the Debtor from seeking to reject any executory contracts or unexpired leases pursuant to Section 365 of the Bankruptcy Code.

   (f)  <u>Superpriority Administrative Expense Status; Postpetition Liens</u>.

The Postpetition Debt is hereby granted superpriority administrative expense status under Section 364(c)(1) of the Bankruptcy Code, with priority over all costs and expenses of administration of the Chapter 11 Case that are incurred under any provision of the Bankruptcy Code other than the Carveout and the Post-Termination Date Carveout.  In addition, Lender is hereby granted the Postpetition Liens to secure the Postpetition Debt in the Postpetition Collateral.  The Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) are, by this Order hereby deemed to be, and shall be for all purposes, properly perfected, valid, and enforceable liens without any other or further action by the Debtor or Lender, and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, title notation, or other document or instrument; (3) under Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, are Priority Liens (subject only to Permitted Priority Liens) without any further action by the Debtor or Lender, and without the execution, delivery, filing, or recordation of any financing statements, security agreements, control agreements, title notations, mortgages, or other documents or instruments; (4) will not be subject to any security interest or lien that is avoided and preserved under Section 551 of the Bankruptcy Code; (5) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Case; (6) will not be subject to Section 510(c) of the Bankruptcy Code; (7) shall rank junior to the Carveout and the Post-Termination Date Carveout; and (8) upon entry of the Final Order, will not be subject to any non-consensual statutory liens as described in Section 546(b) of the Bankruptcy Code.  Without limiting the foregoing, the Debtor

must deliver to Lender any such financing statements, security agreements, control agreements, mortgages, title notations, and other documents and instruments as Lender may request from time to time in its discretion.  In addition, all Prepetition Third Party Documents will be deemed to be for the benefit of Lender without any further order of Court or action by any Person. Without limiting the foregoing, Lender has, and will be deemed to have, a perfected Postpetition Lien on all existing deposit accounts of the Debtor and any new deposit account that the Debtor may establish on or after the date hereof without any further action by the Debtor or Lender.

(g)    Prohibition Against Additional Debt.  The Debtor may not incur or seek to incur debt secured by a lien which is equal to, or superior to, the Prepetition Liens or the Postpetition Liens, or that is given superpriority administrative expense status under Section 364(c)(1) of the Bankruptcy Code, unless, in addition to the satisfaction of all requirements of Section 364 of the Bankruptcy Code:  (1) Lender has consented to such order; (2) at the time such an order is entered, there is no Postpetition Debt outstanding, and no obligation of Lender to extend Postpetition Debt; or (3) such credit or debt is first used to, and is sufficient to, cause the Aggregate Debt to be Paid in Full.

4.    Adequate Protection of Interests of Lender in the Prepetition Collateral and the Prepetition Liens.  Lender has consented to the terms of this Order and is entitled to adequate protection as set forth herein and to the extent required under Sections 361, 362, 363, or 364 of the Bankruptcy Code for any decrease in the value of such interests in the Prepetition Collateral from and after the Petition Date on account of the stay, use, sale, lease, license, grant, or other disposition of any Prepetition Collateral.

(a)    Priority of Prepetition Liens; Allowance of Lender's Claim. Subject to the terms of Paragraph 10 of this Order: (1) the Prepetition Liens constitute Priority Liens, subject only to the Carveout and the Post-Termination Date Carveout, the Postpetition

Liens and the Permitted Priority Liens; (2) the Prepetition Secured Debt constitutes the legal, valid, and binding obligation of the Debtor, enforceable in accordance with the terms of the Prepetition Secured Debt Documents; (3) no offsets, defenses, or counterclaims to the Prepetition Secured Debt exist, and no liens securing the Prepetition Secured Debt in connection with advances under the Prepetition Secured Promissory Notes after November 27, 2019, are subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (4) Lender's claim with respect to the Prepetition Secured Debt is for all purposes an allowed claim within the meaning of Section 506 of the Bankruptcy Code, exclusive of accrued and accruing Allowable 506(b) Amounts.

(b)    <u>Replacement Liens</u>.    Subject to the Carveout and the Post-Termination Date Carveout, Lender is hereby granted the Replacement Liens as security for the complete payment and performance of the Prepetition Secured Debt.  The Replacement Liens: (1) are in addition to the Prepetition Liens; (2) are, by this Order hereby deemed to be, and shall be for all purposes, properly perfected, valid, and enforceable liens without any other or further action by the Debtor or Lender, and without the execution, filing, or recordation of any financing statement, security agreement, control agreement, mortgage, title notation, or other document or instrument; and (3) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Case.  Without limiting the foregoing, the Debtor is authorized to, and must, execute and deliver to Lender any such financing statements, security agreements, control agreements, mortgages, title notations and other documents and instruments as Lender may request from time to time in its discretion in respect of the Replacement Liens.

(c)    <u>Allowed Section 507(b) Claim</u>.  If and to the extent the adequate protection of the interests of Lender in the Prepetition Collateral granted pursuant to this Order proves insufficient, Lender will have an allowed claim under Section 507(b) of the Bankruptcy

Code, subject to the Carveout and the Post-Termination Date Carveout, in the amount of any such insufficiency, with priority over (1) any and all costs and expenses of administration of the Chapter 11 Case (other than Lender's claims under Section 364 of the Bankruptcy Code) that are incurred under any provision of the Bankruptcy Code and (2) the claims of any other party in interest under Section 507(b) of the Bankruptcy Code.

(d)     Cash Consideration.  As further adequate protection of the interests of Lender in the Prepetition Collateral, unless Lender may otherwise subsequently agree in writing in its discretion, any sale or other disposition of all or any portion of the Aggregate Collateral outside of the ordinary course of the Debtor's business must be for cash consideration until the Aggregate Debt has been Paid in Full pursuant to the Prepetition Secured Debt Documents and the Postpetition Documents.

5.     Termination Date; Rights and Remedies.

(a)     Effect of Termination Date.  Unless extended by the Court upon the written agreement of Lender, upon the Termination Date without further notice or order of Court, and subject to the terms of this Order with respect to the Carveout and the Post-Termination Date Carveout: (1) the Debtor's authorization to use Cash Collateral and to incur Postpetition Debt hereunder will automatically terminate; and (2) at Lender's election (i) the Postpetition Debt will be immediately due and payable in full in cash, (ii) the Debtor will be prohibited from using any Cash Collateral for any purpose other than for application to the Aggregate Debt in accordance with Paragraph 2(d) of this Order, and (iii) Lender will be entitled to setoff any and all Cash Collateral in its possession or control and apply such Cash Collateral to the Aggregate Debt in accordance with Paragraph 2(d) of this Order.

(b)     Rights and Remedies.  On the fifth (5th) business day after the Termination Date, at Lender's election without notice or further order of the Court:  (1) Lender

will have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral (without regard to the passage of time provided for in Bankruptcy Rule 4001(a)(3)), and will be entitled to exercise all rights and remedies available to it under the Prepetition Secured Debt Documents, the Postpetition Documents, and applicable nonbankruptcy law; and (2) the Debtor must surrender the Aggregate Collateral promptly upon Lender's written demand and will not interfere in any manner with Lender in the exercise of Lender's rights and remedies under the Prepetition Secured Debt Documents, the Postpetition Documents, and applicable nonbankruptcy law, and the Debtor will file a motion to retain one or more agents to sell, lease, or otherwise dispose of the Aggregate Collateral upon the written request of, and subject to terms and conditions acceptable to, Lender.  The costs of such agent(s), including, without limitation, the costs related to filing the retention motion(s) shall be paid by Lender.  Notwithstanding the foregoing, during the five (5) business day period following the Termination Date, the Debtor, any Committee, and the United States Trustee may seek an order of this Court determining that an Event of Default alleged to have given rise to the Termination Date did not occur or seek other appropriate relief; provided, however, that during such five (5) business day period, and subject to the terms of this Order with respect to the Carveout, the Post-Termination Date Carveout, and the funding under the DIP Credit Agreement of Lenders' Fees and Expenses, Lender will have no obligation whatsoever to advance any Postpetition Debt to the Debtor or allow the use of the Cash Collateral.  For the avoidance of doubt, notwithstanding the foregoing, the Debtor shall be permitted to fund and make payments from the Professional Fee Escrow (as defined below) as provided for in this Order.

(c)     Access to Aggregate Collateral.  Upon the entry of the Final Order, notwithstanding anything to the contrary herein or in any Prepetition Third Party Document or Postpetition Document, upon written notice to the landlord of any of the Debtor's leased

premises that an Event of Default has occurred and is continuing, Lender may elect to (but will not be obligated to) enter upon any such leased premises for the purpose of exercising any right or remedy with respect to the Aggregate Collateral located thereon and will be entitled to the Debtor's rights and privileges under such lease without any interference from such landlord; provided, however, that Lender shall pay to such landlord rent first accruing after the date on which Lender commences occupancy of the leased premises, calculated on a per diem basis at the nondefault rate of rent, solely for the period during which Lender actually occupies such leased premises.

6.      Carveout; Professional Fee Escrow.

(a)      Carveout Terms.  For purposes of this Order, "Carveout" shall mean the sum of: (i) all fees required to be paid to the clerk of the Court (including fees and expenses of the noticing and claims agent) and statutory fees payable to the U.S. Trustee under Section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) for the Chief Restructuring Officer and Independent Director, $1,500,000 to pay any current or future Indemnity Obligations; (iii) for each Carveout Professional, an aggregate amount not to exceed the lesser of (A) the aggregate amount provided in the applicable line item in the Budget for such Carveout Professional for the period commencing on the Petition Date and ending on the Termination Date and (B) the aggregate amount of allowed fees and expenses that accrued during the period commencing on the Petition Date and ending on the Termination Date; provided, however, that such amount for each Carveout Professional will be reduced dollar-for-dollar by (1) any payments of fees and expenses to such Carveout Professional during the period commencing on the Petition Date and ending on the Termination Date and (2) the amount of any remaining Specified Retainer held by such Carveout Professional as of the Termination Date.  In addition to the Carveout, upon the Termination Date, Lender shall provide Postpetition Debt to

the Debtor, to be used by the Debtor for the sole purpose of funding Carveout Professionals for fees and expenses first incurred after the Termination Date, in the aggregate amount of $100,000 for Carveout Professionals retained by the Debtor (minus the amount of any remaining Specified Retainers held by such Carveout Professionals as of the Termination Date not previously applied to the fees and expenses of such Carveout Professionals set forth in clause (iii) above) and in the aggregate amount of $25,000 for Carveout Professionals retained by any Committee (the "Post-Termination Date Carveout").  Lender has, and will retain, the continuing right from time to time, in its discretion, to reserve against the DIP Commitment and availability in respect of all of the Carveout obligations, including, without limitation, by establishing one or more "Reserves" (as such term is defined in the DIP Credit Agreement) under the DIP Credit Agreement.  Except as set forth in this Order, Lender will not have any obligation to fund any fees, costs, expenses, or any other amounts of any Carveout Professional accrued at any time on, prior to, or after the Termination Date.  After the occurrence of the Termination Date, any surplus portion of any prepetition or postpetition retainers of any Carveout Professional (including any Specified Retainer) that may remain after the payment of all allowed Carveout and Post-Termination Date Carveout amounts payable to such Carveout Professional shall be returned to Lender within three (3) business days after the date on which all such allowed Carveout and Post-Termination Date Carveout amounts were first paid in full for application in accordance with Paragraph 2(d) of this Order.  Nothing contained herein constitutes, or may be construed to be, consent by any Person to the allowance of any fees, costs, expenses, or other amount of any Carveout Professional, and shall not affect the rights of the Debtor, Lender, any Committee, the United States Trustee, or any other party in interest to object to the allowance or payment of any amounts incurred or requested.

(b)     <u>Carveout Usage</u>.  No portion of the Carveout or Post-Termination Date Carveout (including the Professional Fee Escrow) and no Postpetition Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any Person, including the Debtor, any Committee, or any Carveout Professional, in connection with claims or causes of action adverse (or which claim an interest adverse) to Lender, or any of its affiliates, or any of its respective rights or interests in the Aggregate Collateral, the Postpetition Documents, or the Prepetition Secured Debt Documents, including, without limitation, (1) preventing, hindering, or delaying Lender's enforcement or realization upon any of the Aggregate Collateral or the exercise of its rights and remedies under this Order, any Postpetition Document, any Prepetition Secured Debt Document, or applicable law, in each case, once an Event of Default has occurred, (2) using or seeking to use any Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral without Lender's written consent, or (3) objecting to, or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any Aggregate Debt, any Prepetition Secured Debt Document, any Postpetition Document, or any mortgages, liens, or security interests with respect thereto or any other rights or interests of Lender, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against Lender; <u>provided</u>, <u>however</u>, that (i) the foregoing shall not apply to costs and expenses, in an aggregate amount not to exceed $15,000, incurred by the Committee's Carveout Professionals in connection with the investigation of a potential Challenge in accordance with Paragraph 10 of this Order, (ii) the Carveout (including the Professional Fee Escrow) may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation, and entry of this Order or any amendment hereto consented to by Lender, and (iii) the portion of the Carveout relating to the Indemnity Obligations may be utilized in any of the restricted actions

or proceedings listed above against Lender, or any of its affiliates, or any of its rights or interests, if incurred by the Chief Restructuring Officer or the Independent Director if either or both of them are a party (or threatened to be made a party) to such action or proceeding, or if either must respond to a subpoena or any discovery, or take part in any way in any hearing, trial, or other matter in such action or proceeding.

7.    Carveout Procedure.   The Debtor shall, upon written request of Lender, provide to Lender a written report ("Carveout Report") disclosing its then current good faith estimate of the aggregate amount of unpaid professional fees, costs, and expenses accrued or incurred by the Carveout Professionals through the date of the Carveout Report.   Nothing herein may be construed as consent by Lender to the allowance of any fees, costs, or expenses of the Carveout Professionals or will affect Lender's right to object to the allowance and payment of any such fees, costs, or expenses, or Lender's right to the return of any portion of the Carveout that is funded with respect to fees, costs, and expenses for a Carveout Professional that are approved on an interim basis, but that are later denied on a final basis.   No Carveout Professional will be entitled to any portion of the Carveout allocated for any other Carveout Professional in the Budget.   Any Indemnity Obligations existing at any point now or in the future shall be funded either based on the agreement of Lender and the Chief Restructuring Officer and the Independent Director, or if no such agreement can be reached, as directed by the Court after notice and a hearing (or by any other court of competent jurisdiction if this Court no longer has jurisdiction).

8.    Funding of Professional Fee Reserve Account.   The Debtor is authorized to wire transfer funds, on a weekly basis, to the Young Conaway client trust account in an amount equal to, but not to exceed, the amounts set forth in the "CRO and Additional Personnel" and "Restructuring Professional Fees" line items of the Budget for each such week (the

"Professional Fee Escrow").  The Debtor may only fund the Professional Fee Escrow (i) prior to the Termination Date, up to, but not to exceed, the amounts set forth in the "CRO and Additional Personnel" and "Restructuring Professional Fees" line items of the Budget for each week prior to the Termination Date, and (ii) after the Termination Date, up to, but not to exceed, an amount equal to (x) the "CRO and Additional Personnel" and "Restructuring Professional Fees" line items of the Budget for the week in which the Termination Date occurs (but only to the extent not previously funded) plus (y) the amount of the Post-Termination Date Carveout.  No Cash Collateral shall be transferred to or deposited into the Professional Fee Escrow in a manner or amount that is inconsistent with the Budget or other than in accordance with the terms of this Order.  Except as provided in this Order, including with respect to the Post-Termination Date Carveout, on and after the Termination Date, no funds of the Debtor (including Cash Collateral) shall be transferred or deposited into the Professional Fee Escrow.

9.    No Surcharge.  Subject to entry of the Final Order, there shall be no surcharge of the Aggregate Collateral for any purpose unless agreed to in writing by Lender, and effective upon entry of the Final Order, the Debtor (or any Trustee), on behalf of its estate, will be deemed to have waived any and all rights, benefits, or causes of action under Section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of Section 552 of the Bankruptcy Code, and under any other legal or equitable doctrine (including, without limitation, unjust enrichment) as they may relate to, or be asserted against, Lender or any of the Aggregate Collateral.

10.    Reservation of Rights; Bar of Challenges and Claims.  The stipulations and representations contained in this Order, including, without limitation, in Paragraph D, will be binding on all Challenge Parties and all other parties in interest, unless (a) a Challenge Party has timely commenced an adversary proceeding or other appropriate contested matter during the

Investigation Period against Lender in connection with matters related to the Prepetition Secured Debt Documents, the Prepetition Secured Debt, the Prepetition Unsecured Debt, the Prepetition Unsecured Promissory Notes, the Prepetition Liens and the Prepetition Collateral, including by (i) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Debt, the Prepetition Unsecured Debt, or Prepetition Liens, or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Secured Debt, Prepetition Unsecured Debt, Prepetition Liens or prepetition acts or omissions of Lender (a "Challenge Proceeding"), and (b) there is a final, non-appealable order in favor of the Challenge Party sustaining any Challenge Proceeding in any such timely filed adversary proceeding or contested matter; provided that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such Challenge and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred.  For the avoidance of doubt, a Challenge Party's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to the Challenge Party commencing the Challenge Proceeding (and such Challenge shall be limited to the Challenge identified with specificity prior to the expiration of the Challenge Period).

(a)  Challenge Procedure.  If a Challenge Party identifies a basis to assert a Challenge within the Investigation Period, then it must notify the Debtor and Lender in writing during the Investigation Period of its demand that the Debtor initiate a Challenge Proceeding in this Chapter 11 Case in respect of such Challenge.  From the date that the Debtor and Lender receive such written notice, the Debtor will then have five (5) business days to notify the Challenge Party of whether the Debtor intends to initiate any such Challenge Proceeding and

seven (7) business days to initiate any such Challenge Proceeding.  If the Debtor notifies such Challenge Party that the Debtor does not intend to initiate a Challenge Proceeding, then such Challenge Party will have five (5) business days from the receipt of such notice to file a motion with the Court for leave to initiate a Challenge Proceeding in respect of such Challenge.  Nothing herein grants standing in favor of any Challenge Party absent further order of this Court.  The Debtor, if timely notified of a potential Challenge, will retain authority to prosecute, settle, or compromise any such Challenge in the exercise of its business judgment and subject to any applicable further order of the Court.  Nothing in this paragraph shall affect or truncate the Investigation Period.

(b)    <u>Bar of Challenges and Claims</u>.  If no such Challenge Proceeding is timely commenced, then without further order of the Court, (1) the Prepetition Secured Debt, the Prepetition Unsecured Debt and the Prepetition Liens will be deemed to be allowed for all purposes in the Chapter 11 Case and will not be subject to any challenge whatsoever by any party in interest, including, without limitation, as to validity, extent, amount, perfection, priority, enforceability, or otherwise, and (2) the Debtor and its estate will be deemed to have absolutely, unconditionally, and irrevocably waived, released, and discharged Lender and its successors and assigns, and its present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, advisors, principals, employees, consultants, agents, legal representatives, and other representatives (solely in their capacities as such) of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature, and description whatsoever, that may have occurred on or prior to the date of entry of this Order with respect to, or in connection with, the Prepetition Secured Debt, the Prepetition Unsecured Debt, the Prepetition Liens, any of the Prepetition Secured Debt Documents, or any of the Prepetition

Unsecured Promissory Notes; _provided_, _however_, that the foregoing does not apply to Scott Hassan solely in his capacity as former director and officer of the Debtor.  If any Challenge Proceeding is timely commenced, the claims liens, and security interests of Lender shall nonetheless be deemed to be allowed as set forth in clause (1) of this paragraph and the waiver, releases, and discharge set forth in clause (2) shall nonetheless remain binding and preclusive on the Challenge Parties, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

11.     _Right to Credit Bid_.  In connection with a sale or other disposition of all or any portion of the Aggregate Collateral, whether under Bankruptcy Code sections 363, 1129 or otherwise, pursuant and subject to Section 363(k) of the Bankruptcy Code, (a) Lender will have the continuing right to use the amounts then outstanding under the Postpetition Debt, or any part thereof, to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral and (b) subject to Paragraph 10 of this Order, Lender will have the continuing right to use the amounts then outstanding under the Prepetition Secured Debt, or any part thereof, to credit bid with respect to any bulk or piecemeal sale of all or any portion of the Aggregate Collateral.  With respect to any such sale or other disposition of all or any portion of the Aggregate Collateral, and any auction and sale process relating thereto, Lender is, and will be deemed to be, a qualified bidder for all purposes under any sale and bidding procedures, and any order approving any bidding and sale procedures, and may attend and participate at any auction and any sale hearing, in each case, without regard to any of the requirements or conditions set forth therein and without any other or further action by Lender.

12.     _Plan_.  Unless Lender subsequently consents in writing, the Debtor will not seek entry of an order confirming any plan in the Chapter 11 Case unless the Aggregate Debt

shall be Paid in Full on the earlier of (a) the effective date of such plan and (b) the Termination Date.

13.     <u>Application of Sale Proceeds</u>.   Subject to the Carveout and the Post-Termination Date Carveout and payment of any sale transaction fees of Stout from the proceeds of any applicable sale or other disposition of all or any portion of the Aggregate Collateral in accordance with Stout's engagement agreement and any order of this Court approving Stout's retention application (a "<u>Stout Transaction Fee</u>"), all proceeds from any sales or any other dispositions of all or any portion of the Aggregate Collateral not in the ordinary course of the Debtor's business will be remitted to Lender for application to the Aggregate Debt, subject to Paragraph 2(d) of this Order.

14.     <u>Waiver of Right to Return/Consent to Setoff</u>.   Without the prior written consent of Lender, the Debtor will not agree or consent to any of the following: (a) to return any Aggregate Collateral pursuant to Section 546(h) of the Bankruptcy Code; or (b) to setoff pursuant to Section 553 of the Bankruptcy Code.

15.     <u>Tax Obligations</u>.   The Debtor will timely pay or remit, as applicable, all sales tax, payroll tax, and trust fund tax obligations under applicable law from time to time that are set forth in the Budget.

16.     <u>Indemnification of Lender</u>.   The Debtor will indemnify and hold harmless Lender, in accordance with the terms of the Prepetition Secured Debt Documents and Postpetition Documents.   The Debtor's indemnification obligations to Lender shall constitute Postpetition Debt.

17.     <u>No Marshaling</u>.   Upon entry of the Final Order, neither the Lender nor any of the Aggregate Collateral will be subject to the doctrine of marshaling.

18.     <u>Lender's Fees and Expenses</u>.    The Debtor is hereby authorized and directed to pay all such Lenders' Fees and Expenses in accordance with this Order and the Postpetition Documents, without need for filing any application with the Court for approval or payment thereof.  The invoices for the Lender's Fees and Expenses shall be provided to the Fee Notice Parties, and without the need for any further action of the Debtor, the submission of such invoices shall be considered a request for Borrowing by the Debtor to Lender for the amount of Lender's Fees and Expenses reflected therein, and such Lender's Fees and Expenses shall nevertheless be (i) permitted to be paid by the Debtor as provided for herein and (ii) funded by Lender under the DIP Credit Agreement notwithstanding the fact that such Lender's Fees and Expenses are not included in the Budget and the DIP Commitment.  The invoices to be provided to the Fee Notice Parties may contain reasonable detail, may contain redactions, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If no objections to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within the Fee Objection Period, then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtor.  If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtor.

19.     <u>Force and Effect of Prepetition Secured Debt Documents</u>.    Except as modified herein, and subject to the other provisions of this Order (including Paragraph 10 hereof) and the Bankruptcy Code, the Prepetition Secured Debt Documents and the Prepetition Third Party Documents will remain in full force and effect with respect to the Prepetition

Secured Debt.  To the extent that there exists any conflict among the terms of the Motion, the Prepetition Secured Debt Documents, the Prepetition Third Party Documents, and this Order, this Order governs and controls.

20.     <u>Modification of Stay</u>.    The automatic stay of Section 362 of the Bankruptcy Code is hereby modified with respect to Lender to the extent necessary to effectuate the provisions of this Order, including, without limitation, after the Termination Date to permit Lender to exercise its rights contemplated by, and subject to, Paragraph 5 above.

21.     <u>No Waiver</u>.  The Lender will not be deemed to have suspended or waived any of its rights or remedies under this Order, the Prepetition Secured Debt Documents, the Postpetition Documents, the Bankruptcy Code, or applicable non-bankruptcy law unless such suspension or waiver is hereafter made in writing, signed by a duly authorized officer of Lender and directed to the Debtor.  Lender's failure to require strict performance by the Debtor (or by any Trustee) of any provision of this Order will not waive, affect, or diminish any right of Lender thereafter to demand strict compliance and performance therewith, and no delay on the part of Lender in the exercise of any right or remedy under this Order, the Prepetition Secured Debt Documents, the Postpetition Documents, the Bankruptcy Code, or applicable non-bankruptcy law will preclude the exercise of any right or remedy.  Further, this Order does not constitute a waiver by Lender of any of its rights under the Prepetition Secured Debt Documents, the Bankruptcy Code, or applicable non-bankruptcy law, including, without limitation, its right to later assert: (a) that any of its interests in the Aggregate Collateral lack adequate protection within the meaning of Sections 362(d) or 363(e) of the Bankruptcy Code or any other provision thereof or (b) a claim under Section 507(b) of the Bankruptcy Code.

22.     <u>Responsible Person</u>.  By taking any actions pursuant to this Order, Lender will not be deemed to be (a) in control of the operations or liquidation of the Debtor or (b) acting

as a "responsible person" with respect to the operation, management, sale, or liquidation of the Debtor.

23.    Release.  Upon the date that the Postpetition Debt is Paid in Full and prior to the release of the Postpetition Liens, the Debtor, on behalf of its estate and itself, must execute and deliver to Lender and its successors and assigns, and its present and former affiliates, shareholders, subsidiaries, divisions, predecessors, members, managers, directors, officers, attorneys, employees, agents, advisors, principals, consultants, and other representatives (collectively, the "Releasees"), a general release of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature, and description, that the Debtor had, has, or hereafter can or may have against any of the Releasees, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, in equity, or otherwise, with respect to, or in connection with, the Prepetition Secured Debt, the Prepetition Unsecured Debt, the Prepetition Liens, any of the Prepetition Secured Debt Documents, or any of the Prepetition Unsecured Promissory Notes in respect of events that occurred on or prior to the date on which the Postpetition Debt is Paid in Full (collectively, the "Release"); provided, however, that the foregoing does not apply to Scott Hassan solely in his capacity as a former director and officer of the Debtor.  The Release shall not impair any continuing rights of the Chief Restructuring Officer or the Independent Director to funding of the Indemnity Obligations, including their future funding by access to the Aggregate Collateral via the Carveout.

24.    Amendments.  The Debtor and Lender may enter into amendments or modifications of the Postpetition Documents or the Budget without any further notice, hearing, or order of this Court; provided, however, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party in interest and (b) notice

of any such amendment or modification is filed with this Court and provided to any Committee and the United States Trustee.

25.     <u>Proof of Claim</u>.  Lender is not required to file a proof of claim with respect to any of the Prepetition Secured Debt or the Postpetition Debt and the stipulations and findings set forth in this Order constitute, for all purposes, a proof of claim in respect thereof.

26.     <u>Binding Effect</u>.  Except as provided in Paragraph 10 herein, this Order is binding on all parties in interest in the Chapter 11 Case and their respective successors and assigns. If, in accordance with Section 364(e) of the Bankruptcy Code, this Order does not become a final nonappealable order or if any of the provisions of this Order are hereafter modified, amended, vacated, or stayed by any subsequent order of this Court or any other court, such termination or subsequent order will not affect: (a) subject to Paragraph 10 of this Order, any of the agreements, stipulations, representations, or findings contained in this Order, or any of the relief granted by, or any of the releases contained in, this Order; and (b) the validity, extent, amount, perfection, priority, enforceability, or effectiveness of any lien, security interest, or other benefit or claim authorized hereby with respect to Cash Collateral remitted (subject to Paragraph 10 of this Order), or Postpetition Debt incurred, prior to the effective date of such termination or subsequent order.  All such liens, security interests, claims, and other benefits will be governed in all respects by the original provisions of this Order, and Lender will be entitled to all of the rights, remedies, privileges, and benefits granted herein, including, without limitation, the liens and priorities granted herein with respect to the Postpetition Debt.  Except as otherwise explicitly set forth in this Order, no third party is intended to be, or may be deemed to be, a third party beneficiary of this Order.

27.     <u>Survival</u>.  The provisions of this Order, and any actions taken pursuant to or in reliance upon the terms hereof, will survive entry of, and govern in the event of any conflict

with, any order that may be entered in the Chapter 11 Case: (a) confirming any chapter 11 plan, (b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Case, (d) after the occurrence of the Termination Date or an Event of Default, (e) withdrawal of the reference of the Chapter 11 Case from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court. The terms and provisions of this Order, including, without limitation, the rights granted to Lender under Sections 364(c) and (d) of the Bankruptcy Code, will continue in full force and effect until all of the Aggregate Debt is Paid in Full.

28.    <u>Notice of Final Hearing</u>.    The Final Hearing is scheduled for _____, at \_\_\_:\_\_\_ \_\_.m. (prevailing Eastern time), and may be continued from time to time without further notice other than that given in open court.  The Debtor is directed to serve a copy of this Order, in accordance with the Local Rules, on counsel for Lender, any Persons known by the Debtor to have asserted a lien or other interest in any of the Debtor's assets, the Debtor's twenty (20) largest unsecured creditors, all taxing authorities that have, or whom the Debtor believes may, assert claims against the Debtor or any of the Debtor's assets, and the United States Trustee, which service will constitute appropriate notice of the Final Hearing.  Any objection to the Final Order must be filed with the Court by _____, at 4:00 p.m. (prevailing Eastern time) and at the same time served upon:  (i) Suitable Technologies, Inc., Attn: Charles C. Reardon, Chief Restructuring Officer, c/o Asgaard Capital LLC, 1934 Old Gallows Rd., Suite 350, Tysons Corner, VA 22183 (creardon@asgaardcapital.com); (ii) proposed counsel for the Debtor, Young Conaway Stargatt and Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware, 19801, Attn: Robert S. Brady (rbrady@ycst.com) and Robert F. Poppiti, Jr. (rpoppiti@ycst.com); (iii) counsel for the Lender, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington,

DE 19801, Attn: Curtis S. Miller (cmiller@mnat.com); and (iv) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Juliet M. Sarkessian (juliet.m.sarkessian@usdoj.gov).

_____

United States Bankruptcy Judge

Dated:  February _____, 2020

**EXHIBIT A**

**DEFINED TERMS**

1.    ***Aggregate Collateral***.    Collectively, the Prepetition Collateral and the Postpetition Collateral.

2.    ***Aggregate Debt***.    Collectively, the Prepetition Secured Debt and the Postpetition Debt.

3.    ***Allowable 506(b) Amounts***.    To the extent allowable under Section 506(b) of the Bankruptcy Code, interest at the default rate of interest as set forth in Section 1.5(c) of the DIP Credit Agreement, all fees, costs, expenses, and other charges due or coming due under the specified Prepetition Secured Debt Documents or in connection with the specified Prepetition Secured Debt (regardless of whether such interest, fees, costs, expenses, and other charges are included in the Budget), and all costs and expenses at any time incurred by Lender in connection with: (a) the negotiation, preparation, and submission of this Order and any other order or document related hereto, and (b) the representation of Lender in the Chapter 11 Case, including, without limitation, in defending any Challenge.

4.    ***Bankruptcy Code***.    The United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as amended, and any successor statute.

5.    ***Blocked Account***.    Deposit account number ending -5446 maintained by the Debtor at Silicon Valley Bank or such other deposit account that Lender may subsequently agree to in writing.

6.    ***Budget***.    The "Budget" (as such term is defined in the DIP Credit Agreement) attached to this Order as Exhibit B, as amended, supplemented, or otherwise modified from time to time in accordance with the DIP Credit Agreement.

7.    ***Carveout Professionals***.    Collectively, (a) Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as counsel for the Debtor, (b) Charlie Reardon, as chief restructuring officer of the Debtor (the "Chief Restructuring Officer"), and such other personnel of Asgaard Capital LLC ("Asgaard") that will assist Mr. Reardon during the Chapter 11 Case, (c) Stout Risius Ross, LLC ("Stout"), as the Debtor's investment banker, for its fees and expenses in accordance with its engagement agreement, with the exception of the Stout Transaction Fee, which shall be paid from the proceeds of any applicable sale or other disposition of all or any portion of the Aggregate Collateral, (d) Ronald Barliant, as the Debtor's independent director (the "Independent Director"), and (e) such other professionals that are authorized by the Court to be retained by any Committee that are specifically identified in the Budget.

8.    ***Cash Collateral***.    All "cash collateral", as that term is defined in Section 363(a) of the Bankruptcy Code, in which Lender has an interest, all deposits subject to setoff rights in favor of Lender, and all cash arising from the collection or other conversion to cash of all or any portion of the Aggregate Collateral, including, without limitation, from the sale or other disposition of any inventory and the collection of any accounts receivable of the Debtor.

9.     ***Challenge***.  A claim or cause of action (a) challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Debt, Prepetition Unsecured Debt or Prepetition Liens or (b) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Secured Debt, Prepetition Unsecured Debt, Prepetition Liens or acts or omissions of Lender, brought by an Challenge Party in accordance with Paragraph 10 of this Order.

10.     ***Challenge Party***.  Any Committee, any Trustee, or other party in interest with the requisite standing under applicable law.

11.     ***Chapter 11 Case***.  The chapter 11 case or any superseding chapter 7 case of the Debtor.

12.     ***Committee***.  Any official creditors' committee appointed to represent unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

13.     ***DIP Commitment***.  $5,956,000 of the Commitments (as defined in the DIP Credit Agreement).

14.     ***DIP Credit Agreement***.  That certain Debtor-in-Possession Credit and Security Agreement dated as of February 26, 2020, between Suitable Technologies, Inc., as the Borrower and Debtor-in-Possession, and MagicHeart Investments, LLC, as Lender, as may be amended, modified, supplemented, replaced, or refinanced from time to time in accordance with the terms thereof.

15.     ***Event of Default***.  At Lender's election, the occurrence of any of the following: (a) the occurrence and continuance of any "Event of Default" (as defined in the DIP Credit Agreement) first arising after the Petition Date under the DIP Credit Agreement or any other Postpetition Document; (b) the Debtor fails to timely comply with the covenants or perform any of its obligations in strict accordance with the terms of this Order; (c) the Debtor, without the consent of Lender, uses, or seeks the use of, Cash Collateral other than in accordance with the terms of this Order; (d) the Debtor, without the written consent of Lender, files a motion to incur debt secured by a lien with priority equal to, or superior to, the Prepetition Liens or the Postpetition Liens or which is given superpriority administrative expense status under Section 364(c) of the Bankruptcy Code other than in accordance with the terms of this Order; (e) Charlie Reardon is no longer the chief restructuring officer of the Debtor for any reason (a "CRO Event"), and the Debtor has not selected and appointed a replacement chief restructuring officer reasonably acceptable to Lender, on terms acceptable to Lender, within five (5) business days after such CRO Event; (f) the Debtor files a motion to conduct a sale of all or any part of the Aggregate Collateral pursuant to Section 363 of the Bankruptcy Code on terms unacceptable to Lender; (g) the Debtor or other Person files a chapter 11 plan in the Chapter 11 Case under which the Aggregate Debt is not Paid in Full on the earlier of (i) the effective date of such plan or (ii) the Termination Date; (h) entry of any order authorizing any party in interest to reclaim any material Aggregate Collateral, granting any party in interest relief from the automatic stay with respect to any material Aggregate Collateral, or requiring that the Debtor turnover any material Aggregate Collateral, in each case, prior to the full, final, and indefeasible repayment of all of the Aggregate Debt; (i) any material representation or warranty made by the Debtor in any certificate, report, or financial statement delivered to Lender proves to have been false or

misleading in any material respect as of the time when made or given (including by omission of material information necessary to make such representation, warranty, or statement not misleading); (j) the Debtor files a motion in the Chapter 11 Case to dismiss or convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (k) the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (l) a Trustee is appointed or elected in the Chapter 11 Case, or an examiner with expanded powers, including to manage the Debtor's business, is appointed in the Chapter 11 Case; (m) commencement of any adversary proceeding or contested matter objecting to the extent, validity, amount, perfection, priority or enforceability of all or any portion of the Prepetition Secured Debt, Prepetition Secured Debt Documents, or Prepetition Liens by the Debtor or any other Person (provided, that, in the event that any Person (other than a Committee asserting a Challenge pursuant to Paragraph 10 hereof) other than the Debtor commences any such adversary proceeding or contested matter, the Debtor does not file a responsive pleading within twenty-one (21) days after the commencement date thereof to contest the same); (n) the Debtor's exclusivity period under Section 1121 of the Bankruptcy Code is terminated or shortened for any reason whatsoever; (o) any payment is made by the Debtor, or any adequate protection is granted by the Debtor, with respect to any indebtedness of the Debtor other than as provided in this Order or otherwise consented to in writing by Lender and approved by the Court; (p) the Debtor fails at any time to pay all undisputed accrued administrative expenses and other obligations when due in accordance with, and subject to, the Budget and the Postpetition Documents; (q) this Order is modified, amended, reversed, vacated, or stayed in any manner not consented to in writing by Lender; or (r) the Final Order is not entered within thirty-five (35) days following the entry of this Order in form and substance satisfactory to Lender.

16.    ***Fee Notice Parties***.  Counsel to the Debtor, the U.S. Trustee and counsel to any Committee.

17.    ***Fee Objection Period***.  Ten (10) calendar days after delivery of the applicable invoices to the Fee Notice Parties.

18.    ***Final Hearing***.  The final hearing on the Motion conducted in accordance with Fed. R. Bankr. P. 4001.

19.    ***Final Order***.  A final order authorizing the Debtor to use Cash Collateral and incur Postpetition Debt entered at, or in connection with, the Final Hearing.

20.    ***Indemnity Obligations***.  The fees, expenses, charges, claims, damages, or any amounts whatsoever incurred by the Chief Restructuring Officer or the Independent Director for which they may be indemnified by the Debtor under the Organizational Documents.

21.    ***Investigation Period***.  The period from the Petition Date until the date that is the earlier of (a) seventy-five (75) days after the entry of this Order and (b) sixty (60) days after the date that a Committee is formed, if any; provided, however, that (x) if the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, then any Trustee that is appointed in such case prior to the expiration of the periods described in subclauses (a) and (b) will have the benefit of any investigation period that may be remaining under the preceding sentence.

22.     **Lender**.   MagicHeart Investments, LLC, a California limited liability company.

23.     **Lender Charges**.   Interest at the applicable rate of interest under the DIP Credit Agreement and Lenders' Fees and Expenses.

24.     **Lenders' Fees and Expenses**.   All fees, costs, expenses, and other charges incurred prepetition by Lender, or any legal and financial advisors of Lender, or as provided for in the DIP Credit Agreement at any time in connection with the documentation, negotiation, administration, and enforcement of the DIP Credit Agreement, this Order or the Final Order (regardless of whether any such fees, costs, expenses, interest, and other charges are included in the Budget)

25.     **Obligations**.   The "Obligations," as that term is defined in the DIP Credit Agreement.

26.     **Organizational Documents**.   Collectively, the Certificate of Incorporation of Suitable Technologies, Inc. dated January 19, 2011 (as renewed and revived by that certain Certificate for Renewal and Revival of Chapter dated November 19, 2014) and the Bylaws of Suitable Technologies, Inc. dated January 21, 2011.

27.     **Paid in Full**.   With respect to the Postpetition Debt or the Prepetition Secured Debt, as applicable, and except as otherwise agreed to in writing by Lender: (a) the termination of the DIP Credit Agreement and the other Postpetition Documents or the Prepetition Secured Promissory Notes and the other Prepetition Secured Debt Documents, as applicable; (b) the indefeasible payment in full in cash of all Postpetition Debt or Prepetition Secured Debt, as applicable, together with all accrued and unpaid interest and fees thereon; (c) all commitments under the DIP Credit Agreement or commitments under the Prepetition Secured Promissory Notes or other Prepetition Secured Debt Documents, as applicable, shall have terminated or expired; (d) the indefeasible payment or repayment in full in cash of any and all other "Obligations" (as defined in the Prepetition Secured 2020 Promissory Note), if applicable, including, without limitation, the payment of any termination amount then applicable; (e) Lender shall have received cash collateral in such amount as Lender deems is reasonably necessary to secure Lender in respect of any asserted or threatened claims, losses, demands, actions, suits, proceedings, investigations, liabilities, fines, fees, costs, expenses (including attorneys' fees and expenses), penalties, or damages for which Lender may be entitled to indemnification or reimbursement by the Debtor pursuant to the terms of the DIP Credit Agreement, the other Postpetition Documents, the Prepetition Secured Promissory Notes, or the other Prepetition Secured Debt Documents.

28.     **Permitted Priority Liens**.   Collectively, (a) the Carveout and the Post-Termination Date Carveout, and (b) liens in favor of third parties upon the Prepetition Collateral, which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law to the Prepetition Liens, and (3) are non-avoidable, valid, properly perfected, and enforceable as of the Petition Date.

29.     **Permitted Variance**.   The Debtor and MagicHeart will not permit the percentage variance of any line item in any Budget, as such percentage variances are reflected in

certain variance reports provided to Lender every two weeks, to be less than 90% of the budgeted receipts or greater than 110% of the budgeted disbursements.

30. ***Person***. Any individual, partnership, limited liability company, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or any other entity whatsoever.

31. ***Petition Date***. February 26, 2020.

32. ***Postpetition Collateral***. All of the real property and personal property of the Debtor of any description whatsoever, wherever located, and whenever arising or acquired, including, without limitation, any and all accounts, books, cash (including, without limitation, all Cash Collateral, cash deposits, and all cash proceeds held in escrow), cash equivalents, chattel paper, commercial tort claims, deposits, deposit accounts, documents, equipment, fixtures, goods, general intangibles, instruments, intellectual property, intellectual property licenses, inventory, investment property, leasehold interests, negotiable collateral, and supporting obligations, and all proceeds, rents, issues, profits, and products, whether tangible or intangible, of any and all of the foregoing, including, without limitation, any and all proceeds of insurance covering any of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto. Notwithstanding the foregoing, Postpetition Collateral shall not include any claims and causes of action under chapter 5 of the Bankruptcy Code, including, without limitation, Sections 542, 544, 545, 547, 548, 549, 550, 551, and 553, and all proceeds thereof.

33. ***Postpetition Debt***. All of the indebtedness and obligations of the Debtor to Postpetition Lender and the other Postpetition Secured Parties incurred on or after the Petition Date pursuant to this Order or otherwise, including, without limitation, all Obligations and any advances made by Postpetition Lender to pay all or any portion of the Carveout and the Post-Termination Date Carveout, and all Prepetition Secured Debt refinanced as postpetition debt under this Order.

34. ***Postpetition Documents***. Collectively, the DIP Credit Agreement and all of the other "Loan Documents" (as defined in the DIP Credit Agreement), in each case, as amended, supplemented, or otherwise modified from time to time.

35. ***Postpetition Liens***. Priority Liens in the Aggregate Collateral, subject only to Permitted Priority Liens.

36. ***Prepetition Collateral***. Collectively, all of the "Collateral" (as that term is defined in the Prepetition Secured 2020 Promissory Note), existing as of the Petition Date, and any and all proceeds, rents, issues, profits, and products thereof.

37. ***Prepetition Liens***. Lender's security interests in, and liens on, the Prepetition Collateral under the Prepetition Secured Debt Documents, subject only to Permitted Priority Liens.

38. ***Prepetition Secured Debt***. (a) All of the indebtedness and obligations under the Prepetition Secured Debt Documents as of the Petition Date, including, without limitation, all "Obligations" (as such term are defined in the Prepetition Secured 2020

Promissory Note), and all fees, costs, interest, expenses, and other charges as and when due and payable pursuant to the Prepetition Secured Debt Documents, plus (b) all Allowable 506(b) Amounts.

39. ***Prepetition Secured Debt Documents***. Collectively, the Prepetition Security Agreement, the Prepetition Secured Promissory Notes and any and all other collateral documents and ancillary agreements related to any of the Prepetition Secured Promissory Notes, in each case, as amended, supplemented, or otherwise modified from time to time.

40. ***Prepetition Secured Promissory Note Debt***. (a) All of the indebtedness and obligations under the Prepetition Secured 2020 Promissory Note as of the Petition Date, including, without limitation, all "Obligations" (as such term are defined in the Prepetition Secured 2020 Promissory Note), and all fees, costs, interest, expenses, and other charges as and when due and payable pursuant to the Prepetition Secured 2020 Promissory Note and related "Collateral Documents", plus (b) all Allowable 506(b) Amounts.

41. ***Prepetition Security Agreement***. That certain Security Agreement dated as of January 20, 2020, by and between the Debtor and Lender, as amended, supplemented, or otherwise modified from time to time.

42. ***Prepetition Secured 2020 Promissory Note***. That certain Secured Line of Credit Promissory Note dated January 20, 2020 between the Debtor and Lender.

43. ***Prepetition Secured Promissory Notes***. Collectively, the Prepetition Secured 2020 Promissory Note, that certain Secured Promissory Note dated January 14, 2019 between the Debtor and Lender, and that certain Secured Line of Credit Promissory Note dated October 22, 2019 between the Debtor and Lender.

44. ***Prepetition Third Party Documents***. Collectively, any deposit account control agreements, leases, licenses, landlord agreements, warehouse agreements, bailment agreements, insurance policies, contracts or other similar agreements or documents of the Debtor in which Lender has an interest.

45. ***Prepetition Unsecured Debt***. All of the indebtedness and obligations of the Debtor under the Prepetition Unsecured Promissory Notes as of the Petition Date, including, without limitation, all fees, costs, interest, expenses, and other charges as and when due and payable pursuant to the applicable unsecured promissory notes.

46. ***Prepetition Unsecured Promissory Notes.*** Collectively, any unsecured promissory note between Lender or its affiliates, including, but not limited to, Greenheart Investments, LLC, and the Debtor entered into prior to the Petition Date.

47. ***Priority Liens***. Liens which are first priority, properly perfected, valid, and enforceable security interests, that are not subject to any claims, counterclaims, defenses, setoff, recoupment, or deduction, and that are otherwise unavoidable and not subject to recharacterization or subordination pursuant to any provision of the Bankruptcy Code, any agreement, or applicable non-bankruptcy law.

48.     ***Replacement Liens***.  Priority Liens in the Postpetition Collateral granted to Lender pursuant to this Order, subject only to the Carveout and the Post-Termination Date Carveout, the Postpetition Liens and the Permitted Priority Liens.

49.     ***Specified Retainers***.  Collectively, the professional fee retainers held and maintained by each of Young Conaway, as counsel for the Debtor, Charlie Reardon and Asgaard, as the Debtor's chief restructuring officer, and Stout, as the Debtor's investment banker, in each case, in an amount not to exceed the following retainer amounts: $150,000 for Young Conaway; $125,000 for Asgaard; and $50,000 for Stout; provided, that all such retainer funds shall in each case be used solely to pay the allowed Carveout and Post-Termination Date Carveout amounts of the Carveout Professional holding such funds under, and subject to, the Carveout, the Post-Termination Date Carveout, and the terms of this Order.

50.     ***Termination Date***.  At Lender's election, the earliest to occur of:  (a) the date on which Lender provides, via facsimile, electronic mail, or overnight mail, written notice to counsel for the Debtor, counsel for any Committee, and the United States Trustee of the occurrence and continuance of an Event of Default; (b) the date that is thirty-five (35) days following the entry of this Order if the Final Order is not entered in form and substance reasonably satisfactory to Lender by such date; (c) the date of the Final Hearing, if this Order is modified at the Final Hearing in a manner reasonably unacceptable to Lender; (d) the closing date of the sale of all or substantially all of the assets of the Debtor; (e) the date on which the Aggregate Debt is Paid in Full; and (f) August 4, 2020.

51.     ***Trustee***.  Any trustee appointed or elected in the Chapter 11 Case.

## **EXHIBIT B**

**Budget**

[*See attached.*]

**Suitable Technologies, Inc.**
Cash Forecast
DIP Budget

| | | (a) Feb 26-29 | W/E 3/7 | W/E 3/14 | W/E 3/21 | W/E 3/28 | W/E 4/4 | W/E 4/11 | W/E 4/18 | W/E 4/25 | W/E 5/2 | W/E 5/9 | W/E 5/16 | W/E 5/23 | W/E 5/30 | 13 Weeks Ending 5/30 | M/E 6/27 (4 weeks) | M/E 7/31 (5 weeks) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | (b) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Cash Receipts** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRO and Additional Personnel | (c) | 34,800 | 83,275 | 69,200 | 53,575 | 58,100 | 70,050 | 43,050 | 43,050 | 43,050 | 39,600 | 31,450 | 31,450 | 42,775 | 50,275 | 693,700 | 119,100 | 205,125 | 1,017,925 |
| Independent Director Fees | | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 20,000 | 0 | 0 | 0 | 0 | 60,000 | 20,000 | 20,000 | 100,000 |
| Independent Contractors | (d) | 0 | 182,848 | 5,000 | 5,000 | 5,000 | 149,848 | 0 | 0 | 0 | 134,848 | 0 | 0 | 0 | 0 | 487,816 | 119,848 | 119,848 | 727,512 |
| Utilities | (e) | 9,600 | 17,541 | 0 | 0 | 0 | 7,800 | 0 | 0 | 0 | 7,800 | 0 | 0 | 0 | 0 | 42,741 | 7,800 | 7,800 | 58,341 |
| Rent | | 0 | 11,700 | 0 | 0 | 11,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23,400 | 0 | 0 | 23,400 |
| Other Miscellaneous Expenses | (f) | 0 | 137,480 | 0 | 0 | 30,000 | 62,980 | 0 | 0 | 0 | 73,280 | 0 | 0 | 0 | 0 | 303,740 | 70,780 | 120,780 | 495,300 |
| Restructuring Professional Fees | | 0 | 79,000 | 75,333 | 87,333 | 75,333 | 70,875 | 70,875 | 70,875 | 70,875 | 65,260 | 54,260 | 54,260 | 54,260 | 54,260 | 882,799 | 271,300 | 271,300 | 1,425,399 |
| US Trustee Fees | | 0 | 0 | 0 | 0 | 0 | 4,875 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,875 | 0 | 27,400 | 32,275 |
| **Total Disbursements** | | 49,672 | 531,844 | 149,533 | 145,908 | 180,133 | 386,428 | 113,925 | 113,925 | 113,925 | 340,788 | 85,710 | 85,710 | 97,035 | 104,535 | 2,499,071 | 608,828 | 772,253 | 3,880,152 |
| **Net cash flow before financing** | | (49,672) | (531,844) | (149,533) | (145,908) | (180,133) | (386,428) | (113,925) | (113,925) | (113,925) | (340,788) | (85,710) | (85,710) | (97,035) | (104,535) | (2,499,071) | (608,828) | (772,253) | (3,880,152) |
| Beg Cash Balance (Book) | (g) | 80,000 | 80,328 | 80,484 | 80,951 | 81,043 | 80,910 | 501,482 | 501,557 | 501,632 | 501,707 | 501,919 | 502,209 | 502,499 | 502,464 | 80,000 | 501,929 | 501,101 | 80,000 |
| DIP Advances (Paydowns) | | 50,000 | 532,000 | 150,000 | 146,000 | 180,000 | 807,000 | 114,000 | 114,000 | 114,000 | 341,000 | 86,000 | 86,000 | 97,000 | 104,000 | 2,921,000 | 608,000 | 772,000 | 4,301,000 |
| End Cash Balance (Book) | | 80,328 | 80,484 | 80,951 | 81,043 | 80,910 | 501,482 | 501,557 | 501,632 | 501,707 | 501,919 | 502,209 | 502,499 | 502,464 | 501,929 | 501,929 | 501,101 | 500,848 | 500,848 |
| Beg DIP Balance | (h) | 1,655,000 | 1,705,000 | 2,237,000 | 2,387,000 | 2,533,000 | 2,713,000 | 3,520,000 | 3,634,000 | 3,748,000 | 3,862,000 | 4,203,000 | 4,289,000 | 4,375,000 | 4,472,000 | 1,655,000 | 4,576,000 | 5,184,000 | 1,655,000 |
| **End DIP Balance** | (i) | 1,705,000 | 2,237,000 | 2,387,000 | 2,533,000 | 2,713,000 | 3,520,000 | 3,634,000 | 3,748,000 | 3,862,000 | 4,203,000 | 4,289,000 | 4,375,000 | 4,472,000 | 4,576,000 | 4,576,000 | 5,184,000 | 5,956,000 | 5,956,000 |

(a)  Includes stub week (Feb 26-29)
(b)  To the extent that any receipts are received, the Debtor will adjust its anticipated DIP Advances set forth below accordingly and account for the same in an updated budge
(c)  Includes fees and expenses of Chief Restructuring Officer and his staff
(d)  Includes former employees and other third parties paid as independent contractors
(e)  Assumes utility adequate assurance deposit established during 1st week of case
(f)  Includes security alarm service, outside storage, pest control, janitorial, postage, permits , taxes, licenses, bank fees, credit card charges, ordinary course professionals and other ordinary course expenses
(g)  Amount does not include $100,000 balance in money market account as of the petition date
(h)  Includes roll-up amounts
(i)  Principal only