**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SUITABLE TECHNOLOGIES, INC.,[1] | Case No. 20- 10432 (____) |
| Debtor. | |

**DECLARATION OF CHARLES C. REARDON IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Charles C. Reardon, pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer (CRO) of Suitable Technologies, Inc., the above-captioned debtor (the "**Debtor**" or the "**Company**").  I am also a Senior Managing Director and the founder of Asgaard Capital LLC ("**Asgaard**").  I am reasonably familiar with the Debtor's business and financial affairs and its assets and liabilities, having served as its CRO since January 17, 2020.  All facts set forth in this declaration (this "**Declaration**") are based on:  (a) my personal knowledge; (b) my communications with former members of the Debtor's management team who now serve as independent contractors for the Company, with Asgaard colleagues who are assisting me in my role as CRO, and with other professionals retained by the Company (collectively, "**Company Representatives**"); or (c) my opinions developed through my overall professional experience, personal knowledge of the Debtor's history, business affairs and financial condition, and review of pleadings and other documents from the Chancery Court Action (as defined below).

---

[1] The last four digits of the Debtor's United States federal tax identification number are 7816.  The Debtor's mailing address is 921 East Charleston Road, Palo Alto, CA 94303.

25930726.8

2.      If called as a witness, I could and would testify competently to the matters set forth herein based on the foregoing.  My testimony is further based on my review of the Debtor's books and records and other relevant documents and information compiled and communicated to me by Company Representatives.  I am duly authorized to submit this Declaration on behalf of the Debtor.

3.      I have a bachelor's degree, with highest distinction, from the University of Virginia and a Juris Doctor from Yale Law School.  I have more than 25 years of expertise in directing operational and financial restructurings, healthy and distressed mergers and acquisitions (M&A), debt and equity capital financing and real estate development.  I have advised both public and private companies, including family owned and operated businesses, across a broad spectrum of industries, including retail, energy, government services, defense, hospitality, manufacturing, mining, technology, telecommunications, and real estate.  In 2011, I founded Asgaard, a specialty consulting and financial advisory firm that focuses on, among other things, assisting distressed and underperforming companies in all areas of an operational and financial restructuring, including conducting asset and going concern sales pursuant to section 363 of the Bankruptcy Code (as defined below).  Before founding Asgaard, I was a Partner in the investment banking division of Carl Marks & Co., and, prior to that, a Director with Houlihan Lokey in its Financial Restructuring Group, where I was the head of distressed M&A in the mid-Atlantic region.

4.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**").  The Debtor intends to continue in possession of its assets and the management of its business as a debtor in possession during the pendency of this chapter 11 case (the "**Chapter 11 Case**").

25930726.8

5.      This Declaration is submitted:  (a) to provide a brief overview of the Debtor and the Chapter 11 Case; and (b) in support of the Debtor's chapter 11 petition and "first day" motions and applications (collectively, the "**First Day Pleadings**"), which have been filed to minimize the adverse effects of the Debtor's filing for chapter 11 protection, and to enhance the Debtor's ability to maximize value for the benefit of its estate and creditors through the contemplated sale of substantially all of its assets pursuant to a robust auction and sale process.

6.      This Declaration is generally structured as follows.  Section A provides a brief overview of the Debtor's business history and its products.  Section B summarizes the Debtor's capital structure.  Section C describes the events and circumstances that triggered the commencement of the Chapter 11 Case, the Debtor's efforts to obtain postpetition financing and the agreement reached in connection therewith, and the Debtor's objective for this case and the contemplated means by which that objective will be met.  Finally, Section D provides the relevant facts in support of the First Day Pleadings and briefly summarizes the relief requested thereby.

**A.      The Debtor's Business History and Products**

7.      The Debtor, founded in 2011 by Scott Hassan,[2] is a privately held Delaware corporation headquartered in Palo Alto, California,[3] which historically focused on the development, manufacturing, and sale of a telepresence system and technology platforms in both domestic and international markets.  The Debtor also maintains an intellectual property portfolio, which includes a number of different patents associated with, among other things, wireless connectivity, as well as trademarks in the United States and other foreign jurisdictions.  Prior to

---

[2]  Mr. Hassan is a Silicon Valley-based software developer with experience as a founder and investor in start-ups.  He was a key software architect and developer of Google, Alexa Internet, and the Stanford Digital Library, and he is the founder of what is now Yahoo! Groups.  He also previously self-funded and managed Willow Garage.

[3]  The Debtor leases its corporate headquarters in Palo Alto, California, pursuant to a lease agreement with Landings Investments LLC, an entity owned and controlled by Mr. Hassan.

25930726.8

resigning as a director of the Debtor on February 13, 2020, and as an officer of the Debtor on February 18, 2020, Mr. Hassan was the Company's Chief Executive Officer, as well as the sole member of its Board of Directors (the "**Board**"). In connection with Mr. Hassan resigning from the Board, Ronald Barliant, a former United States Bankruptcy Judge for the Northern District of Illinois, was appointed as the Company's sole (independent) director.

8.      The Debtor's primary product is called "Beam", a telepresence device designed to promote remote collaboration, provide individuals with the ability to communicate remotely with others on both a visual and audio basis, and move freely through a workplace using the Company's manufactured devices and companion software. The "Beam" has two product lines: (a) the Beam for the consumer market; and (b) the BeamPro for the enterprise market. Prior to terminating its direct sales operations in December 2018, which is discussed below, the Debtor sold or leased over 7,000 Beams to customers directly and through its authorized distributors. The Debtor generally sold and leased its Beams using a subscription service model, with customers registering for a one- or three-year subscription service, and in connection with their purchase, customers also received a limited warranty. The Debtor also maintains servers that support the Beam's operation. As of the Petition Date, although the Debtor is continuing to wind down its operations and affairs, it continues to maintain the servers.

9.      In connection with the wind down of its operations and affairs that began in December 2018, all remaining employees of the Company were terminated. Several of the Company's key employees, however, did enter into agreements with the Company, pursuant to which they continued to provide critical services to the Company as independent contractors. As of the Petition Date, the Debtor continues to rely on certain services provided by a small number

25930726.8

of independent contractors.  At this point, I am the only officer of the Company, and Mr. Barliant

is the sole (independent) director.

**B.      The Debtor's Capital Structure**

10.     Mr. Hassan owns and controls, directly and through affiliated entities, over

50% of the Debtor's stock.  The remaining common stock is held by former executives and

employees of the Debtor.[4]  Since the Debtor's formation in 2011, Mr. Hassan has been, through

certain entities owned and controlled by him, including the DIP Lender (as defined below), the

Company's sole source of funding, providing almost $92 million pursuant to documented

promissory notes.  Of this amount, $5.93 million was through secured notes with the DIP Lender

(the most recent of which was executed on January 20, 2020), $8 million was through an unsecured

note with the DIP Lender, and the remainder was through unsecured notes with Greenheart

Investments, LLC ("**Greenheart**"), an entity affiliated with Mr. Hassan.  Aside from these

obligations, the Debtor has no bank debt, less than $1 million in unsecured (liquidated) trade debt,

and contingent liabilities arising from subscription service, warranty and repair obligations tied to

its products.

**C.      Circumstances Leading to the Chapter 11 Case; Chapter 11 Objectives**

11.     Beam was invented to realize a simple goal:  allow employees to move

freely through the workplace without the cost and inconvenience of extensive travel.

Unfortunately, remote collaboration, whether within companies or customer-facing, did not evolve

in the manner the Debtor anticipated, and, in turn, the demand for a telepresence system was slow

---

[4]  Mr. Hassan's spouse, Allison Huynh, is a co-beneficial owner of at least 600,000 shares of the Debtor's common stock, held as community property under California law (the "**Hassan Community Property Shares**").  Mr. Hassan disputes that Ms. Huynh is a shareholder in the Company.  Mr. Hassan and his spouse are in divorce proceedings in California.

25930726.8

to materialize.  As a result, the Debtor has never been profitable, and the Company suffered

operating losses exceeding $50 million between 2013 and 2018.  As a result, the Debtor has always

relied on Mr. Hassan to fund its operations and affairs.  As of December 19, 2018, the Company

reported (on an unaudited basis) revenue of $3 million and net income of negative $10.9 million

for 2018, with over $91.5 million in notes payable to Greenheart at that time.

12.     Followings these significant and continued losses, Greenheart ultimately

determined that it would no longer fund the continuing operating losses of the Company.  As a

result, in December 2018, the Company determined to wind down its operations, and attempted to

find a third party buyer.  These options were balanced against a desire, on behalf of Mr. Hassan

and his executive team, to find a buyer that would support the brand and the Company's customers,

whether as a going concern or during a wind-down process, by maintaining the subscription service

model and Beam's operating servers described above.  In furtherance of this, between December

2018 and May 2019, the Debtor initiated numerous discussions with over a dozen prospective

purchasers that the Debtor believed maintained the capacity and industry wherewithal to, among

other things, sustain the servers.  Mr. Hassan, through Greenheart, continued to fund the

Company's losses during this sale process.

13.     In August 2019, at the conclusion of its sale efforts, the Company entered

into an Asset Purchase Agreement (the "**Blue Ocean APA**") with Blue Ocean Robotics ApS and

certain of its affiliates (collectively, "**Blue Ocean**"), a Denmark based Beam distributor interested

in maintaining its customer relationships (and thus certain of the Debtor's relationships) in the

telepresence market, for the sale of substantially all of the Debtor's assets (the "**Blue Ocean Sale**").

Among other things, the Blue Ocean APA required Blue Ocean to continue servicing certain Beam

customers, and to assume certain liabilities associated with the Debtor's business.  Under the Blue

25930726.8

Ocean APA, Blue Ocean would not have acquired the Company's patent assets pertaining to certain systems and methods for wireless connectivity, but would have obtained a non-exclusive license to use them.

14.     Although the Blue Ocean APA, in the Company's business judgment, presented the only viable offer for the Company's assets under the circumstances, in November 2019, Mr. Hassan's spouse, in her alleged capacity as a minority shareholder (as a result of the Hassan Community Property Shares), commenced a civil action in the Court of Chancery of the State of Delaware (the "**Chancery Court**"), styled *Huynh v. Hassan et al.,* Civil Action No. 2019-0893-JTL (the "**Chancery Court Action**").  In the Chancery Court Action, Ms. Huynh asserts various breach of fiduciary duty claims and other state law claims against Mr. Hassan (as well as certain aiding and abetting claims against Blue Ocean), and sought, among other things, a preliminary injunction (the "**Preliminary Injunction Request**") to enjoin the Blue Ocean Sale.

15.     On December 13, 2019, in an oral ruling, Vice Chancellor J. Travis Laster denied the Preliminary Injunction Request because, among other things, he could impose an appropriate equitable remedy under the circumstances if the Blue Ocean Sale, at trial, did not meet the "entire fairness" standard by which it would be evaluated under Delaware law.  In doing so, however, the Vice Chancellor expressed reservations about whether an appropriate sale process— one not constrained in timing and scope or by personal requirements for bidding, such as maintaining the Company's business and supporting its existing customers (however laudable those requirements may be), and one in which the Company retains professional advisors, such as an investment banker—had been undertaken to benefit all interested parties.

16.     Although the Blue Ocean APA constituted an arms-length, third-party transaction, the Blue Ocean Sale ultimately did not close.  As a consequence, even though the

Company and Mr. Hassan do not agree with the reservations expressed by the Chancery Court in connection with the ruling on the Preliminary Injunction Request, the Company and Mr. Hassan determined to turn control of the Company over to an independent chief restructuring officer, director, and professionals to lead a process to maximize the value of all the Company's assets, including its patents. It was at this point that: (a) I was appointed as CRO to oversee (and later with Mr. Barliant) the Company's efforts to sell its assets and wind down its affairs in a manner that preserves and maximizes value for the benefit of all stakeholders; and (b) the Company engaged restructuring counsel.

17.     As part of my mandate to find a value-maximizing transaction for the Company's assets, after soliciting interest from eight investment banking and patent broker firms, and after interviewing four candidates (each of whom submitted detailed proposals) and carefully considering their credentials and relevant experience, the Company retained Stout Risius Ross Advisors, LLC ("**Stout**"), an experienced investment banker, to canvass the market for interested buyers. This Chapter 11 Case was then initiated to effectuate a transparent, orderly and efficient process to sell substantially all of the Company's assets for the benefit of all stakeholders (the "**Sale Process**").

18.     Prior to the Petition Date, Stout began to conduct meetings with me, certain members of my team, and the Debtor's other professional advisors regarding the Sale Process, and initiated the process of assembling detailed marketing materials and related diligence information for an electronic data room and a confidential information memorandum. Stout will continue these efforts subsequent to the Petition Date. Given the nature of the Company's assets, which primarily consist of the Debtor's intellectual property, brand, and remaining equipment and inventory, the Debtor is confident that interested parties will be able to assess the sale opportunity in an

25930726.8

expeditious and thorough manner, and the Company is pursuing a value-maximizing transaction in the first approximately 160 days of the Chapter 11 Case (i.e., August 4, 2020).

19.     In furtherance of these efforts, consistent with the milestones (collectively, the "**DIP Financing Milestones**") established by the Debtor's proposed DIP Facility (as defined below), the Debtor will be filing a motion seeking authority to proceed with a bidding and auction process to consummate a sale or series of sales (collectively, the "**Sale**") that the Debtor expects will generate maximum value for the Debtor's assets.  To facilitate the Sale, the Debtor, in consultation with its professional advisors, will develop certain customary bidding procedures (collectively, the "**Bidding Procedures**") to preserve flexibility in the Sale Process, generate the greatest level of interest in the Debtor's assets, and result in the highest or otherwise best value for those assets.  Among other things, the Bidding Procedures will create an appropriate timeline for the Sale Process, consistent with the DIP Financing Milestones.

20.     To enable the Debtor to fund the administration of the Chapter 11 Case and pursue the Sale Process, the Debtor, through me and its other professionals advisors, solicited post-petition financing proposals from certain parties, including Mr. Hassan.  As a result of those efforts, the Debtor was able to secure post-petition financing from MagicHeart Investments, LLC (the "**DIP Lender**"), an entity owned and controlled by Mr. Hassan, in the form of a $5.956 million secured line of credit, as provided for in that certain *Debtor-in-Possession Credit and Security Agreement* between the Company and the DIP Lender (such financing, the "**DIP Facility**").  The DIP Facility, which is discussed further below in connection with the First Day Pleadings, is secured by a lien on substantially all of the Company's assets, and is a multi-draw term loan facility in the amount of new funds up to $3.801 million.  In the case of the Interim Order, the Debtor seeks to borrow up to an aggregate principal amount of $2.713 million.  Upon entry of the Interim

Order, the DIP Credit Agreement rolls up an aggregate amount of the Prepetition Secured Debt equal to the amount of the Prepetition Secured 2020 Promissory Note (i.e., $1.655 million) (the "**Interim Roll-Up**"). And upon entry of the Final Order, in addition to the Interim Roll-Up, the DIP Credit Agreement will also roll up the aggregate amount of all advances made on or after November 27, 2019 in connection with the Prepetition Secured Debt Documents (i.e., an additional $500,000).

21.     In my business judgment, access to the DIP Facility will provide the Debtor with the liquidity necessary to administer the Chapter 11 Case and conduct the contemplated Sale Process. Without access to the DIP Facility, the Debtor's ability to successfully prosecute the Chapter 11 Case will be jeopardized, to the detriment of all of the Debtor's stakeholders.

**D.     First Day Pleadings**

22.     In my capacity as CRO, I believe that the relief requested in the First Day Pleadings is necessary and essential to ensuring that the Debtor's immediate needs are met, and that the Debtor (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11 Case. My opinion as to the necessity of the First Day Pleadings is based upon my firsthand experience as CRO and my review of various materials and information provided to me by the Company Representatives, as well as discussions had in connection therewith. In considering the necessary first-day relief, the Company Representatives and I were cognizant of the limitations imposed on a debtor-in-possession and, in light of these limitations, narrowed the relief requested at the outset of the Chapter 11 Case to those matters that require urgent relief to preserve value during the pendency of this chapter 11 proceeding.

25930726.8

### *"Claims Agent Retention Application"*[5]

23.     The Debtor requests entry of an order, pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f), authorizing the retention and appointment of Donlin Recano & Company, Inc. ("**Donlin Recano**") as the claims and noticing agent in the Chapter 11 Case.  I believe that the relief requested in the Claims Agent Retention Application will ease the administrative burden on the Clerk of the Court in connection with the Chapter 11 Case.  In light of the foregoing and Donlin Recano's competitive rates, the Debtor respectfully requests that the Claims Agent Retention Application be approved.

### *"Utilities Motion"*

24.     Pursuant to the Utilities Motion, the Debtor requests the entry of interim and final orders, pursuant to section 366(b) of the Bankruptcy Code:  (i) prohibiting the Debtor's utility service providers from altering, refusing, or discontinuing utility services on account of pre-petition invoices; (ii) deeming the Debtor's utility service providers adequately assured of future payment; (iii) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtor to provide additional adequate assurance of future payment to its utility service providers; and (iv) setting a final hearing related thereto.

25.     The Utility Companies provide the Debtor with various Utility Services, and the termination or cessation (even if only temporary) of any of those services will result in disruption to the Debtor's business affairs and diminish or impair the Debtor's efforts to preserve and maximize the value of its estate and successfully prosecute the Chapter 11 Case.  The Debtor has historically paid on average approximately $19,059 per month on account of the Utility

---

[5] Capitalized terms used in summarizing the First Day Pleadings but not otherwise defined herein in shall have the meanings ascribed to them in the respective First Day Pleadings.

25930726.8

Services.  To provide adequate assurance of payment for future services to the Utility Companies

under section 366 of the Bankruptcy Code, the Debtor proposes to segregate $9,530 within twenty

(20) days of entry of the Interim Order, to be maintained during the pendency of the Chapter 11

Case in the manner provided for in the Proposed Orders.

26.     I believe and am advised that the Assurance Procedures are necessary,

because if such procedures are not approved, the Debtor could be forced to address additional

adequate assurance requests by the Utility Companies in a disorganized manner during the critical

first weeks of the Chapter 11 Case.  Moreover, a Utility Company could unilaterally determine, on

or after the 30th day following the Petition Date, that it is not adequately assured of future payment

and discontinuing service or making an exorbitant demand for payment to continue service.

27.     Accordingly, on behalf of the Debtor, I respectfully request that the Utilities

Motion be approved.

### *"Taxes and Fees Motion"*

28.     The Debtor requests authority to pay certain prepetition Taxes and Fees that,

in the ordinary course, accrued or arose before the Petition Date.  In the ordinary course, the Debtor

incurs or collects certain Taxes and Fees, and remits them to various Authorities in accordance

with applicable law.

29.     Any failure to pay the Taxes and Fees could, among other things, impair the

Debtor's ability to conduct the Sale Process and administer the Chapter 11 Case, which could

diminish estate value and frustrate the Debtor's chapter 11 efforts.  In addition, certain Authorities

may take precipitous action for certain unpaid Taxes and Fees that undoubtedly would distract the

Debtor from prosecuting the Chapter 11 Case.  Also, based on my knowledge and conversations

with the Debtor's professional advisors, it is my understanding that certain Taxes and Fees are

25930726.8

entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied under a chapter 11 plan.  Finally, to the best of the Debtor's knowledge, the Taxes and Fees generally consist of current tax and fee obligations, and are not in respect of catch-up payments, other than any prepetition payments that were interrupted by the commencement of the Chapter 11 Case.

30.     Therefore, on behalf of the Debtor, I respectfully request that the Taxes and Fees Motion be approved, because in the absence of such relief I believe that the Debtor and its estate would suffer immediate and irreparable harm.

### *"Cash Management Motion"*

31.     Through the Cash Management Motion, the Debtor requests, among other things, (i) authority to continue using its existing Cash Management System and Bank Accounts, (ii) authority to continue using its existing Business Forms; (iii) an extension of time by which the Debtor must comply with the requirements of section 345(b) of the Bankruptcy Code; and (iv) certain related relief.

32.     The Debtor maintains an account at Silicon Valley Bank from which the Debtor manages cash receipts and disbursements in the ordinary course of business, as well as a money market account, which the Debtor is currently working with the Cash Management Bank to close or further reduce the balance (currently $100,000).  The Debtor submits that maintenance of the existing Bank Accounts at the Cash Management Bank will prevent any unexpected or inopportune interruption to the Debtor's chapter 11 efforts while protecting the Debtor's cash for the benefit of the estate.  I believe that requiring the Debtor to change the Bank Accounts at this critical time would cause unnecessary disruption to the Debtor and the Sale Process.  If the Debtor is authorized to continue using the Bank Accounts, the Debtor will ensure that appropriate

25930726.8

13

procedures are in place to protect against unauthorized payment of any prepetition obligations. Specifically, the Debtor will not pay, and the Cash Management Bank will be directed not to pay, any debts incurred before the Petition Date other than as authorized by the Court.

33.     Furthermore, if enforced, the U.S. Trustee Guidelines would impose unwarranted costs on the estate, and impede the Debtor's chapter 11 efforts.  I believe that maintaining the Bank Accounts is necessary to avoid delays in paying debts incurred post-petition, and to preserve the value of the Debtor's estate during the Sale Process.  If the Debtor is required to transfer the existing Bank Accounts, it will be disruptive, time consuming and expensive. Likewise, because the Debtor is currently in the process of completing the wind down of its business operations and affairs, it would be unnecessary and burdensome for the Debtor to cease using all existing Business Forms and to purchase and begin using new forms solely on account of the commencement of the Chapter 11 Case.

34.     In light of the foregoing, on behalf of the Debtor, I respectfully request that the Cash Management Motion be approved to avoid immediate and irreparable harm to the Debtor's estate.

### *"DIP Financing Motion"*

35.     The Debtor has negotiated and reached agreement on the DIP Facility, pursuant to which the Debtor, subject to Court approval, will be provided with a senior secured superpriority postpetition financing facility from the DIP Lender.  I believe that the terms and amount of the proposed DIP Facility will permit the Debtor to meet its business and other obligations in connection with the Chapter 11 Case in accordance with the Budget, the DIP Order and the DIP Credit Agreement, which is expressly premised on approval of the DIP Facility on an interim and final basis.  As the Budget demonstrates, without the availability provided under the

25930726.8

DIP Facility, the Debtor would be unable to prosecute the Chapter 11 Case and conduct the contemplated Sale Process.

36.     The Debtor sought but was unable to obtain postpetition financing from another source, including a facility that would be on an unsecured, administrative expense basis. Under the circumstances, including the nature and amount of the Prepetition Secured Debt and the Debtor's other outstanding prepetition debt obligations, obtaining the financing needed by the Debtor as unsecured debt, or even debt secured by liens junior to the liens of the DIP Lender, was simply not a realistic option.  No other lender that the Debtor reached out to was willing to provide the financing necessary to pay the Prepetition Secured Debt and fund the Debtor's business and the contemplated Sale Process on terms more favorable than those provided in the DIP Facility, which includes:  (i) no commitment fees or the like; (ii) the Postpetition Liens not extending to any Avoidance Actions; and (iii) interest rates (5% non-default rate) and DIP Financing Milestones (including a 160-day sale process)[6] that I believe are reasonable under the circumstances of this Chapter 11 Case, and will afford the Debtor an opportunity to conduct a fulsome Sale Process.

37.     It is important to note that although the DIP Lender is an entity owned and controlled by Mr. Hassan (and is therefore an insider of the Debtor), who resigned from his roles with the Debtor prior to the commencement of this Chapter 11 Case, the Debtor negotiated with the DIP Lender in good faith to ensure that the terms of the DIP Facility and the Interim DIP Order are customary, consistent with what I believe (based on my experience and discussions with counsel for the Debtor) are "market terms," and are fair and reasonable to the Debtor.  To that end,

---

[6] Other DIP Financing Milestones include, generally:  (a) filing a motion to approve Bidding Procedures on or before the date that is 35 days after the Petition Date; (b) obtaining entry of an order approving the Bidding Procedures on or before the date that is 60 days after the Petition Date; and (c) obtaining entry of an order approving the Sale on or before the date that is 150 days after the Petition Date.

25930726.8

the Debtor, on the one hand, and the DIP Lender, on the other hand, each had separate professional advisors negotiating the DIP Facility.

38.    Based on my experience, and in my business judgment, I believe that the terms of the DIP Facility are fair and reasonable to the Debtor and appropriate under the circumstances, and that good and sufficient cause exists to grant the relief requested in the DIP Financing Motion.    As explained above, the DIP Facility will provide the Debtor with the necessary liquidity to administer the Chapter 11 Case and conduct the contemplated Sale Process, without which the Debtor's ability to successfully prosecute the Chapter 11 Case will be jeopardized, to the detriment of all of the Debtor's stakeholders.    Further, I believe that the absence of the DIP Facility and access to Cash Collateral would cause immediate and irreparable harm to the Debtor's estate, its creditors and other stakeholders, by compromising the Debtor's ability to, among other things, maintain its business relationships and pay independent contractors that are providing necessary services to the Debtor.

39.    In conclusion, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: February 26, 2020.

*/s/ Charles C. Reardon*
Charles C. Reardon
Chief Restructuring Officer

25930726.8

16